EXHIBIT 6-000001

MEMORANDUM

TO:    Mike Helfer, Howard Willens
FROM:  Erica Ward
RE:    Marianas

## Applicability of the United States Constitution

The proposed Commonwealth Agreement for the
Northern Marianas Islands provides that certain specific
provisions of the United States Constitution will be
applicable in the Marianas.  These provisions are intended
to place the same sorts of limitations on the exercise of
governmental power by the federal and the Commonwealth
governments as are placed by the U. S. Constitution on the
actions of the federal and state governments in every
state of the Union.  This memorandum will sketch the most
important judicial interpretations of these provisions,
and will examine the major doctrines and central lines of
cases which have been developed under them.  Any provisions
which might be troublesome if applied without special
exception to the Marianas will be particularly noted.  I
will discuss first those provisions which both the United
States and the Marianas have included in their proposals,
and secondly, those provisions which only one side has
suggested.  Finally, I will suggest any other provisions of

EXHIBIT 6-000002

- 2 -

the Constitution which might be considered for express
applicability.

It should be noted that certain provisions of
the Constitution will apply to the Marianas even if they
are not expressly provided for in the Commonwealth
Agreement. To date, both sides have ignored this fact
and have simply included in their drafts all provisions
which they wanted to insure would be applicable. For both
certainty and clarity, this is undoubtedly a wise practice.
However, there is little to be gained by opposing the
express inclusion of a provision which, like some of the
United States' proposals, would apply even if it were not
specifically mentioned. It is worthwhile, then, to
mention here the three situations in which the courts have
held that constitutional guarantees apply outside of the
United States. (For greater detail, see, Memo, Ex Proprio
Vigore Application of the Constitution in Unincorporated
Territories, Gil Kujovich, August 6, 1973.) In Downes v.
Bidwell, 182 U.S. 244, 277, 294 (~~1922~~ /90/) (in the opinion of
the Court and of J. White, concurring), the Supreme Court
suggested that particular provisions of the Constitution
are applicable beyond the United States and its incorporated
territory. First, if a constitutional prohibition is

EXHIBIT 6-000003

- 3 -

expressly extended to areas other than those incorporated
into the United States, then of course it is applicable to
unincorporated territories. The only example of this
discovered by the Court was the Thirteenth Amendment,
which prohibits slavery "within the United States, <u>or any</u>
<u>place subject to their jurisdiction</u>." 182 U.S. at 251,
336-337 (emphasis added). Secondly, if a constitutional
prohibition goes "to the very root of the power of Congress
to act at all, irrespective of time or place," or if it is,
"an absolute denial of all authority under any circumstances
or conditions to do particular acts," then it will apply
even to unincorporated territories. 182 U.S. at 277, 294.
The Court suggested that Article I, Section 9, Clause 3
(no bills of attainder or ex post facto laws) and Clause 9
(no titles of nobility) are examples of these absolute
prohibitions. These two tests of extraterritorial applica-
bility have not been specifically followed by other courts,
however, and most decisions rely on the vague concept of
"fundamental rights" in determining what constitutional
provisions apply to unincorporated territories. <u>See</u>, <u>e.g.</u>,
<u>Balzac v. Puerto Rico</u>, 258 U.S. 298, 312 (1922), <u>Virgin</u>
<u>Islands v. Bode</u>, 427 F.2d 532,533 (3rd Cir. 1970). Finally,
in Reid v. Covert, 354 U.S. 1 (1957), the Supreme Court

EXHIBIT 6-000004

- 4 -

established a third basis for the application of certain
constitutional provisions in unincorporated territories.
The Court there rejected "the idea that when the United
States acts against citizens abroad it can do so free of
the Bill of Rights." 354 U.S. at 5. United States
citizens thus carry certain fundamental constitutional
rights with them, no matter where they go. The Court in
Reid held that "trial before a civilian judge and by an
independent jury picked from the common citizenry" is such
a fundamental right in criminal cases.

*murder cases*

I.  PROVISIONS AGREED TO BY BOTH THE UNITED STATES AND THE
    MARIANAS

I will simply sketch the major rules and doctrines
which have been developed under these constitutional pro-
visions, note any important areas within them which are
unsettled at this time, and mention the possible difficulties,
if any, which might arise if they were applied without special
exception to the Marianas.

Article 1, Section 9, Clause 2 -- Writ of Habeas Corpus

Section 9 is devoted to restraints on the powers
of the Congress and of the national government.  Barron
v. Baltimore, 7 Pet. (32 U.S.) 243 (1883).  It does not
affect the states in the regulation of their own domestic
affairs.  Munn v. Illinois, 94 U.S. 113, 135 (1877).  The

06364

EXHIBIT 6-000005

- 5 -

Supreme Court has at least implied that this guarantee of the privilege of the writ of habeas corpus is binding only on the federal government, and not on the states. Gasquet v. Lapeyre, 242 U.S. 367, 369 (1917). Its express application would therefore impose no special obligations upon the Commonwealth government, and would afford a valuable protection against the federal government.

Article I, Section 9, Clause 3 -- Prohibition of Bills of Attainder and of Ex Post Facto Laws

According to the rule in the Downes case, supra, this provision, which constitutes an express prohibition, would be binding whether or not it was expressly applied to the Marianas. It "goes to the competency of Congress to pass a bill of that description." Downes v. Bidwell, 182 U.S. 244, 277 (1901) (emphasis in original). This clause is also intended to protect individuals and groups against the federal government, and does not apply to the states. The prohibition against bills of attainder is intended to ban the traditional bills of pains and penalties as well, and has been broadly construed to prohibit all trials by legislatures. United States v. Brown, 381 U.S. 437, 441-442 (1965). The prohibition against ex post facto laws, on the other hand, applies only to penal and criminal statutes. Calder v. Bull, 3 Dall. (3 U.S.) 386, 393 (1798).

EXHIBIT 6-000006

- 6 -

## Article IV, Section 1 -- Full Faith and Credit Clause

This section is really a codification of the accepted principles of comity, which the framers wanted to raise to a level of constitutional obligation between the states. It has its main effect in the area of judicial judgments, when suits are brought in foreign jurisdictions for enforcement or defended against by a claim of res judicata from a judgment in another state. The Court has waivered as to the extent of the application of this section to other rights which are not yet final judgments, but it most recently appears to have said that when the statute or policy of a foreign state is asserted as a defense to a suit under the jurisdiction of another state or territory, or vice versa, the conflict is to be resolved by appraising the governmental interest of each jurisdiction, and deciding accordingly, and not by giving automatic effect to the full faith and credit clause. Alaska Packers Association v. Commissioner, 294 U.S. 532, (1935). By statute, 28 U.S.C. § 1738-1739, the full faith and credit rule requires the recognition by "every court within the United States" of the records and proceedings of courts of any territory or any country subject to the jurisdiction of the United States.

EXHIBIT 6-000007
- 7 -

The potential impact of this clause of the Consti-
tution has been relatively little developed to date. The
Court might, under this Clause, give to state statutes
whatever extraterritorial operation seemed reasonable to the
Court. Congress could decree the effect that the statutes
of one state shall have in all others, as, for example, by
describing a certain type of divorce and by saying that it
and no other shall be granted recognition by all states.
If such a development were to occur, it might impose on the
Marianas some obligations and rules which might prove
troublesome; however, the possibility is sufficiently remote
that it does not seem necessary to guard against it.

### First Amendment -- Freedoms of Religion, Speech, the Press, Assembly, and Petition

The first clause of this amendment prohibits the
establishment of religion, and guarantees the free exercise
of religion. It was intended not to prevent some general
governmental encouragement of religion, but to prevent the
national establishment of any particular religion, and to
guarantee against any religious persecution. The judicial
standards and tests under both sections are the same; the
Court will examine the legislative purpose, the primary
effect, and the possibility raised of excessive government
entanglement of any legislation or practice challenged
under this amendment. Further, in free exercise cases, the
plaintiff must prove an actual coercive effect. The

EXHIBIT 6-000008

establishment cases are very complex, and unclear in the
standards that they set, but should not prove troublesome
for the Marianas.  The only serious objection might be to
the prohibition of substantive aid to parochial schools,
but this concern does not seem serious enough to warrant
a special exception.  The free exercise cases are certainly
not objectionable, especially if there is some custom in
local religions that the Marianas want to retain.  Such
retention is not automatic, however, because the guarantee
of free exercise of religion is subject to the police
powers of the state, the clashes between the two have con-
siderable litigation.  See, e.g., Reynolds v. United States,
98 U.S. 145 (1878) (prohibition of polygamy), Jacobson v.
Massachusetts, 197 U.S. 11 (1905) (compulsory vaccination),
Sherbert v. Vernier, 374 U.S. 398 (1963) (religious refusal
to work on Sunday), Wisconsin v. Yoder, 406 U.S. 205 (1972)
(compulsory high school education).

 The guarantees of freedom of speech and of the
press bar not only most prior restraints on expression,
but also the subsequent punishment of all but a narrow
range of expression.  New York Times v. Sullivan, 376 U.S.
254 (1964).  There is a particularly heavy presumption
against all prior restraints.  Bantam Books v. Sullivan,

# EXHIBIT 6-000009

- 9 -

372 U.S. 58, 70 (1963). There are strict limits on subsequent punishment as well, and although the Court has waivered on its standards for impermissible speech, obscenity, and action, there is nothing in these standards which suggests particular problems for the Marianas. This is particularly so in the area of obscenity, because of the recently renewed stress on the importance of local community standards. Miller v. California, 413 U.S. 15 (1973). In fact, this portion of the First Amendment may prove particularly important, since it guarantees freedom of expression to any different traditions and beliefs which may exist in the Marianas. Since Tinian will be the site of a major military base, there are likely to be instances in which the United States Government will try to suppress various liberties of the local citizens, on the grounds of national security. Therefore, the First Amendment, which requires a balancing of the protected freedoms against the exigencies of national security, may be particularly important in the Marianas. The line of cases concerning loyalty oaths and security checks are also potentially valuable to those Marianans who might some day work for the United States Government or the military in some capacity. See, Keyishian v. Board of Regents, 385 U.S. 589 (1967). Also potentially important are the specific cases concerning

EXHIBIT 6-000010

- 10 -

*There go the attorney?*

political activities and freedom of expression of federal employees. See United Public Workers v. Mitchell, 330 U.S. 75 (1947). The First Amendment will also limit the control that the United States might otherwise seek to exercise over the Marianan communications media, including not only the archetypal written press, but also over the movies, radio, and television (Rosenbloom v. Metromedia, Inc., 403 U.S. 29 (1971)), books (Bantam Books v. Sullivan, 372 U.S. 58 (1963)), and stage products, (Schact v. United States, 398 U.S. 58 (1970)). [This provision will also serve to restrict the categories of libel that can constitutionally be punished. New York Times. v. Sullivan, 376 U.S. 254 (1964).] Certain kinds of expressive or symbolic conduct will be protected, and although others will not, this section could serve to allow some demonstrations which might otherwise be supressed. Brown v. Louisiana, 383 U.S. 131 (1966) (silent vigil in public library protected), Tinker v. Des Moines Independent School District, 393 U.S. 503 (1969) (wearing armbands in high school protected unless it results in disruption), Shuttlesworth v. City of Birmingham, 394 U.S. 147 (1969) (predcedural guarantee required of a permissible licensing system for parades and meetings).

EXHIBIT 6-000011

- 11 -

This clause also protects the right of peaceable assembly, and the right to petition the government for redress of grievances. These are broadly protected rights, but have rarely been litigated, and are generally not important in themselves. They are usually merged with the guarantees of freedom of speech and of the press, as a part of the inclusive right to freedom of expression. Although certain conduct has been labelled as falling within these categories, no substantive issues to date have turned on such identifications. See, United States v. Harriss, 347 U.S. 612 (1954) (petition), Coates v. City of Cincinnati, 402 U.S. 611 (1971) (assembly).

Second Amendment -- Right to Keep and Bear Arms

This amendment, noting the necessity of a well-regulated militia to the security of a free state, prohibits infringement by Congress of the right to keep and bear arms, but it does not extend this prohibition to state action. Presser v. Illinois, 116 U.S. 252, 265 (1886). Thus, even though the nature and extent of the right are somewhat unclear the amendment would impose no special obligations on the Marianan government, and would afford some limitation on federal power. The one case which tested a Congressional enactment against the second amend-ment held that the required registration of sawed-off

EXHIBIT 6-000012

- 12 -

shotguns was constitutional, because their possession
bears no reasonable relationship to the preservation or
efficiency of a well-regulated militia. In other words,
the Court placed heavy emphasis on the subordinate clause
in the amendment, which says that "[A] well-regulated
Militia, being necessary to the security of a free State,"
the right to keep and bear arms is guaranteed. <u>United
States v. Miller</u>, 307 U.S. 174 (1939). At what point
the importance of a well-regulated Militia would mandate
greater freedom to remain armed is not explained by this
case, and remains unclear.

## Third Amendment -- No Quartering of Soldiers in Houses

There has been no judicial explication of this
amendment to date. It should cause no problems for the
Marianas, however, since it is simply one guarantee of the
preference of the Constitution for the civilian population
over the military. It should be particularly reassuring,
in fact, because of the planned military base.

## Fourth Amendment -- Prohibition of Unreasonable Searches and Seizures

This provision is binding upon both the state
and the federal governments, and so would regulate certain

EXHIBIT 6-000013

- 13 -

activities of the commonwealth government.  See, Wolf v. Colorado, 338 U.S. 25 (1949), Mapp v. Ohio, 367 U.S. 643 (1961).  It is accepted today that the "principal object of the Fourth Amendment is the protection of privacy rather than property . . ."  Warden v. Hayden, 387 U.S. 294, 304 (1967).  It "protects people, not places," Katz v. United States, 389 U.S. 347, 353 (1967), and it protects against arbitrary arrests, as well as against unreasonable searches and seizures.  Giordenello v. United States, 357 U.S. 480, 485-486 (1958).  Further, it applies to non-criminal searches as well as to those conducted in criminal investigations.  See, e.g., Camara v. Municipal Court, 387 U.S. 523 (1967) (administrative search of a home).  The general rule is that "except in certain care-fully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant", Camara, supra, at 528-29.  A valid search warrant requires issuance by a neutral magistrate, Shadwick v. City of Tampa, 407 U.S. 345 (1972), upon a showing which constitutes probable cause.  Brinegar v. United States , 338 U.S. 160 (1949). The warrant must particularly describe the things to be seized, and so it will act to limit the scope of the search.

EXHIBIT 6-000014

- 14 -

Stanford v. Texas, 379 U.S. 476 (1965). There are some
situations, however, said to be "jealously and carefully
drawn," in which searches without warrants are acceptable.
Jones v. United States, 357 U.S. 493, 499 (1958). These
include the stop-and-frisk, Terry v. Ohio, 392 U.S. 1
(1968), the search incident to arrest, Chimel v. California,
395 U.S. 752 (1969), Gustafson v. Florida, 42 U.S.L.W. 4068
(U.S., December 11, 1973), searches of vehicles, if the
officer has probable cause to believe that they contain things
properly subject to seizure, Carroll v. United States,
267 U.S. 132 (1925), and consent searches, Schneckloth v.
Bustamonte, 412 U.S. 218 (1973). The application of the
Fourth Amendment to the Marianas would require certain
behavior by both the federal government and the Common-
wealth government, and would apply the exclusionary rule
in all of the courts in the Marianas. However, I cannot
foresee that this would cause any particular difficulties.

Sixth Amendment -- In all Criminal Prosecutions, Speedy and
Public Trial by Impartial Jury, Notice of Accusation, Right
to Confront Witnesses, and Right to Assistance of Counsel

These guarantees in criminal prosecutions do not
apply in unincorporated territories. Balzac v. Puerto
Rico, 258 U.S. 298, 304-305 (1922). Thus, it is particularly
important to expressly adopt this provision.

EXHIBIT 6-000015

- 15 -

The Court has adopted an ad hoc balancing approach in determining whether the right to a speedy trial has been infringed. <u>Barker v. Wingo</u>, 407 U.S. 514 (1972). The right to a public trial has not been much litigated, and the only unclear area within it are the rules on prejudicial publicity. The Supreme Court has recently reexamined some of the traditional standards for acceptable juries under this provision, and has held that a jury of twelve persons is not absolutely required, and that in State Courts although not in Federal Courts, a less than unanimous verdict is acceptable. <u>Williams v. Florida</u>, 399 U.S. 78 (1970), <u>Apodaco v. Oregon</u>, 406 U.S. 404 (1972). The jury selection must be structured so as to present a cross-section of the community, <u>Williams</u>, <u>supra</u>, and the jurors must be unbiased, and willing to decide the case on the basis of the evidence presented. <u>Frazier v. U.S.</u>, 335 U.S. 497 (1948). The defendant must be specifically appraised of the crime with which he is charged, so that he can make his defense with reasonable certainty. The right of the criminal defendant to confront the witnesses against him is fairly straightforward, although lately, in cases like <u>California v. Green</u>, 399 U.S. 149 (1970), the Court seems to be stressing the fact that the Confrontation Clause will not bar the admission of an out-of-Court statement, if the

EXHIBIT 6-000016

- 16 -

particular circumstances are such that the trier of fact
has some satisfactory basis for evaluating the truth of
the evidence.  The right to compulsory process to obtain
defense witnesses in a criminal trial guarantees not only
the particular legal process, but also the underlying right
to be allowed to introduce defense witnesses at all.
Washington v. Texas,  388 U.S. 14 (1967) Finally, since
Gideon v. Wainwright,  372 U.S. 335 (1963), both the State
and the Federal Courts are required to provide the
assistance of counsel to anyone who requests it.  This right
extends to any misdemeanor case in which imprisonment may
result.  Argersinger v. Hamlin,  407 U.S. 25 (1972)  Still
unclear is the extent to which the right applies in situations
such as custodial interrogations or identifications.  However,
nothing in this Amendment should prove particularly trouble-
some to the Marianas.

## Eighth Amendment -- Prohibition of Excessive Bail, Fines, and Cruel and Unusual Punishment

The principle live issue in the area of excessive
bail is whether this provision was intended only to forbid
bail that was set too high, or also to guarantee the
underlying right to bail in all cases.  Dicta in various
Supreme Court cases seems to go both ways; one case suggests
that Congress has discretion to determine what persons may

EXHIBIT 6-000017

- 17 -

be granted bail, <u>Carlson v. Landon</u>, 342 U.S. 524 (1952),
while dicat in other cases appears to be contrary, <u>Stack
v. Boyle</u>, 342 U.S. 1 (1951). On the determination of this
conflict rests the question of the continutionality of
"preventive detention." In any case, this provision is
not applicable to the states and so would impose no
special obligation on the Marianas. The Supreme Court
has held that the prohibition against crue and unusual
punishment forbids the use of capital punishment except
in certain narrowly defined situations. <u>Furman v. Georgia</u>,
408 U.S. 238 (1972). This area is, of course, one of
great current legislative activity, and so the final
resolution remains entirely unclear. It is clear, how-
ever, that the provision also forbids penalties which are
unnecessarily cruel and inhumane, or which subject the
individual to a fate forbidden by the "principles of
civilized treatment." <u>Trop v. Dulles</u>, 356 U.S. 8699 (1956)
Also forbidden are punishments which by their excessive
length or severity are greatly disproprotionate to the
offense charged. <u>Weems v. United States,</u>  217 U.S. 349
(1910).

EXHIBIT 6-000018

- 18 -

## Ninth Amendment -- Enumeration of Certains Rights Does Not Deny Nor Disparage Others Retained by the People

It was originally assumed that this Amendment was merely a rule of construction. However, since Griswold v. Connecticut, 381 U.S. 479 (1965), it has been cited as a positive affirmation of the existence of rights not enumerated in the Constitution, but none the less protected by other provisions. It is not a substantive source of guarantees, but it is an affirmation that other fundamental rights not listed do exist.

## Thirteenth Amendment -- Prohibition of Slavery

This section has been expressly incorporated by both the United States and the Marianas, but according to the Downes case, supra, it would apply to the Marianas even if it were not so specifically named. By its own terms, the prohibition against slavery and involuntary servitude extends to "the United States, or any place subject to their juridiction," which would certainly include unincorporated territories. This Amendment provides the constitutional support for the various congressional enactments against private racial discrimination, which Congress had previously based on the Commerce Clause. See,

EXHIBIT 6-000019

- 19 -

Jones v. Alfred H. Mayer Co., 392 U.S. 409 (1968) (13th
Amendment), as opposed to Heart of Atlanta Motel v. United
States, 379 U.S. 241 (1965) (Commerce Clause). The Amend-
ment also prohibits peonage, which is defined as any
condition of inforced servitude by which an individual
is compelled to labor against his will to liquidate some
debt or obligation. Bailey v. Alabama, 219 U.S. 219 (1911).


Fourteenth Amendment, Section 1, Sentence 2 No State shall
make or enforce any law which shall abridge the privileges
or immunities of citizens of the United States.

The potential scope of this provision was
drastically limited only five years after the amendment
was passed, by the Supreme Court's holding that the only
privileges which it was intended to protect are those, "which
owe their existence to the Federal Government, its National
character, its Constitution, or its Laws." Slaughter-House
Cases, 16 Wall. (83 U.S.) 36, 79 (1873) These include,
for example, the right of access to the seat of government,
the right of assembly and privilege of habeas corpus, the
rights secured by treaties, the right to enter public
lands, the right to be protected against violence while in
the custody of a U. S. Marshal, and the right to vote
for national officers. Twining v. New Jersey, 211 U.S. 78
(1908).

EXHIBIT 6-000020

- 20 -

It could perhaps be argued that Marianans are being impermissibly denied the right to vote for national officers, because that is a privilege of American citizenship that cannot be abridged by the states. However, this argument would not prevail, because it is the Congress, rather than a state, which is refusing them the vote. Further, the constitutional provisions establishing the electoral college system, and the doctrines defining the power of the United States over an unincorporated territory, make clear that the citizens of these territories were not intended to be allowed to vote in national elections.

The Court has only occasionally chosen to use this clause to expand the restraints that the Constitution imposes on the states, but one such expansion is of particular concern to the Marianas. In Oyama v. California, 332 U.S. 633 (1948), the Court held that the right to acquire and to retain property is a privilege of American citizenship. As noted in the Joint Communiques and in other memoranda, this doctrine might prohibit the restraints on land alienation based on ancestry which both sides agreed are desirable. It is, therefore, vitally important that a special exception to the Constitution be expressly provided in the Commonwealth Agreement, so as to allow such

EXHIBIT 6-000021

- 21 -

restraints to be established.

Nor shall any State deprive any person of life, liberty or property without due process of law.

      This clause has been used by the courts to protect citizens against wide varieties of arbitrary state action, by imposing both substantive and procedural restraints on the powers of the state governments, in the same way that the Fifth Amendment curbs the Federal Government. The doctrine of substantive due process has been used to protect many different civil liberties, and yet to permit a wide variety of reasonable exercise of authority by the states, or in this case, by the Commonwealth. It has been construed as permitting the enactment by the states of laws which regulate the terms and conditions of employment, because these laws guarantee the civil liberty of the individual by imposing certain restraints on his behalf upon his neighbors. See, e.g., West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937) (minimum wage law for women), New York Central R.R. v. White, 243 U.S. 188 (1917) (workmen's compensation laws), Holdon v. Hardy, 169 U.S. 366 (1898) (maximum work hours in mines and smelters). The due process clause also allows the state to regulate the rates and conditions of various business enterprises,

EXHIBIT 6-000022

- 22 -

provided only that such regulation is not arbitrary, discrim-
inatory, or demonstratively irrelevant to the policy that
the legislature is free to adopt. Nebbia v. New York,
291 U.S. 502 (1934). The power of the states to
regulate public utlities is subject to the standards
of substantive due process, which are offended by any
arbitary or unreasonable exercises of power. See, e.g.,
Chicago and G. T. Ry. Co. v. Wellman, 143 U.S. 339 (1892).
The same is true for state regulation of corporations,
business, professions, and trades, and for protection of
the resources of the state. See , e.g., Lake Shore and M.S.
Ry. Co. v. Smith, 173 U.S. 684 (1899) (corporations), Nebbia
v. New York, 291 U.S. 502 (1934) (business), McNaughton v.
Johnson, 242 U.S. 344 (1917) (medicine), Lehon v. Atlanta,
242 U.S. 53 (1916) (detectives), Thompson v. Consolidated
Gas Co., 300 U.S. 55 (1937), Hudson Water Co. v. McCarter,
209 U.S. 349 (1908). Because of their possession of the
police power, the states may place some limitations on the
rights of ownership of real property, Reinman v. Little
Rock, 237 U.S. 171 (1915) (zoning), provided that they
are not violative of substantive due process, Euclid v.
Ambler Co., 272 U.S. 365 (1926). The police power also
grants to the states the authority to safeguard by appropriate
means the public health, safety, and morals, limited only

EXHIBIT 6-000023

- 23 -

by the rights guaranteed to individuals by the Constitution. See, e.g., <u>Sligh v. Kirkwood</u>, 237 U.S. 52 (1915) (impure foods), <u>Hutchinson v. Valdosta</u>, 277 U.S. 52 (1913) (sewers), <u>Ah Sin v. Wittman</u>, 198 U.S. 500 (1905) (gambling).

The 14th Amendment will not restrain the power of the Commonwealth Government to tax its people, except by forbidding arbitary legislation, <u>Tonawanda v. Lyon</u>, 181 U.S. 389 (1901), and by establishing some doctrines as to the jurisdiction of a state to levy taxes. See, e.g., <u>Union Transit Co. v. Kentucky</u>, 199 U.S. 194 (1905) (tangible property outside of the state), <u>International Harvester Co. v. Department of Taxation</u>, 322 U.S. 435 (1944) (dividends of a corporation paid to nonresident stockholders). Some recent cases have suggested the extension of the protections of substantive due process to include noneconomic liberties. See, e.g., <u>Loving v. Virginia</u>, 388 U.S. 1 (1967) (statute prohibiting interracial marriage violates substantive due process right to marriage); <u>Poe v. Ullman</u>, 367 U.S. 497 (1961) (J. Harlan, dissenting, would have applied a due process standard to a law banning the use of all contraceptives).

None of these substantive due process restrictions should cause any particular difficulties in the Marianas. On the contrary, the fact that both sides feel that it is important to so limit the powers of the Commonwealth governments at less suggests that they are agreed that the government

EXHIBIT 6-000024

- 24 -

shall have at least most of these power to exercise. ✓

The requirements of procedural due process of
law in civil cases vary with the circumstances, and do
not require uniformity of procedure in all state courts,
or regulate specific practices in state proceedings.  How-
ever, the laws must operate alike for all, and must not
subject the individual to the arbitary exercise of govern-
mental power.  Marchant v. Pennsylvania Railroad, 153 U.S.
380 (1894).  The right to procedural due process is so
fundamental that it is guaranteed to all United States
citizens, no matter where they may be.  Reid v. Covert,
354 U.S. 1, 10 (1957).  The states have broad powers to
regulate the procedures of their courts, so long as they
do not offend fundamental principles of justice.  See, e.g.,
Boddie v. Connecticut, 401 U.S. 371 (1971).  States may
also establish their own jurisdictional principles, but
in general may not attempt to exercise their powers with
respect to persons or things beyond their borders.
Pennoyer v. Neff, 95 U.S. 714 (1878).  The requirements of
Fourteenth Amendment procedural due process apply only to
the deprivation of interests encompassed within the terms
of "life, liberty and property."  Morrissey v. Brewer,
408 U.S. 471, 481 (1972)  The Courts have recently
recognized the concept of "entitlements," which are not

EXHIBIT 6-000025

- 25 -

within the traditional common-law concept of property,
but of which people cannot be deprived without due process.
See, e.g., Goldberg v. Kelly, 397 U.S. 254 (1970) (welfare),
Perry v. Sindermann, 408 U.S. 593 (1972) (teaching position).
Also important in this area has been the recent demise of
the right-privilege distinction, since until recently it
was regularly argued that if something was "only" a privilege,
the guarantees of procedural due process did not apply.
See, e.g., Barsky v. Board of Regents, 347 U.S. 442 (1954) (the
old privilege argument); for the current view, see, Goldberg,
and Perry, supra, and Bell v. Burson, 402 U.S. 535 (1971).
Generally speaking, the basic requirements of procedural
due process are as follows:  notice, Mullane v. Central Hanover
Trust Co., 339 U.S. 306 (1950); hearing, Armstrong v. Manzo,
380 U.S. 545 (1965); an impartial tribunal, Goldberg, supra,
397 U.S. at 271; confrontation and cross examination,
Goldberg, supra, 397 at 270.  In drafting the provision
to exempt the Marianas from the various constitutional
prohibitions against restrains on land alienation based on
ancestry, these requirements of procedural due process must
be scrupulously satisfied.

Procedural due process is also important for the
limitations that it places on the state or Commonwealth
criminal justice system.  Again, the basic standard is

EXHIBIT 6-000026

- 26 -

whether in a particular case, the challenged policy or practice violates the fundamental principles of liberty and justice. Twining v. New Jersey, 211 U.S. 78, 106 (1908). In recent years, the Court has held that these principles include, but are not limited to, virtually all of the criminal procedure guarantees of the Bill of Rights. Duncan v. Louisiana, 391 U.S. 145 (1968) Pursuant to the requirements of procedural due process in criminal cases, the courts have elaborated the void-for-vagueness doctrine, Cantwell v. Connecticut, 310 U.S. 296 (1940), and various rules to ensure a fair trial, including not only the guarantees of the Bill of Rights, but also procedures to guard against any indication of of bias or lack of essential justice, Tumey v. Ohio, 273 U.S. 510 (1927). There are strict requirements for acceptable guilty please (Boykin v. Alabama, 395 U.S. 238 (1969)), the standard of proof (In Re Winship, 397 U.S. 358 (1970)). Procedural due process requires special treatment of the incompetent or insane defendant, Pate v. Robinson, 383 U.S. 375 (1966), and of juvenile offenders, In Re Gault, 387 U.S. 1 (1967). Procedural due process also sets some standards for appeals, Griffin v. Illinois, 351 U.S. 12 (1956), the treatment of prisoners, Coffin v. Reichard, 143 F.2d 443, 445 (5th Cir. 1944), cert. denied,

EXHIBIT 6-000027

- 27 -

325 U.S. 887 (1945), and the administration of probation
and parole, Morrissey v. Brewer, 408 U.S. 471 (1972).

Nor shall any State deny to any person within its jurisdi-
ction the equal protection of the laws.

This clause prohibits state action which denies
the right to equal protection of the laws.  State action,
of course, includes far more than the obvious legislative
denials of equal protection, but the extent to which the
Court will find that private actions are sufficiently
significantly related to or brigaded by state actions
so as to invoke the amendment is unclear.  In Shelley v.
Kraemer, 334 U.S. 1 (1948), the Court found state action
in the fact that the challenged racially restrictive
covenants on real property were secured by state judical
enforcement.  See also, Reitman v. Mulkey, 387 U.S. 369
(1967).  The Court appears to have drawn back from this
extreme position in such recent cases as Moose Lodge No.
107 v. Irvis, 407 U.S. 163 (1972), in which the Court
held that the fact that a private club was required to
and did have a liquor license did not bar it from
discriminating against Negroes.

Together with other provisions of the Constitution,
the Equal Protection Clause would normally operate to prevent
the restraints on land alienation based on ancestry which

EXHIBIT 6-000028

- 28 -

both the United States and the Marianas think are desirable.
It would also prevent the Commonwealth from structuring
its legislature, or one house of its legislature, to
provide an equal number of representatives from each
island, because of the "one-man, one-vote" rule elaborated
in Reynolds v. Sims, 377 U.S. 533 (1964). (See Steve
Lawrence's memo on these problems.) Special provisions
will therefore be necessary in the Commonwealth Agreement
to ensure that the Constitution will not prevent the
Marianas from carrying out these two policies should it
choose to do so.

In the area of equal protection challenges to
economic regulation, the Court developed the traditional
standard of review, which looks only to the reasonable-
ness of the classification, to ascertain that it has some
fair and substantial relationship to the objective of the
legislation. See, e.g., Lindsley v. Natural Carbonic Gas
Co., 220 U.S. 61 (1911). However, when legislation acts
either on the basis of a suspect classification or with
regard to a fundamental interest, the Court will exercise
strict scrutiny; the Government must then show a compelling
interest justifying the legislation, and must prove that the
challenged classifications are necessary to serve that vital
purpose. See, e.g., Korematsu v. United States, 323 U.S.

EXHIBIT 6-000029

- 29 -

214 (1944), Graham v. Richardson, 403 U.S. 365 (1971).
In the most recent cases, the Court has apparently been
developing a new standard of review of equal protection
cases, which falls somewhere between the two described
above, but the precise formula remains unclear. The Court
has so far spoken of applying "close scrutiny" to determine
whether a classification was "reasonably necessary" to the
accomplishment of state aims. Bullock v. Carter, 405 U.S.
134, 144 (1972). See also, Weber v. Aetna Casualty and
Surety Co., 406 U.S. 165 (1972).

The equal protection clause has been used to
some extent by the Court in regulating classifications
established for the purpose of taxation. See, e.g., Bell's
Gap R. Co., v. Pennsylvania, 134 U.S. 232 (1890), Cargill
Co. v. Minnesota, 180 U.S. 452 (1901). Challenges are
often made under the equal protection clause to actions
taken under the state police power, or to the regulation of
business and employment relations, but these are only
occasionally sustained. See, e.g., McGowan v. Maryland,
366 U.S. 420 (1961) (police power), New York Central R. Co.
v. White, 243 U.S. 188 (1917) (workmen's compensation
laws). Equal protection has of course been most important
in cases involving racial discrimination. See, e.g.,
Peters v. Kiss, 407 U.S. 493 (1972) (juries), Burton v.

EXHIBIT 6-000030

- 30 -

Wilmington Parking Authority, 365 U.S. 715 (1961) (public facilities), Brown v. Board of Education, 347 U.S. 438 (1954) (education). The Court has lately been concerned with other suspect classifications as well as race, including religion, alienage and nationality, Hirabayashi v. United States, 320 U.S. 81 (1943), and perhaps sex, Frontiero v. Richardson, 411 U.S. 677 (1973), and illegitimacy, Levy v. Louisiana, 391 U.S. 68 (1968). In the area of fundamental interests, the Court has acted to protect, amongst others, the right to vote, Dunn v. Blumstein, 405 U.S. 330 (1972), the reasonable apportionment of voting districts, Baker v. Carr, 369 U.S. 186 (1962), the right to travel, Shapiro v. Thompson, 394 U.S. 618 (1969), and the right to equal treatment by the criminal justice system, Griffin v. Illinois, 351 U.S. 12 (1956).

Fifteenth Amendment. -- The right to vote shall not be denied or abridged on account of race, color or previous condition of servitude.

The Supreme Court has held that this amendment is not only the source of a prohibition against racial discrimination in voting, but it also in some circumstances an immediate source of the right to vote. Ex parte Yarbrough,

EXHIBIT 6-000031

- 31 -

110 U.S. 651 (1884)  It has been used to condemn various state efforts to either overtly or covertly disenfranchise black citizens.  These include the "grandfather clauses," Guinn v. United States, 238 U.S. 347 (1915), and the white primary elections or political parties, Smith v. Allwright, 321 U.S. 649 (1944).

Nineteenth Amendment -- The right to vote shall not be denied or abridged on account of sex.

The Supreme Court has never interpreted this amendment, but the state courts which considered it have ruled that it does not confer upon women the right to vote, but only the right not to be discriminated against on the basis of sex in setting voter qualifications.  See, e.g., In re Cavellier 287 N.Y.S. 739 (1936).  This is, of course, only a formalistic distinction, but it has served to restrain any far-reaching applications of this amendment.

EXHIBIT 6-000032

- 32 -

II.  PROVISIONS PROPOSED BY ONLY ONE PARTY

A.  Provisions Proposed By the Marianas

Article IV, Section 2, Clause 1 -- Citizens of each
state shall be entitled to all privileges and immunities
of citizens in the several states.

This clause is actually proposed in both drafts,
but only the Marianas proposal includes it in the listing
of specific provisions of the United States Constitution
which are made expressly applicable to the Commonwealth.
The United States draft includes it instead in Section
402, which is primarily concerned with the retention of
authority by the Marianas to regulate and to limit the
alienation of land by ancestry.  This placement is
extremely ill-advised, because it suggests both that this
clause is to apply with different force and effect than
those mentioned in the listing, and that this is the
only constitutional provision which might prohibit such
regulation.  Since neither implication is correct, the
Marianas draft proposal which places this provision in the
regular list is certainly preferable.

This clause guarantees the privileges and immunities
of citizens between and among the states, in the same way
that the Fourteenth Amendment guarantees them within the
United States.  It forbids any state, and so in this case

EXHIBIT 6-000033

- 33 -

the Commonwealth, to discriminate against citizens of other
states in favor of its own citizens. <u>Paul v. Virginia</u>,
8 Wall. (75 U.S.) 168 (1869)  A provision has been added
to the draft Commonwealth Agreement to require the states
of the Union to respect the privileges and immunities
of the citizens of the Marianas.  The privileges and
immunities protected are those rights that are fundamental
and that belong to the citizens of all free governments.
<u>Corfield v. Coryell</u>, 6 Fed. Cas. 546 (E.D. Pa. 1823) (J.
Washington on circuit).  This provision has particularly
protected non-residents in their right of access to state
courts, <u>Chambers v. Baltimore and Ohio R.R.</u>,  207 U.S. 142
(1907), and from discriminatory taxation, <u>Ward v. Maryland</u>,
12 Wall, (79 U.S.) 418 (1871).  It has been expressly
extended to Puerto Rico, Guam, and the Virgin Islands.

<u>Fifth Amendment</u> -- No person shall be held to answer for
a capital or otherwise infamous crime, unless on a
presentment or indictment of a Grand Jury, except in cases
arising in the land or naval forces . . .

Both drafts contain provisions making this
amendment expressly applicable in the Marianas, but the
United States draft excepts the clause which provides a
right to indictment by a grand jury.  We can see no reason
why this exception should be agreed to by the Marianas.

EXHIBIT 6-000034

- 34 -

Since 1968, this entire amendment has applied to Guam
and to the Virgin Islands, 48 U.S.C. § 1421b and § 1561,
although in the Virgin Islands, certain exceptions are
made to the requirement of an indictment, in order to
conform to prior local laws.  It has repeatedly been
held that the requirement of a grand jury indictment does
not apply to the states through the Fourteenth Amendment,
and so it would not be binding upon the Commonwealth Govern-
ment.  Hurtado v. California,  110 U.S. 516 (1884).  The
United States must apparently be attempting to prevent
the grand jury requirement from applying against its own
actions.  They must certainly provide some impressive
justification for this exception before the Marianas could
seriously consider agreeing to it.  The United States may
assert, however, that this exception was accepted by the
Marianas during the May-June 1973 negotiations in Saipan.
The Joint Communique from that meeting said that, "[t]he
requirements in the United States Constitution of indict-
ment by grand jury and of a jury trial in civil cases need
not be made applicable to the Marianas."  (at ¶ 8, p. 4)
It is certainly reasonable to argue, however, that this
sentence referred only to the requirements to be placed
on the Marianan Government.  There would be no reason for
the Marianas to agree to such an expansion of United States

# EXHIBIT 6-000035

- 35 -

authority, and in fact, the proposal of such a diminution of procedural safeguards must give rise to some serious questions regarding the United States intentions.

The constitutional function of grand juries in the federal courts is, of course, to return criminal indictments in "infamous" cases. They also serve a vital investigative function, and may issue reports indicating the presence of non-indictable misbehavior. Whether a crime is "infamous" depends on the quality of the punishment which may be imposed for it, and may change with public opinion over time. Ex parte Wilson, 114 U.S. 417 (1885). A person can be tried only upon the offenses charged in the grand jury indictment, and only upon the particular language found in the charging part of the document. Stirone v. United States, 361 U.S. 212 (1965). The exception to the grand jury requirement for the military was intended to facilitate trial by court-martial of members of the armed services, even for crimes which under the Fifth and Sixth Amendments might otherwise have been cognizable in civil courts. Ex parte Quirin, 317 U.S. 1 (1942).

Nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb.

EXHIBIT 6-000036

- 36 -

The constitutional prohibition against being tried more than once for the same alleged offense is binding upon both the states and the federal government, and so would place requirements on both the Commonwealth and the United States Governments. Benton v. Maryland, 395 U.S. 784 (1969). A retrial is barred once jeopardy has attached in the first trial, which according to federal court rules, occurs very early in the proceedings. United States v. Jorn, 400 U.S. 470 (1971). There are a few situations in which a retrial will be permitted if the first case did not go to a judgment, United States v. Tateo, 337 U.S. 463 (1964), but if it continued to judgment, a second trial is partically always barred. Green v. United States, 355 U.S. 184 (1957).

Nor shall [any person] be compelled in any criminal case to be a witness against himself.

This privilege may be invoked in any situation in which an individual is compelled to make testimonial disclosures, if those disclosures might be used against him in any criminal proceeding. See, Mirana v. Arizona, 384 U.S. 436 (1966), Reina v. United States, 364 U.S. 507 (1960). This provision is fully applicable against the states, as well as against the federal government. Malloy

EXHIBIT 6-000037

- 37 -

v. Hogan, 378 U.S. 1 (1964). A criminal defendant who chooses to take the stand is considered to have waived the privilege as to matters reasonably related to his direct examination, Brown v. United States, 356 U.S. 148 (1958), but neither the prosecutor nor the judge may comment in the presence of the jury if the defendant chooses not to testify. Griffin v. California, 380 U.S. 609 (1965). One important line of cases has held that both the transactional and the use immunity statutes are constitutional, but that the latter is all that is required by the Fifth Amendment. See, e.g., Kastigar v. United States, 406 U.S. 441 (1972). In 1966, the Court announced that no statements made by a defendant during a custodial interrogation could be introduced in court unless he had been fully informed of his rights. Miranda v. Arizona, 384 U.S. 436 (1966). Although recently narrowed in some of its applications, this rule remains basically valid. Michigan v. Tucker, 42 U.S.L.W. 4887 (U.S., June 11, 1974).

Nor [shall any person] be deprived of life, liberty, or property without due process of law.

   This clause, which is a restraint only against the federal government, does not apply of its own force to unincorporated territories. Public Utility

# EXHIBIT 6-000038

- 38 -

<u>Comm. v. Ynchausti and Co.</u>, 251 U.S. 401 (1920). Since
this Fifth Amendment due process clause co-exists with
the other restraints on the federal government contained
in the Bill of Rights, it is not precisely the same
thing as the due process clause in the Fourteenth Amendment.
However, both clauses do impose certain implicit require-
ments, such as fair trials, which exist separately from
the express constitutional guarantees, and in this sense,
the interpretation of the two clauses is at least substantially
the same. The discussion above of the due process clause
of the Fourteenth Amendment has therefore already identified
the major doctrines and important areas of development
under this clause as well. The essential difference is,
of course, that this clause is binding only on the Federal
Government, while the Fourteenth is binding on the states.
It is important that this clause should apply in the
Marianas, because it places significant restrictions
on the actions of the United States in the Commonwealth.

Certain areas of law peculiar to the Federal
Government have also been developed under the Fifth
Amendment Due Process Clause. These include the procedural
due process standards for federal administrative agency
proceedings and federal criminal statutes and trials, and
for the entry or deportation of aliens. <u>See</u> , <u>e.g.</u>, <u>Bowles</u>

EXHIBIT 6-000039

- 39 -

v. Willingham, 321 U.S. 503 (1944), United States v. National Dairy Prod. Corp., 372 U.S. 29 (1963), Jencks v. United States, 353 U.S. 657 (1957), United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537 (1950). Although the Fifth Amendment contains no equal protection clause, the Supreme Court has held that the Fifth Amendment due process clause makes many of the requirements of equal protection applicable against the Federal Government; the Court explained that discrimination in some cases will be equivalent to confiscation, and so will be prohibited by substantive due process. Bolling v. Sharpe, 347 U.S. 497 (1954). In two more recent cases, the Supreme Court has treated the two clauses as virtually co-extensive and interchangeable. Shapiro v. Thompson, 394 U.S. 618 (1969), Schneider v. Rusk, 377 U.S. 163 (1964).

Nor shall private property be taken for public use, without just compensation.

The federal power of eminent domain may be exercised only to effectuate a constitutionally granted power. United States v. Gettysburg Electric Ry. Co., 160 U.S. 668 (1896). The ambit of national powers is so broad-ranging, however, that vast numbers of objectives may actually be obtained. Berman v. Parker, 348 U.S. 26 (1954).

EXHIBIT 6-000040

- 40 -

The states are required to adhere to almost the same standards under the Fourteenth Amendment due process clause as the Federal Government must meet under this amendment. <u>Chicago, B. & Q. R.R. Co. v. City of Chicago</u>, 166 U.S. 226 (1897). To the Marianans, however, the central importance of this provision lies in the limitations that it places on the powers of the Federal Government to take their land.

The general standard for "just compensation" is fair market value . <u>United States v. Miller</u>, 317 U.S. 369 (1943). The most important area of dispute under this doctrine is whether in a particular circumstance the Government's action has actually caused a "taking" in the Fifth Amendment sense. If damage to property results from Government actions not directed at that property, the Court has ruled that that property is "taken" only when "inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired." <u>United States v. Dickinson</u>, 331 U.S. 745 (1947).

<u>Seventh Amendment</u> -- <u>In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the</u>

# EXHIBIT 6-000041

- 41 -

United States, than according to the rules of the common
law.

      Both drafts of the Commonwealth Agreement include
the Seventh Amendment in their lists of provisions to be
made expressly applicable to the Marianas, but the United
States seeks to exclude one clause from that applicability.
The United States wants to exclude the right provided
to trial by jury in non-criminal cases.  As in the case of
the Fifth Amendment, this provision is, by judicial decision,
not applicable against the states through the Fourteenth
Amendment, and so would impose no special obligations
on the Commonwealth government.  Minneapolis and St. Louis
R.R. Co. v. Bombolis, 241 U.S. 211 (1916).  It has been
explicitly extended to Guam and to the Virgin Islands.
48 U.S.C. § 1421(b) and 1561.  It appears then, that the
United States is simply attempting to avoid the require-
ment of jury trials in non-criminal cases in the federal
courts located in the Commonwealth.  Unless the United
States can offer some convincing justification for its
position, I can see no reason why the Marianas should
agree to this exception.

      Traditionally, the Supreme Court has held that
the Seventh Amendment preserves the right of trial by a

EXHIBIT 6-000042

- 42 -

jury of the sort that existed under English common law.
Baltimore and Carolina Line v. Redman, 295 U.S. 654 (1913).
Since the Court has eased this requirement in criminal
cases, however, it will probably do the same in civil
cases in the near future. If a case presents a mixture
of legal and equitable claims for decision, the Seventh
Amendment requires that the issues pertaining to the
legal relief must be tried by a jury. Dairy Queen v.
Wood, 369 U.S. 469, (1962).

Twenty-Sixth Amendment -- The right of citizens of the
United States, who are 18 years of age or older, to vote
shall not be denied or abridged by the United States or
by any State on account of age.

This provision, if applied to the Marianas,
would have no practical effect on the United States
Government's policies or actions, because Marianas can-
not vote in federal elections in any case. It seems
unlikely, then, that the Federal Government could
seriously object to the desire of the Marianas to include
this amendment in the Commonwealth Agreement. Its only
effect will be to insure a voting age of 18 in the
Marianan elections. Since this is in accord with the
national policy of the United States, and also represents

EXHIBIT 6-000043

- 43 -

the expressed desire of the Marianas, there is no reason
that it should not be made expressly applicable.

B.    Provisions Proposed by the United States

Article I, Section 9, Clause 6 -- No Preference shall be
given by any Regulation of Commerce or Revenue to the
Ports of one State over those of another:   nor shall
Vessels bound to, or from, one State, be obliged to
enter, clear, or pay duties in another.

This clause is a restriction only upon the
Federal Government, and in no way affects the states in
the regulation of their domestic affairs.   Morgan v.
Louisiana,  118 U.S. 455 (1886).  The clause does not
apply by its own force to the ports of any territory,
Alaska v. Troy,  258 U.S. 101 (1922), and has not been
specifically extended to Guam or to the Virgin Islands.
Since it can only restrict the powers of the United
States Government, however, I can see no reason to object
to its being made expressly applicable to the Marianas.
The only possible reason to object would be if there was
some real possibility that, absent this prohibition,
Congress might enact a statute favoring Marianan ports
over domestic ports.  This seems, at best, highly unlikely,

# EXHIBIT 6-000044

- 44 -

and is not sufficient reason to oppose inclusion of this
provision.

The provision was designed to prevent preferences
granted as between certain ports because of their locations
in different states; it does not forbid discrimination
between individual ports. Louisiana Public Service Comm.
v. Texas & N.O.R. Co., 284 U.S. 125 (1931). Under the
Commerce Clause, Congress does many things which benefit
particular ports, and which may incidentally disadvantage
others. It may, for example, set differential rates,
establish ports of entry, erect and operate lighthouses,
improve rivers and harbors, and provide structures for
the covenient and economical handling of traffic, even
if such activities in fact give an advantage to one port
over another. Louisiana Public Service Comm., supra.
The clause also does not prevent Congress from allocating
to the states the power to supervise and to regulate
pilots. Thompson v. Darden, 198 U.S. 315 (1905).

Article I, Section 9, Clause 8 -- No Title of Nobility
shall be granted by the United States: And no Person
handling any Office of Profit or Trust under them, shall,
without the Consent of the Congress accept of any present,
Emolument, Office, or Title, of any kind whatever, from any
King, Prince or Foreign State.

EXHIBIT 6-000045

- 45 -

This clause has apparently occasioned no litigation in the federal courts. From its language, and by analogy to the rest of Section 9, however, it would appear to be a prohibition directed solely against the Federal Government and against federal officers. It has not been specifically extended to Guam or to the Virgin Islands, but because it is an "express prohibition," which goes to the power of the Federal Government to take any action at all in this area, it may well apply to unincorporated territories without any specific extension. It is specifically mentioned in Downes v. Bidwell, 182 U.S. 244, 277 (1901), as an example of such an express prohibition. I suspect that the United States wants it to be made expressly applicable for the sake of clarity, and precisely because it is probably already applicable in any case. Since it operates only against the Federal Government, I can see no reason for the Marianas not to agree to its inclusion.

This provision has been interpreted only in a few opinions given by the United States Attorney General. In 1871, he ruled that a minister of the United States abroad may not accept a formal commission from any foreign power, because that creates an official relationship of

EXHIBIT 6-000046

- 46 -

the type prohibited by this provision. 13 Ops. Atty.
Gen. 538 (1871). The clause does not extend, however,
to gifts or commissions bestowed on departments or
institutions of the United States Government. Gifts
from Foreign Prince -- Officer -- Constitutional
Prohibition, 24 Ops. Atty. Gen. 117 (1902). The only
recent incident ruled upon by the Attorney General
involved a retired enlisted member of the Fleet Reserve,
who accepted employment in a civilian position with an
Australian state while continuing to draw retirement
pay. The Attorney General ruled that this constituted
acceptance of an emolument from a foreign state without
the proper consent of Congress, and so, that an amount
equal to the foreign salary received must be withheld
from the amount of retirement pay to which the individual
would otherwise have been entitled.

Article I, Section 10, Clause 1 -- No State shall enter
into any Treaty, Alliance, or Confederation; grant
Letters of Marque and Reprisal; coin Money; emit Bills of
Credit; make any Thing but gold and silver Coin a Tender
in Payment of Debts; pass any Bill of Attainder, ex post
facto Law, or Law impairing the Obligation of Contracts
or grant any Title of Nobility.

EXHIBIT 6-000047

- 47 -

This clause places limitations upon the States, or in this case, upon the Commonwealth, which fall into the following two categories: first, some are limitations upon the power of the States to deal with matters having a bearing on international relations, or second, some are absolute prohibitions against certain types of actions by the States, most of which are also forbidden to the Federal Government by other constitutional provisions. This provision has not been extended to Guam or to the Virgin Islands. There is no reason for the Marianas to object to the first type, because the Commonwealth specifically intends to grant to the United States full responsibility for and complete authority in all foreign relations. The second category is also acceptable, both because it works no particular disadvantage upon the Marianas, and because it is no more stringent than the requirements placed on the Federal Government.

There has been very little litigation concerning the prohibition against making treaties, and none concerning the granting of letters of marque and reprisal, or of coining money. They are all based on the concept of the unity of the United States, and on the explicit power of the Federal Government to conduct its foreign affairs.

EXHIBIT 6-000048

- 48 -

These principles led the Supreme Court to hold that the
Federal Government had paramount rights in and control
over the three-mile marginal belt under the ocean along
the California coastline, because the oil there might well
become the subject of international dispute.  United States
v. California, 332 U.S. 19 (1947).  However, in Skirotes v.
Florida,  313 U.S. 69 (1941), the Court unanimously held
that Florida could regulate the sponge fishing of its
citizens outside its territorial waters.  The Court said
there that,  "[w]hen its action does not conflict with
federal legislation, the sovereign authority of the State
over the conduct of its citizens upon the high seas is
analogous to the sovereign authority of the United States
over its citizens in like circumstances."  (313 U.S. at
78-79) (Letters of marque and reprisal are defined as
"commissions given to a private ship by a government to
make reprisals on the ships of another state."  Black's
Law Dictionary, 4th ed., 1951.)

The prohibition against Bills of Credit applies
to any paper medium of exchange, intended to circulate
between individuals, and between the government and
individuals, for the ordinary purposes of society.
Poindexter v. Greenhow, 114 U.S. 284 (1885).  The States
are allowed, however, to issue coupons receivable for

EXHIBIT 6-000049

- 49 -

taxes, or to execute instruments binding themselves to
pay money at some future date for services rendered or
money borrowed. See, e.g., Poindexter, supra, and
Houston and Texas Central Rd. v. Texas, 177 U.S. 66
(1900). This prohibition and the one following,
concerning legal tender, were clearly intended "to
provide a fixed and uniform standard of value throughout
the United States, by which the commerce and other
dealings between the citizens thereof, or between them
and foreigners, . . . should be regulated," Ogden v.
Saunders, 25 U.S. 213 (1827).

　　The prohibition against making anything but
gold or silver into legal tender clearly applies only
to the States. Juilliard v. Greenman, 110 U.S. 421 (1884).
It does not prevent a bank depositor from agreeing to
receive an exchange draft in payment on his check, if
the state law so provides. Farmers and Merchants Bank v.
Fed. Reserve Bank, 262 U.S. 649 (1923).

　　The prohibition against passage by the states
of ex post facto laws and bills of attainder parallels
that against the Federal Government in Article I, Section
9, Clause 3. The prohibition against bills of attainder
applies to both civil and criminal laws, and has been used

CS 09

EXHIBIT 6-000050

- 50 -

to invalidate statutes such as those that were passed
after the Civil War, which required persons who wished
to enter certain professions to swear that they had never
given aid to the Confederacy.  See, e.g., Klinger v.
Missouri, 13 Wall. (80 U.S.) 257 (1972).  The prohibition
against bills of attainder is intended to prevent all
legislative acts which inflict punishment on individuals
without judicial trial.  Cummings v. Missouri,  71 U.S.
277 (1867).  The prohibition against ex post facto laws
applies only to criminal legislation, Calder v. Bull,
3 Dall (3 U.S.) 386 (1798).  It can be violated by changes
in punishment, or occassionally in procedure as well as
by legislation which makes a certain act a crime, which
when it was carried out was not criminal.  See., e.g., Graham
v. West Virginia,  224 U.S. 616 (1912), Thompson v. Utah,
170 U.S. 343 (1898).

The prohibition against passage by the states
of laws impairing the obligation· of contracts is intended
to preserve the absolute inviolability of contracts against
all state legislative interference.  There is no parallel
prohibition placed on the Federal Government, and the
Court has held that it may act to impair contracts, but
apparently only in pursuance of an express power.

*due process includes this → or, taking w/o compensation*

EXHIBIT 6-000051

- 51 -

Continental Illinois Nat. Bank and Trust Co. v. Chicago,
R.I. & P. Ry. Co., 294 U.S. 648 (1935). The provision
applies only against statutes, and not against judicial
decisions, except in a few unusual circumstances. Tidal Oil
Co., v. Flannagan, 263 U.S. 444 (1924). Although this
clause has proved to be of relatively little importance
in recent times, it still provides a basis for judicial
review of the factual justifications offered by a state
legislature for its exercise of the police power.
Chastleton Corp. v. Sinclair, 264 U.S. 543 (1924). This
provision still protects the remedial rights of creditors
against unreasonable legislative erosion. See, e.g.,
W. B. Worten Co. v. Thomas, 292 U.S. 426 (1934), but see,
Home Building and Loan Assn. v. Blaisdell, 290 U.S.
398 (1934).

No cases have arisen under the provision which
forbids the states to grant any titles of nobility. Its
meaning is quite clear, and, like the rest of this
clause, should cause no particular difficulties in the
Marianas.

# EXHIBIT 6-000052

-52-

Article I, Section 10, Clause 2 -- No State shall, without
the Consent of the Congress, lay any Imposts or Duties on
Imports or Exports, except what may be absolutely necessary
for executing it's inspection Laws:  and the net Produce of
all Duties and Imposts laid by any State on Imports or Exports
shall be for the Use of the Treasury of the United States; and
all such Laws shall be subject to the Revision and Control of
the Congress.

The applicability of this Section will have to be
carefully examined by both parties in light of the provisions
of the Status Agreement relating to customs duties and excise
taxes.  My initial opinion, however, is that the Marianas
should not agree to the applicability of this provision of
the Constitution, because it is in direct conflict with the
proposed agreement on custom duties.  Under that agreement,
the Marianas will not be included in the customs territory
of the United States, and will retain the authority to extablish
a "duty-free" port, to enact local customs laws relating to
imports from foreign countries, and to impose taxes on exports
from the Commonwealth.  It is entirely contradictory, therefore,
to expect the Marianas to agree here not to pass any such laws
without their being subject to the revision and control of
Congress.  It is irrelevant that Marianas exports will be
allowed to enter the United States without paying any import
duties both because that is a separate agreement, and because

EXHIBIT 6-000053

-53-

this arrangement also exists with Guam, to which this constitu-
tional provision has never been extended.  I can only assume
that the United States proposed the inclusion of this provision
through some oversight or error.

This provision serves as a restriction on the states
only in regard to articles imported from or exported to a
foreign country, or "a place over which the Constitution has
not extended its commands with respect to imports and their
taxation."  Hooven and Allison Co. v. Evatt, 324 U.S. 652 (1945).
In Brown v. Maryland, 12 Wheat. (25 U.S.) 419, 441-442 (1827),
the Supreme Court enunciated the "original package doctrine,"
to determine how long imported goods remain under the strictures
of this clause.  The test is whether the thing imported has
become so "incorporated and mixed up with the mass of property
in the country" that it has "lost its distinctive character as
an import"; if this is not the case, then it remains within
the prohibition of this clause, and cannot be taxed by the states.
The clause also forbids such indirect taxes on imports as
importers licenses.  Brown, supra, at 447.  The Supreme Court
has sustained many state inspection laws, however, as an exercise
of the state's police power.  See, e.g., Turner v. Maryland,
107 U.S. 38 (1833).

Article I, Section 10, Clause 3 -- No State shall, without the
Consent of Congress, lay any Duty of Tonnage, keep Troops, or

# EXHIBIT 6-000054

-54-

<u>Ships of War in time of Peace, enter into any Agreement or</u>

<u>Compact with another State, or with a foreign Power, or engage</u>

<u>in War unless actually invaded, or in such imminent Danger as</u>

<u>will not admit of delay</u>.

This provision is intended to insure the unity of the National Union, and to guarantee absolute power in foreign affairs and defense to the Federal Government. It is a restriction only against the states, and has not been extended to the Virgin Islands or to Guam. With the possible exception of the restriction on the laying of duties of tonnage, there is no reason for the Marianas to reject to the inclusion of this provision, since it is the intention of the Commonwealth that the United States will exercise complete power and authority over its foreign relations and defense. Although the prohibition against tonnage duties without the consent of Congress will prevent the Marianas from levying any charges for the privilege of entering, trading in, or lying in their ports, it should probably also be accepted. This restriction is one which applies to all other United States ports as well, and since the United States will be instrumental in constructing any ports in the Marianas, it is only reasonable that this standard restriction on interstate commerce should be enforced.

The prohibition against laying tonnage duties without the consent of Congress is intended to forbid all taxes which are actually charges solely for the privilege of entering, trading in

# EXHIBIT 6-000055
-55-

or lying in a port, whether these charges are measured by the tonnage of the vessel or not. Clyde Mallory Lines v. Alabama, 296 U.S. 261 (1935). The section does not forbid charges by the states for services rendered to a vessel, such as pilotage, towage, wharfage, or storage, even if the rates for these services are determined by tonnage. Packet Co. v. Catlettsburg, 105 U.S. 559 (1882).

The restrictions on keeping troops or ships of war in time of peace, and on engaging in war, do not forbid the organization and maintenance of an active state militia. Presser v. Illinois, 116 U.S. 252 (1886). Except on this point, there has apparently been no litigation in the Federal Courts under these clauses.

The clause forbidding interstate compacts and agreements with foreign powers without the consent of Congress is not intended to strip the states, or the Commonwealth, of the power to make such agreements. It merely makes the consent of Congress necessary to the establishment of such a compact. See, e.g., Hinderlider v. La Plata Co., 304 U.S. 92 (1938), Bootery Inc. v. Washington Metropolitan Transit Authority, 326 F. Supp 794 (D.D.C. 1970). This restriction on "agreements or compacts" was intended to compliment the prohibition against "any treaty, alliance, or confederation," in Article I, Section 10, Clause 1, and to make the prohibition against agreements with foreign powers more comprehensive. Holmes v. Jennison, 14 Pet. (39 U.S.) 540 (1840). The Congress has approved many compacts between

EXHIBIT 6-000056

-56-

states, relating both to boundary disputes and to affirmative
programs for solving common problems.  See, e.g., Act of
June 6, 1934, 48 Stat. 909 (1934), which consented in advance
to agreements for the control of crime.  Such Congressional
consent may be given either before or after the agreement is
reached, and need not be express or specific.  Green v. Biddle,
8 Wheat. (21 U.S.) 1 (1823).

Article IV, Section 2, Clause 2 -- A person charged in any
State with Treason, Felony, or other Crime, who shall flee from
Justice, and be found in another State, shall on Demand of the
executive Authority of the State from which he fled, be delivered
up, to be removed to the State having Jurisdiction of the Crime.

This clause binds all of the States to an extradition
agreement with all of the other states.  It has never been
extended to Guam or to the Virgin Islands, and it would impose
certain obligations on the Commonwealth government.  These
obligations do not seem unreasonable, however, expecially since
the duty to surrender the accused is not absolute and unqualified.
I can see no serious objections to the Marianas agreeing to
accept the express applicability of this provision.

As noted above, the duty to surrender an accused is
not absolute; if the laws of the state to which the fugitive
has fled have already been put into force against him, and he
is imprisoned there, then the demands of those laws may be

# EXHIBIT 6-000057
-57-

satisfied first, before the obligation to extradite is fulfilled.
Taylor v. Taintor, 16 Wall. (83 U.S.) 366 (1873).  The governor
of a state can only demand the return of a fugitive after the
individual has been actually charged with a crime.  Strassheim
v. Daily, 221 U.S. 280 (1911).  Once the request is made, however,
the surrender of the fugitive is required by the Constitution,
and can not be interfered with upon grounds which properly go
to the eventual result of a criminal trial.  Drew v. Thaw,
235 U.S. 432(1942).

Article VI, Clause 2 -- This Constitution, and the Laws of the
United States which shall be made in Pursuance thereof; and all
Treaties made, or which shall be made, under the Authority of the
United States, shall be the supreme Law of the Land; and the
Judges in every State shall be bound thereby; any Thing in the
Constitution or Laws of any State to the Contrary notwithstanding.

If this section is read absolutely literally, it
states that all  of the Constitution and all of the federal laws
made in pursuance of the Constitution shall be the supreme law
of the land.  Further, it reemphasizes this meaning by saying
that this rule applies no matter what the constitution or laws
of any state might say.  The United States might reasonably argue
from the language that whatever laws it passed based on Constitu-
tional powers would be supreme in the Commonwealth, notwithstanding
the limitations on United States authority outlined in the Status

# EXHIBIT 6-000058
-58-

Agreement. Therefore, the Marianas definitely should not agree to the express applicability of this provision. A properly worded supremacy clause might be helpful, however, and so the Marianas should press for acceptance of their proposed draft Section 205(b). This provides that the Commonwealth Agreement, the applicable portions of the United States Constitution, applicable federal laws, and federal treaties shall be the supreme law of the Commonwealth.

The Supremacy Clause of the United States Constitution, as interpreted by the Supreme Court, states an absolute rule: when Congress legislates pursuant to its delegated powers, conflicting state law and policy must yield. Gibbons v. Ogden, 9 Wheat, (22 U.S.) 1 (1824). The primary task for the Court is to ascertain whether a challenged state law is compatible with the policy of the federal statute. State courts are of course also bound to give effect to federal law when it is applicable, and to disregard state law when there is a conflict. Cooper v. Aaron, 358 U.S. 1 (1958). The uniformity which results in at least some areas, particularly commerce, is vitally important to the preservation of a strong national Union. This clause also supports the doctrine of federal exemption from taxation by the states, Osborn v. United States Bank, 9 Wheat. (22 U.S.) 738 (1824), which remains in force today at least as to activities of the Federal Government itself, and as to that which is explicitly created by statute. See, e.g., Mayo v. United States, 319 U.S. 441 (1943).

EXHIBIT 6-000059
-59-

Fourteenth Amendment, Section 5 -- The Congress shall have power
to enforce, by appropriate legislation, the provisions of this
article.

The initial problem with making this section expressly
applicable to the Marianas is that it refers to enforcement of
the entire Fourteenth Amendment, while only the first section
is being applied to the Marianas.  Further, the Marianas is
reserving certain rights and powers, particularly concerning
apportionment rules, which might normally be forbidden by that
first section.  Therefore, although some enforcement clause
would be acceptable, this section is too broad.  I would suggest
that if the United States really desires an enforcement clause,
this section be incorporated, with the provision that it refers
only to those sections of the Fourteenth Amendment which have
been made specifically applicable to the Marianas, and not to any
parts of those sections under which particular rights have been
specially preserved.  It should be noted, however, that this
section has not been extended to either Guam or the Virgin Islands,
although in view of the broad powers of the United States under
4-3-2 in those territories, there is hardly any reason to do so.

Congress has the discretion under this section to adopt
remedial measures, such as placing jurisdiction over certain
types of cases in the federal courts, and to provide criminal or
civil liability for state officials or agents who violate protected
rights.  These statutory measures designed to eliminate discrimina-
tion under color of law have been consistently upheld by the Court.

EXHIBIT 6-000060

-60-

See, e.g., Ex parte Virginia, 100 U.S. 339 (1880). In a series of cases concerning Reconstruction laws, however, the Court found ·that statutes prohibiting private racial discrimination were beyond the Congress' power to enforce the Fourteenth Amendment. See, e.g., United States v. Cruikshant, 92 U.S. 542 (1875), Civil Rights Cases, 109 U.S. 3(1883). Cruikshant did state, however, that Congress could protect against the private deprivation of those rights which derive particularly from an individual's status as a United States citizen. This principle was used to protect the right to vote in federal elections, Ex parte Yarbrough, 110 U.S. 651 (1884), and the right to interstate travel, United States v. Guest, 338 U.S. 745 (1966), for example. At least some Justices now believe that Section 5 does authorize Congress to make whatever laws are necessary to protect a right created by this Amendment. Guest, supra, 383 U.S. at 774 (J. Brennan, joined by Warren, C. J., and Douglas, J.). It is not clear at this point whether this expansion will be pursued.

EXHIBIT 6-000061

- 61 -

III.  Other Potentially Relevant Provisions

Article I, Section 9, Clause 5 -- No Tax or Duty Shall be
laid on Articles exported from any State.

The problem of export taxes is explicitly discussed
in Section 610 of the Marianas draft of the Status Agreement.
This provision of the Constitution is entirely consistent with
the proposed Agreement, and I can see no reason why the Marianas
should not agree to its express applicability.

This prohibition against export taxes applies only to
goods exported to a foreign country, and not to goods sent to
other states or to unincorporated territories of the United
States.  Dooley v. United States, 183 U.S. 151 (1901).  It
forbids only those taxes which are imposed on goods because
they are being or will be exported; a general tax on all property,
including that intended for export, is not prohibited.  Cornell v.
Coyne, 192 U.S. 418 (1904).  A stamp tax imposed on foreign bills
of lading or other similar documents was held to be void as
being in effect a tax upon exports.  Fairbank v. United States,
181 U.S. 283 (1901).  Another fee, imposed for stamping all
packages of tobacco intended for export, in order to prevent
fraud, was upheld as not forbidden by this provision.  Pace v.
Burgess, 92 U.S. 372 (1876).

Fourteenth Amendment, Section 1, Sentence 1 -- All persons born
or naturalized in the United States, and subject to the juris-

# EXHIBIT 6-000062

- 62 -

diction thereof, are citizens of the United States and the
State wherein they reside.

This sentence was intended to express a national
rule, establishing two independent but equally important
tests to determine who is an American citizen. Since the
draft Status Agreement provides that all Marianans will be
American citizens, this constitutional provision would be
intended to give constitutional status and protection to that
agreement. Because the application of this sentence to the
Marianas could prove valuable in this way, and also because
its application would impose no risks or liabilities on the
Commonwealth government, it should be accepted as proposed
by the United States. However, it should not be relied upon
as the sole source of protection for the right of citizenship,
because a court could reasonably hold that the provision as
written does not include the Marianas within its protection.

Marianans are clearly included as citizens under
the second requirement of this provision, which is that they
be born or naturalized while subject to the jurisdiction of
the United States. This test was intended only to exclude
from citizenship the children born of foreign diplomats in
the United States, the children of alien enemies in hostile
occupation, and the children of members of Indian tribes subject
to tribal laws. United States v. Wong Kim Ark, 169 U.S. 649,
680-682 (1898).

EXHIBIT 6-000063

- 63 -

It is much less clear that the Marianans qualify
as persons "born or naturalized in the United States," which
is the first test of citizenship.  In the ordinary geographical
sense, the Marianas is obviously not "in the United States."
The United States government has clearly adopted this inter-
pretation in the past, when it assumed that Guam was not
"in the United States"; thus, Guamanians were not considered
United States citizens until Congress passed a special law
extending citizenship to them.  It could of course be argued
that this geographical interpretation was wrong, particularly
since it was apparently not tested in the courts, but it does
illustrate the government's understanding of the meaning of
this provision of the Constitution.  Perhaps the best argument
which could be made to a court is that even if this sentence
would not have applied of its own force, Congress has made it
expressly applicable to the Marianas in the Status Agreement,
by providing that the Commonwealth should be treated as a state
for the purposes of the relevant constitutional provisions.
It would be reasonable to assume, then, that for the purposes
of this sentence, the Marianas is to be considered as being
"in the United States."  If this is indeed the case, then this
sentence will constitutionally protect the Marianans' right to
American citizenship.

This first sentence of Section 1 of the Fourteenth
Amendment was intended to set aside the Dred Scott Case rule

EXHIBIT 6-000064

- 64 -

(Scott v. Sandford, 19 How. (60 U.S.) 393 (1857)), and to make
clear that Negroes who met these two tests were American citizens.
The Supreme Court has given a literal interpretation to the
phrase "born or naturalized in the United States," in holding
that a child born in the United States is an American citizen,
despite the fact that both parents were Chinese who were them-
selves ineligible for citizenship. United States v. Wong Kim
Ark, 169 U.S. 649 (1898). Although the Supreme Court has not
ruled on the question, the lower courts have generally held
that the citizenship of the parents determines the citizenship
of children born on vessels in United States territorial waters
or on the high seas. See, e.g., Lam Mow v. Nagle, 24 F.2d 316
(9th Cir. 1928), In re Look Tin Sing, 21 F. 905 (D. Cal. 1884).

Since 1967, the Supreme Court has held that this
provision of the Constitution forbids the federal government
to expatriate United States citizens against their will for
any reason. "Once acquired, this Fourteenth Amendment citizen-
ship was not to be shifted, canceled, or diluted at the will
of the Federal Government, the States, or any other government
unit." Afroyim v. Rusk, 387 U.S. 253, 262 (1967). In a later
decision,however, this sweeping rule was somewhat narrowed. In
Rogers v. Bellei, 401 U.S. 815 (1971), the Supreme Court held
that individuals who were statutorily naturalized because they
were born abroad of at least one American parent could not claim
the protection of this provision, and so were subject to any

EXHIBIT 6-000065

- 65 -

reasonable conditions subsequent which Congress established upon the retention of their citizenship. Since both of these cases were decided by severely divided Courts, the future meaning of this provision is far from clear. However, if the Rogers case is read as excluding from the protections of this provision those individuals whose citizenship is based on special statutory rules, the case may reemphasize the uncertain nature of the protection that the provision can offer to the Marianans. While including the provision might prove helpful, and will cause no harm, it should definitely not be relied upon as the only protection for the right of American citizenship in the Marianas.

EXHIBIT_6-000066

Addendum

Article IV, Section 2, Clause 2 -- Extradition agreement.
See pp. 56-57, supra.

As noted above, there are no serious objections to
the Marianas agreeing to the express applicability of this
provision. A new section should be added, however, to impose
reciprocal extradition obligations on the states, so that the
Marianas would have the right to demand the surrender of a
fugitive from within the United States. These two sections would
simply raise to a constitutional level the requirements already
in fact imposed by a statute, which is written so as to include
territories.

Although this provision did not expressly grant to
Congress the power to legislate so as to carry it into effect,
that body did pass a law concerning extradition shortly after
the Constitution was adopted. This law, 1 Stat. 302 (1793),
now 18 U.S.C. § 3182, provides as follows:

> "Whenever the executive authority of
> any State or Territory demands any person
> as a fugitive from justice, of the executive
> authority of any State, District or Terri-
> tory to which such person has fled, and
> produces a copy of an indictment found or
> any affidavit made before a magistrate of
> any State or Territory, charging the person
> demanded with having committed treason,
> felony, or other crime, certified as
> authentic by the governor or chief magistrate
> of the State or Territory from whence the
> person so charged has fled, the executive
> authority of the State, District, or Territory
> to which such person has fled shall cause him
> to be arrested and secured, and notify the
> executive authority making such demand, or the
> agent of such authority appointed to receive
> the fugitive, and shall cause the fugitive
> to be delivered to such agent when he shall
> appear. If no such agent appears within
> thirty days from the time of the arrest,
> the prisoner may be discharged."

EXHIBIT 6-000067

- 67 -

The Supreme Court has accepted the fact of contemporaneous construction as establishing the validity of this legislation, Roberts v. Reilly, 116 U.S. 80 (1885). The courts have held that under this law, the executive of a territory has the same rights and duties as the governor of a state. Ex parte Krause, 228 F. 547 (D. Wash. 1915). The mechanics of extradition, both with states and with foreign powers, are controlled by 18 U.S.C. Sections 3183-3195, which also apply to territories. In 1934, Congress passed a law making it illegal to flee from one state to another to avoid prosecution in certain types of cases. 18 U.S.C. § 1073. This provision does not specifically include the territories, but the reviser noted that the words, "state, territory, or possession of the United States or the District of Columbia" were omitted only because of the definitive nature of Section 10 of this title; that section defines "interstate commerce" as including commerce between states, territories, possessions, or the District of Columbia. 18 U.S.C. § 10. This 1934 Act gives the federal courts the basis on which to issue a mandamus to compel the governor of one state to surrender a fugitive to another.

EXHIBIT 6-000068

SUMMARY - APPLICABILITY OF THE
UNITED STATES CONSTITUTION TO THE
MARIANAS

Provisions that only the U.S. proposes:

Article I, Section 9, Clause 6 - agree

Regulates commerce of ports & export duties

Article I, Section 9, Clause 8 - agree

Titles of Nobility

Article I, Section 10, Clause 1 - agree

No treaties, bills of credit, bills of attainder

Article I, Section 10, Clause 2 - do not accept

No export duties

Article I, Section 10, Clause 3 - agree

No troops, warships, interstate compacts

Article IV, Section 2, Clause 2 - agree

Extradition treaty between states

Article VI, Clause 2, - do not agree

Supremacy clause

Fourteenth Amendment, Section 5 - agree with reservation

Enforcement power of amendment
granted to Congress.

Provisions that only the Marianas propose:

Article IV, Section 2, clause 1-Insist on our separate placement

State privileges and immunities

# EXHIBIT 6-000069

- 2 -

Fifth Amendment - Do not agree to U.S.
           exclusion of grand jury indictments.

Seventh Amendment - Do not agree to U.S.
           exclusion of jury trials in non-criminal cases.

Twenty-Sixth Amendment - Insist on inclusion
           Eighteen-year-old vote.

EXHIBIT 6-000070

Applicability of the U.S. Constitution to the Marianas

Contents

Article I, Section 9, Clause 2 ...........................4
                        Clause 3 ........................5
                        Clause 5 .......................61
                        Clause 6 .......................43
                        Clause 8 .......................44

Article I, Section 10, Clause 1........................46
                        Clause 2........................52
                        Clause 3........................53

Article IV, Section 1....................................6
            Section 2, Clause 1.........................32
            Section 2, Clause 2.....................56,-66

Article VI, Clause 2....................................57

First Amendment..........................................7

Second Amendment........................................11

Third Amendment.........................................12

Fourth Amendment........................................12

Fifth Amendment.........................................33

Sixth Amendment.........................................14

Seventh Amendment.......................................40

Eighth Amendment........................................16

Ninth Amendment.........................................18

Eleventh Amendment......................................68

Thirteenth Amendment....................................18

Fourteenth Amendment, Section 1, Sentence 1.............61
                      Section 1, Sentence 2.............19
                      Section 1, Sentence 5.............59

Fifteenth Amendment.....................................30

Nineteenth Amendment....................................31

Twenty-Sixth Amendment..................................42