EXHIBIT 9-000001

**BRIEFING PAPER NO. 7**

**BILL OF RIGHTS**

EXHIBIT 9-000002

TABLE OF CONTENTS

Page

Introduction . . . . . . . . . . . . . . . . . . .   1

I.   BACKGROUND AND GENERAL CONSIDERATIONS . . . . . .   2

     A.   Applicable Provisions of the Covenant and
          the United States Constitution. . . . . . .   2

     B.   Basic Alternatives. . . . . . . . . . . . .   3

     C.   General Considerations. . . . . . . . . . .   5

II.  SPECIFIC ISSUES FOR DECISION. . . . . . . . . . .   9

     A.   Rights Secured by the United States
          Constitution Against the Northern
          Marianas Government . . . . . . . . . . . . .  10

          1.   Article I, section 10 (no bill of
               attainder or ex post facto law) . . . . . 10

          2.   Article IV, section 2 (privileges
               and immunities clause). . . . . . . . .  11

          3.   First Amendment (freedoms of
               religion, speech, press and
               assembly) . . . . . . . . . . . . . . .  12

               a)   Freedom of religion . . . . . . . .  12

               b)   Freedoms of speech, press
                    and assembly. . . . . . . . . . . .  16

          4.   Fourth Amendment (searches and
               seizures) . . . . . . . . . . . . . . .  20

               a)   Substantive Fourth Amendment
                    rights. . . . . . . . . . . . . . .  21

               b)   Procedural Fourth Amendment issues:
                    remedies for unlawful searches and
                    seizures. . . . . . . . . . . . . .  26

EXHIBIT 9-000003

Page

5.  Fifth and Sixth Amendments (rights
    of the accused in a criminal case). . . .   29

    a)  General personal rights . . . . . . .   30

    b)  Rights within the judicial
        process . . . . . . . . . . . . . . .   36

6.  Fourteenth Amendment (due process
    and equal protection) . . . . . . . . . .   42

    a)  Due process clause. . . . . . . . .   42

    b)  Equal protection clause . . . . . .   46

B.  Rights Secured by the United States
    Constitution But Not Applicable Against
    the Northern Marianas Government. . . . . .   50

1.  Second Amendment (right to bear
    arms) . . . . . . . . . . . . . . . . . .   50

2.  Third Amendment (quartering soldiers
    in homes) . . . . . . . . . . . . . . . .   53

3.  Fifth Amendment (indictment by
    grand jury) . . . . . . . . . . . . . . .   53

4.  Sixth Amendment (jury trial in
    criminal cases) . . . . . . . . . . . . .   56

5.  Seventh Amendment (jury trial in
    civil cases). . . . . . . . . . . . . . .   58

C.  Rights Not Recognized in the United States
    Constitution. . . . . . . . . . . . . . .   60

1.  Right to an education . . . . . . . . . .   60

2.  Right to a clean environment. . . . . .   62

3.  Right of popular participation in
    government. . . . . . . . . . . . . . . .   62

4.  Right to privacy. . . . . . . . . . . . .   63

EXHIBIT 9-000004

Page

5.  Right to organize and bargain
    collectively. . . . . . . . . . . . . .  65

6.  Prisoner's rights . . . . . . . . . . .  65

Conclusion . . . . . . . . . . . . . . . . . . . . . .  66

EXHIBIT 9-000005

## BILL OF RIGHTS

This briefing paper discusses the considerations relevant to the Convention's drafting of the bill of rights that is required by section 203 of the Covenant. The bill of rights will occupy an important place in the Commonwealth Constitution:

> A bill of rights lists the guarantees of freedom from governmental encroachment considered by constitution-makers to be of sufficient fundamental importance to warrant inclusion in the basic law of a state. All state constitutions contain such declarations and, with few exceptions, they are the lead articles in the documents. Their contents include: statements of basic political principles, a listing of substantive personal and property rights, the rights of persons accused of crime, and other procedural and miscellaneous guarantees. 1/

The first section of the briefing paper describes those provisions of the Covenant and of the United States Constitution that will affect the rights of the people of the Northern Marianas, the basic alternative approaches to drafting a bill of rights for the local Constitution, and the general considerations applicable to an assessment of these alternatives. Part II of this briefing paper contains a discussion of the specific issues for decision by the delegates, and includes extensive

---

1/ Council of State Governments, MODERNIZING STATE CONSTITUTIONS: 1966-1972 p. 18 (1973).

EXHIBIT 9-000006

- 2 -

discussion of the various rights secured by the federal Constitution because the basic issue before the Convention is whether to incorporate or expand the federal guarantees.

I.  BACKGROUND AND GENERAL CONSIDERATIONS

    A.  Applicable Provisions of the Covenant and the United States Constitution

        The Covenant specifies those portions of the United States Constitution that will apply in the Northern Marianas as if the new Commonwealth were a state. [2/] All of the federal bill of rights will be applicable in the Northern Marianas to protect the people against action by the federal government. Some but not all of the federal bill of rights will also be applicable against the Commonwealth government, to the same extent such rights are secured against state action.  In addition to the federal bill of rights, certain other guarantees of the United States Constitution will be applicable to protect the people against arbitrary actions of the federal and Commonwealth governments.

        A precise breakdown of the rights protected pursuant to the Covenant against the federal government, the Commonwealth government, and both governments, is provided in Appendix A.  The only provisions of the "federal" bill of rights

––––––––––––––––––

2/ COVENANT art. V, § 501(a).

EXHIBIT 9-000007

- 3 -

that are presently applicable to the states, but that are not applied to the Commonwealth government, are the rights to indictment by grand jury and trial by jury in criminal cases. These rights, however, may be secured against the Commonwealth government in the Commonwealth Constitution.

B. <u>Basic Alternatives</u>

A constitution of a state or commonwealth can only protect its people against abuses by the local government. The people are protected against the federal government by the United States Constitution. However, the Fourteenth Amendment to the United States Constitution also provides a federal guarantee of certain fundamental rights and liberties against state action. In recent decades, the Supreme Court has used the Fourteenth Amendment as a basis to extend the protection of most of the provisions of the federal bill of rights against the states. The Fourteenth Amendment applies to the Northern Marianas as if it were a state.

In drafting a bill of rights for the Northern Marianas, the delegates should start with the guarantees of the federal Constitution. With respect to each of those federal rights made applicable against the Commonwealth government under the Covenant, the delegates will have essentially four options. First, the Commonwealth Constitution can be silent, and the right involved will be secured in any event by the federal Constitution. Second, the Commonwealth Constitution

EXHIBIT 9-000008

- 4 -

can duplicate the language of the federal Constitution. Third, the Commonwealth Constitution can codify decisions of the United States Supreme Court interpreting the particular right in question. Finally, the Commonwealth Constitution can define the right more broadly than the federal Constitution. In this regard, the Commonwealth Constitution would be creating new rights for the people of the Northern Marianas in their dealings with the Commonwealth government.

With respect to each of the federal rights not made applicable against the Commonwealth government under the Covenant, the delegates have essentially the same alternatives. The consequences of constitutional silence or omission, however, will be different. In this case, omission will mean that the right is not secured against the Commonwealth government, either by the federal or by the Commonwealth Constitution. The delegates can also draft new language that is either more stringent or less restrictive than that of the federal Constitution.

Finally, the delegates may wish to consider whether the Commonwealth Constitution should create or recognize rights that are not guaranteed by the federal Constitution. These can range from the right to a free and public education to the right of collective bargaining.

EXHIBIT 9-000009

- 5 -

C. <u>General Considerations</u>

In assessing the alternatives outlined above, the delegates should weigh the following general considerations.

Ideally, the Commonwealth Constitution should be a comprehensive document. It should, therefore, set forth all of the basic rights of the Northern Marianas people in relation to their government. Such provisions are considered funda- mental to all constitutions. Accordingly, the delegates may wish the Commonwealth Constitution to expressly address all of the federal guarantees that apply to the Commonwealth government pursuant to the Covenant, even though such rights would be secured regardless of their inclusion in the Common- wealth bill of rights. Most state constitutions do contain a bill of rights that overlaps extensively with that of the federal Constitution.

In deciding how to provide such overlapping protec- tion in the Commonwealth Constitution, the delegates must consider whether their goal is to guarantee the same substan- tive right as the federal Constitution or to provide for a different sort of protection.[3/] Duplication of the precise language used in the federal Constitution would provide for the greatest uniformity and harmony between the Commonwealth

---

[3/] If the right in question is one that applies against the Commonwealth government under the Covenant, the delegates' only alternative to uniformity is greater stringency.

EXHIBIT 9-000010

- 6 -

and the federal court systems in applying and enforcing the substantive right.  Even with duplication, however, the Commonwealth courts would be free, based upon special local conditions, to interpret a duplicate provision of the Commonwealth Constitution as conferring a broader right than that granted under the U.S. Constitution.

Using different language, however, would be an open invitation for local courts to reach different results, with the potential for confusion and conflict with the federal system.  If, however, the delegates wish to assure broader protection than that conferred in the U.S. Constitution, there is no alternative but to depart from the language of the federal bill of rights.

If the delegates do not wish to confer broader protection than the U.S. Constitution, but also do not wish to duplicate the language of the federal bill of rights, the alternative of codification is available.  Codification involves the adoption, in the Constitution, of language from U.S. Supreme Court or other decisions interpreting and applying the provisions of the federal bill of rights.  The codified language is more precise than the general language of the U.S. Constitution.  Furthermore, there is no risk of conflict with the federal Constitution as long as the court decision codified remains the law.

EXHIBIT 9-000011

- 7 -

The difficulty with this approach is that decisions of the Supreme Court are overruled from time to time. If this happens, the codification in the Commonwealth Constitution would become either stricter than the new standard or fall short of the new standard. In the latter case, the codification may be held to violate the federal Constitution and be struck down by the courts.

Of course, in fashioning rights that are not applied by the Covenant, there is less potential for conflict with the U.S. Constitution, and the delegates can exercise greater flexibility in drafting the provisions creating such rights. The delegates should keep in mind, however, that there are relatively few injustices that cannot be remedied under the broad protection afforded by a "due process" clause or under the guarantee of equal protection of the laws. Furthermore, unless intended to be mere statements of policy, any new rights recognized in the Commonwealth Constitution will be enforceable in the courts and could be used or misused to create unanticipated problems for the new Commonwealth. [4]/

Finally, with respect to broad statements of policy in the Commonwealth bill of rights, the delegates should recognize that such provisions can lead to confusion on the

---

[4]/ For example, an absolute "right" to a clean environment could result in extensive environmental litigation placing the courts, not the legislature, in control of the future economic development of the Northern Marianas.

EXHIBIT 9-000012

- 8 -

part of courts charged with the duty to interpret and apply the Constitution.  A court may attempt to enforce what was only intended as a policy statement.  Alternatively, the presence of such statements in the Constitution may lead a court to interpret other provisions, which are intended by the delegates to be judicially enforceable, as mere statements of policy.  Perhaps for this reason, commentators have urged the exclusion of broad policy statements from modern state constitutions.[5]

On the other hand, the delegates may view statements of broad policy as a necessary element of a bill of rights, serving as a fundamental repository of the people's view of the role of their government.  As one observer has noted, "Certainly it is not inappropriate to restate the basic principles upon which the government of a state is founded."[6]

The Puerto Rican constitution exemplifies state charters that have translated this view of broad policy statements into provisions of a bill of rights.  The Puerto Rican bill of rights begins with the assertion that "[t]he

---

5/  For an example of a constitution excluding broad policy statements, see National Municipal League, MODEL STATE CONSTITUTION (6th rev. ed. 1968) [hereinafter cited as MODEL CONST.].

6/  Rankin, The Bill of Rights, in MAJOR PROBLEMS IN STATE CONSTITUTIONAL REVISION p. 161 (W. Graves ed. 1960).

EXHIBIT 9-000013

- 9 -

dignity of the human being is inviolable."[7]    It goes on to
provide that, "[e]very person has the right to the protection
of the law against abusive attacks on his honor, reputation
and private or family life."[8]

II.  SPECIFIC ISSUES FOR DECISION

          This part is divided into three sections.  The first
section concerns those rights secured by the U.S. Constitution
against the Commonwealth government pursuant to the Covenant.
The second section deals with those "federal" rights not
applied by the Covenant against the Commonwealth government.
The last section briefly addresses rights that are not found
in the U.S. Constitution, but which have been included or
considered for inclusion in state constitutions.

          As discussed in part I, the delegates have four
options in dealing with specific "federal" rights made appli-
cable against the Commonwealth government by the Covenant:
omission, duplication, codification of judicial interpreta-
tion, and expansion of the right through new language.  In
dealing with "federal" rights not made applicable by the
Covenant, the delegates also have four options: silence;
duplication; codification; and expansion or contraction

_____

7/  P.R. CONST. art. II, § 1.

8/  P.R. CONST. art. II, § 8.

EXHIBIT 9-000014

- 10 -

of the right through new language. Finally, with respect to rights not recognized in the federal Constitution, the delegates have virtually complete freedom to secure such rights, provided they do not conflict with applicable provisions of the U.S. Constitution or with the Covenant.

### A. Rights Secured by the United States Constitution Against the Northern Marianas Government 9/

#### 1. Article I, section 10 (no bill of attainder or ex post facto law)

Article I, section 10 of the U.S. Constitution provides, in relevant part, "No State shall . . . pass any Bill of Attainder [or] ex post facto Law."  A bill of attainder is an act by the legislature finding a person guilty and imposing punishment without affording him a judicial trial. An ex post facto law is a statute passed after the commission of an act declaring that act a criminal offense.

This provision does not in general limit the power of the Commonwealth to determine what is a criminal offense under the laws of the Northern Mariana Islands.  Rather, the clause only regulates "the manner in which the [Commonwealth] may enforce [its] penal Code." 10/

---

9/ Under article V, § 501(a) of the Covenant, the Fifteenth, Nineteenth and Twenty-sixth Amendments to the U.S. Constitution are applicable against the Commonwealth government. These amendments bar the denial or abridgement of the right to vote on account of race, color, previous servitude, sex and age, if the prospective voter is at least 18 years old. The qualifications of voters are discussed in BRIEFING PAPER NO. 8:  ELIGIBILITY TO VOTE AND ELECTION PROCEDURES § II(A).

10/ Rochin v. California, 342 U.S. 165, 168 (1952).

EXHIBIT 9-000015

- 11 -

Although some state constitutions specifically prohibit bills of attainder[11]/ or ex post facto laws[12]/ or both,[13]/ the Northern Marianas people will be fully protected against these unfair legislative practices even if the Commonwealth Constitution remains silent. Emphasis of the delegates' antipathy towards such laws, however, would be achieved by duplicating the federal provision.

    2. <u>Article IV, section 2 (privileges and immunities clause)</u>

Article IV, section 2 guarantees that "[t]he Citizens of each state shall be entitled to all Privileges and Immunities of Citizens in the several States." This provision forbids the Commonwealth from discriminating against United States citizens who are not citizens of the Northern Marianas when no substantial reason other than non-Northern Marianas citizenship exists. "But [the provision] does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for

_____

11/ <u>E.g.</u>, ALAS. CONST. art. I, § 15; ARIZ. CONST. art. II, § 25; MICH. CONST. art. II, § 9.

12/ <u>E.g.</u>, ALA. CONST. art. I, § 22; COLO. CONST. art. II, § 11; WASH. CONST. art. I, § 23.

13/ <u>E.g.</u>, ARIZ. CONST. art. II, § 25; CAL. CONST. art. I, § 16; IDAHO CONST. art. I, § 16.

EXHIBIT 9-000016

- 12 -

it." [14/]    The provision extends only to rights that United

States citizens have always enjoyed.  These include, for

example, protection by the government of personal safety

and property. [15/]

        This type of clause, therefore, is not designed to

protect the rights of Northern Marianas citizens in their

dealings with the Commonwealth government.  Only if the Con-

vention desires to reiterate the protection that non-Northern

Marianas citizens will receive from the clause should it be

duplicated in the Commonwealth Constitution.  A great many

states constitutionally provide that no citizen or class of

citizens may be granted privileges and immunities that are

not granted to all citizens. [16/]

        3.  Freedom of religion, speech,
            press and assembly)

            a)  Freedom of religion

        The First Amendment provides, in relevant part,

_____

14/  Toomer v. Witsell, 334 U.S. 385, 396 (1948).  It should
be noted that under article VIII, § 805(a) of the Covenant,
the Commonwealth government must for the 25-year period fol-
lowing termination of the Trusteeship Agreement, and may
thereafter, prevent persons not of Marianas descent from
acquiring permanent and long-term interests in land.  For
a discussion of this issue, see BRIEFING PAPER NO. 12:
RESTRICTIONS ON LAND ALIENATION § II(E).

15/  See Slaughter-House Cases, 83 U.S. 36, 76 (1873).  Although
in this case the Court construed the privileges and immunities
clause of the Fourteenth Amendment rather than that of Article
IV, it observed, "There can be but little question that the
purpose of both these provisions is the same, and that the
privileges and immunities intended are the same in each."
Id. at 75.

16/  E.g., ARIZ. CONST. art. II, § 13; ARK. CONST. art. II,
§ 18; CAL. CONST. art. I, § 21; CONN. CONST. art. I, § 1;
IND. CONST. art. I, § 23; IOWA CONST. art. I, § 6.

EXHIBIT 9-000017

- 13 -

that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." This clause suggests two principal areas for the delegates' consideration: the separation of church and state and the free exercise of religion.

      i) <u>Separation of church and state</u>. The Supreme Court has held that the First Amendment decrees that a state may not "aid" religion.[17]  While the basic premise of separation of church and state is well accepted, it is often hard to determine what constitutes "aid" to religion.

      State regulation of religious practices, such as requiring prayers in classrooms, has been invalidated by the Supreme Court.[18]  Forms of "neutral aid," however, notably Sunday closing laws[19] and programs directly benefiting children, have been upheld.[20]  The crucial considerations appear to be the government's purpose and the existence, or the lack, of governmental coercion. The Supreme Court's latest decision in the area of aid to religion is <u>Roemer v.</u>

---

17/ <u>Sherbert v. Verner</u>, 374 U.S. 398 (1963).

18/ <u>Engel v. Vitale</u>, 370 U.S. 421 (1962).

19/ <u>McGowan v. Maryland</u>, 366 U.S. 420 (1961) (Maryland statute prohibiting the sale of most retail merchandise on Sunday upheld).

20/ <u>Board of Educ. v. Allen</u>, 392 U.S. 236 (1968) (New York statute authorizing public schools to loan textbooks to parochial school students free of charge held constitutional).

EXHIBIT 9-000018

- 14 -

21/
Board of Public Works. In that case, the Court upheld
grants to religious schools for "non-sectarian," i.e., neutral
purposes, because the "primary effect" was not to aid reli-
gion.

Since the concept of aid to religion is unclear and
evolving, codification of current court decisions may freeze
into the Constitution analyses that may become outmoded.
Duplication would not create such a problem. Local courts
would be free to attempt to devise their own balance of
22/
interests in the cases coming before them, provided that
the balance struck did not contravene the minimum separation
23/
between church and state required by the Supreme Court.

A rule of absolute separation of church and state
might eliminate the need to balance interests. Such a rule,

---

21/ 96 S. Ct. 2337 (1976). See BRIEFING PAPER NO. 13: EDUCA-
TION § II(G).

22/ The words "balance" and "balancing" appear throughout
this briefing paper. They refer to a process by which a
court may decide whether an activity violates the Constitu-
tion. The court first identifies the various interests in
allowing and those in forbidding the activity. Then the
court "balances" -- or compares -- the importance of those
interests. From this balancing emerges a conclusion as to
the constitutionality of the activity in question.

23/ Most states have duplicated the federal provision.
Among these are Hawaii and Alaska. HAWAII CONST. art. I,
§ 3; ALAS. CONST. art. II, § 5. No states have codified a
Supreme Court decision interpreting the concept of aid to
religion.

EXHIBIT 9-000019

- 15 -

however, might create more difficulty than it would eliminate. The experience of Wisconsin is instructive. The Wisconsin constitution originally provided that the state would make "absolutely" no religious expenditures. The Wisconsin convention, however, had to except state national guard chaplains from the absolute provision.[24/] This seems to point out the obvious shortcoming of an absolute rule: it usually must be accompanied by exceptions.

ii) Free exercise of religion. The First Amendment also provides that Congress shall make no law prohibiting the free exercise of religion. The Supreme Court has interpreted this to mean that while religious belief is absolutely protected from governmental interference,[25/] religious conduct is limited insofar as it interferes with the social order or the rights of others.[26/]

Codifying these Supreme Court decisions would emphasize the limits of religious freedom. On the other hand,

---

24/ WIS. CONST. art. I, § 18.

25/ Torcaso v. Watkins, 367 U.S. 488 (1961) (Maryland constitutional provision imposing a declaration of belief in God as a qualification for public office held unconstitutional).

26/ Reynolds v. United States, 98 U.S. 145 (1878) (defendant's religious beliefs held not a defense to bigamy prosecution). See also Prince v. Massachusetts, 321 U.S. 158 (1944) (A Massachusetts statute declared unlawful an adult's furnishing merchandise to a minor for sale on a street; defendant was convicted of providing religious literature to her minor ward for such sale. The Supreme Court ruled that the statute was not violative of defendant's First Amendment freedom of religion).

EXHIBIT 9-000020

- 16 -

since the Court has stuck a delicate balance in this area, the delegates may wish to duplicate the First Amendment so as to take advantage of the Supreme Court's future adjustments of that balance. In addition, duplication offers the virtue of conciseness. Forty states have duplicated the federal provision.[27/]

b) <u>Freedoms of speech, press and assembly</u>

The First Amendment also guarantees that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Discussion of every ramification of the freedoms of speech, press and assembly is beyond the scope of this briefing paper. Instead, the paper discusses two issues of possible importance in drafting a bill of rights. First, the paper considers the degree to which the First Amendment protects "pure" -- or verbal -- speech. Second, the paper explores the distinction between speech and conduct.

i) <u>Protection of "pure" speech</u>. How much protection from governmental interference speech does or should receive is a possible issue for the delegates' consideration. What can an author write without being censored?

---

27/ <u>E.g.</u>, ALAS. CONST. art. I, § 4; LA. CONST. art. I, § 4; MASS. CONST. amend. XLVI, § 1.

EXHIBIT 9-000021

- 17 -

What can a speaker say or where can he speak without being arrested?  What can a newspaper print without being penalized?

The answers to these questions depend on the extent to which the First Amendment protects each form of expression. Supreme Court decisions have, in general, accorded great but not complete protection to speech.[28/]  The Court's approach has involved balancing the interest in social order with the necessity of protecting the interchange of ideas, with speech occupying a "preferred position."[29/]  The Court has also held certain categories of speech to be unprotected.  The most important of these is obscenity.[30/]

Both duplication and codification would preserve the balance between the interest in protecting speech and the interest in social order.  Codification would expressly recognize that freedom of speech is not absolute, but must at times be subordinated to other interests in order to avoid social disruption.[31/]

---

28/  See Brandenburg v. Ohio, 395 U.S. 444 (1969).

29/  Kovacs v. Cooper, 336 U.S. 77, 88 (1949).  It should be noted that in his plurality opinion, Justice Reed found that this "preferred position" did not prevent a municipality from banning amplified statements from sound trucks on public streets.

30/  Roth v. United States, 354 U.S. 476 (1957).

31/  The majority of states has codified along the lines of the Michigan constitution, which provides:

Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of that right . . . .

MICH. CONST. art. I, § 5.  See also MD. CONST. Declaration of Rights art. 40; CAL. CONST. art. I, § 9.

EXHIBIT 9-000022

- 18 -

Rather than accepting the balancing approach, the delegates may favor a more definitive approach, prohibiting "absolutely" any abridgement of the right to free speech. An absolute approach would be appropriate if the delegates believe that speech alone can never be dangerous enough to upset the social order. In this view, the interchange of ideas must be completely free in order to avoid the danger of governmental control of speech.[32/] The same considerations would apply to freedom of expression in the area of obscenity.[33/] On the other hand, an absolute provision

---

[32/] Justice Black eloquently argued for the absolute protection of speech in the "Pentagon Papers" case, New York Times Co. v. United States, 403 U.S. 713, 714-20 (1971), and in Feiner v. New York, 340 U.S. 315, 321-29 (1951).

[33/] See Justice Brennan's dissenting opinion in Paris Adult Theatre I v. Slaton, 413 U.S. 49 (1973), in which he observed:

> [W]hile I cannot say that the interests of the State -- apart from the question of juveniles and unconsenting adults -- are trivial or non-existent, I am compelled to conclude that these interests cannot justify the substantial damage to constitutional rights and to this Nation's judicial machinery that inevitably results from state efforts to bar the distribution even of unprotected material to consenting adults.

West Virginia is the only state that deals with obscenity in its constitution, which specifically prohibits pornographic material. W. VA. CONST. art. III, § 7.

EXHIBIT 9-000023

- 19 -

could be interpreted as prohibiting any reasonable restric-
tions upon the time, place and manner of speech.[34/]

      ii)  <u>The distinction between speech and
conduct</u>.  Although conduct can be as communicative as words,
the Supreme Court has distinguished verbal speech from com-
municative conduct.  Conduct is usually given less protection
than pure speech, with the Court reasoning that communicative
behavior such as flag burning[35/] may exert more harmful effects
than pure speech, such as a political address.

      The delegates may determine that it is illogical
to give verbal communication special protection just because
it involves words.  As one respected commentator has observed:

_____

34/  This fear was suggested by Justice Frankfurter in his
concurrence in <u>Kovacs v. Cooper</u>, 336 U.S. 77, 96-97 (1949).

      In addition, the absolute protection of speech -- or
that of its close analogue, the press -- could result in the
denial of other constitutional rights.  The unhindered privi-
lege to report any and all details of a criminal case -- such
as the shocking details of a crime and the sordid past and
incriminating statements of the suspected criminal -- might
prevent the selection of an impartial jury.  This, in turn,
would violate the defendant's right to a fair trial should
the Constitution provide for jury trials.  For a thorough
consideration of the tension between the First and Sixth
Amendments, <u>see</u> <u>Nebraska Press Ass'n v. Stuart</u>, 96 S. Ct.
2791 (1976).  In that case, the Supreme Court characterized
"gag orders" -- restraints on news reports in advance of
their publication -- as "the least tolerable infringements
on First Amendment rights."  <u>Id</u>. at 2802.  Instead of prior
restraints, the Court suggested the use of less restrictive
alternatives in mediating between the rights to free press
and fair trial.  These alternatives include postponement of
the trial, sequestration of juries, and restrictions on the
dissemination of information by attorneys, police and wit-
nesses.  <u>Id</u>. at 2805.

35/  <u>See</u> <u>Street v. New York</u>, 394 U.S. 576 (1969).

EXHIBIT 9-000024

- 20 -

A constitutional distinction
between speech and nonspeech has no
content.  A constitutional distinction
between speech and conduct is spurious.
Speech is conduct, and actions speak.
There is nothing intrinsically sacred
about wagging the tongue or wielding
a pen; there is nothing intrinsically
more sacred about words than other
symbols.

[I]t would be surprising if those
who poured tea into the sea and who
refused to buy stamps did not recognize
that ideas are communicated, disagree-
ments expressed, protests made other
than by word of mouth or pen . . . .
The meaningful constitutional distinc-
tion is not between speech and conduct,
but between conduct that speaks, communi-
cates, and other kinds of conduct.36/

If, however, the Convention believes that acts that

are harmful to society cannot effectively be prevented or con-

trolled unless verbal and non-verbal communications are distin-

guished,37/ the Constitution should not attempt to formulate

new language in this area.

### 4. Fourth Amendment (searches and seizures)

The Fourth Amendment guarantees that

The right of the people to be secure in
their persons, houses, papers, and effects,
against unreasonable searches and seizures,
shall not be violated, and no Warrants
shall issue, but upon probable cause,
supported by Oath or affirmation, and

---

36/ Henkin, On Drawing Lines, 82 HARV. L. REV. p. 63, at 79-80
(1968).

37/ See Tinker v. Des Moines School Dist., 393 U.S. 503, 517
(1969) (Black, J., dissenting):

While I have always believed that under the
First and Fourteenth Amendments neither the
states nor the Federal Government has any
authority to regulate or censor the content of
speech, I have never believed that any person
has a right to give speeches or engage in de-
monstrations where he pleases and when he
pleases.

EXHIBIT 9-000025

- 21 -

particularly describing the place to
be searched, and the persons or things
to be seized.

All states have some guarantee against illegal
searches and seizures; most duplicate the Fourth Amendment.[38]
This subsection discusses (a) the major substantive aspects
of the search and seizure guarantee and (b) the judicial
administration of the Amendment.

      a)  <u>Substantive Fourth Amendment rights</u>

Two major problems arise with respect to substan-
tive protection against illegal search and seizure: (1) the
degree to which wiretapping is prohibited; and (2) the
degree of probable cause[39] required in order for the
police to intrude on the citizen.

      i)  <u>Wiretapping</u>.  Since the Fourth Amend-
ment was drafted before the electronic age, wiretapping was
not a consideration when the Amendment was ratified.[40]  The
Supreme Court has held that wiretapping is a search and
seizure that is subject to the same probable cause require-
ments as a "normal" search.[41]  Thus, before federal or state

---

38/ <u>E.g.</u>, ALAS. CONST. art. I, § 14; HAWAII CONST. art. I,
§ 5; ILL. CONST. art. I, § 6; MONT. CONST. art. II, § 11;
N.J. CONST. art. I, § 7.

39/ "Probable cause" is defined below at p. 23.

40/ In an early case the Supreme Court held that since wire-
tapping was not a trespass in the traditional sense it was
not covered by the Fourth Amendment. <u>Olmstead v. United
States</u>, 277 U.S. 438 (1928). The Court has since rejected
this view. <u>Katz v. United States</u>, 389 U.S. 347 (1967).

41/ <u>Katz v. United States</u>, 389 U.S. 347 (1967).

EXHIBIT 9-000026

- 22 -

authorities may legally utilize electronic surveillance,
they must usually obtain a warrant based upon probable
cause.[42/]

    The delegates may wish to consider whether to
impose greater restraints on wiretapping by the Commonwealth
government than those prescribed by the Supreme Court.  Some
state constitutions, for example, explicitly prohibit wire-
tapping.[43/]  Alternatively, the Convention could choose to
require a greater showing than mere "probable cause" before
a warrant to wiretap may issue.  Because the victim of a
wiretap may never learn of the intrusion, it has been argued
that the capacity of investigative technology to circumvent
personal rights so easily requires an absolute prohibition
of wiretapping.[44/]

    On the other hand, wiretapping may be regarded as
a legitimate police practice that can be controlled by con-
ventional warrant requirements.[45/]  Just as the means of

---

42/  The Omnibus Crime Control and Safe Streets Act of 1968
permits warrantless interceptions in certain emergency situa-
tions.  An application for an interception order must be
filed with the appropriate court within 48 hours of the start
of the interception.  18 U.S.C. § 2518(7) (1970).

43/  E.g., P.R. CONST. art. II, § 10.  Some states ban wire-
tapping by statute.  E.g., MD. ANN. CODE art. 27, § 585
(1976).

44/  Amsterdam, Perspectives on the Fourth Amendment,
58 MINN. L. REV. p. 349 (1974).

45/  See Berger v. New York, 388 U.S. 41 (1967).  Justice
White's opinion pointed out that a general wiretap over time
is no different from a general search over space; the inva-
sions of privacy are the same.

EXHIBIT 9-000027

- 23 -

criminals have grown in sophistication, so must the police have access to modern electronic technology in combatting crime.  To deprive the police of a modern means of investigation forces them to battle sophisticated criminal activity with outmoded methods.

      ii) <u>Intrusions upon less than probable cause</u>.  "Probable cause" is the existence of substantial proof that the objects for which a search is being conducted are related to the commission of a crime and that those objects will be discovered in the area where the search is to occur.[46/]

      The Supreme Court currently uses a balancing approach to determine whether probable cause or a lesser degree of proof is required for a search.  The Court's attitude appears to be that the lesser the intrusion, the lesser the probable cause requirement.  Thus, a showing of probable cause is required for issuance of a warrant to search a home.[47/]  In contrast, without even obtaining a warrant, the police may "stop and frisk" an individual on "reasonable suspicion," a standard requiring less proof than

---

46/  <u>Aguilar v. Texas</u>, 378 U.S. 108, 111 (1964).

47/  <u>United States v. Ventresca</u>, 380 U.S. 102 (1965).

EXHIBIT 9-000028

- 24 -

48/
probable cause.

The police may also employ area-wide warrants
for administrative searches.  In the case of an inspection
to enforce a housing, fire, safety or health code, the
Supreme Court does not require a showing that there is
probable cause to believe that there are code violations
in the particular building that is under inspection.⁴⁹/

Rather,

> "probable cause" to issue a warrant to
> inspect must exist if reasonable legisla-
> tive or administrative standards for con-
> ducting an area inspection are satisfied
> with respect to a particular dwelling.
> Such standards, which will vary with the
> municipal program being enforced, may be
> based upon the passage of time, the nature
> of the building (e.g., a multi-family
> apartment house), or the condition of the
> entire area, but they will not necessarily
> depend upon specific knowledge of the
> condition of the particular dwelling. 50/

---

48/  Terry v. Ohio, 392 U.S. 1 (1968).  In Terry the Supreme
Court defined a "frisk" as a police officer's search of a
suspect's outer clothing for weapons that the officer be-
lieves could be used to assault him.  Before he conducts
a "frisk," the officer must observe "unusual conduct which
leads him reasonably to conclude [that] criminal activity
may be afoot," and that the suspect presents a danger to
him.  In addition, the officer must identify himself as a
member of the police.  Id. at 30.

49/  Camara v. Municipal Court, 387 U.S. 523 (1967) (defendant
refused to permit city inspectors to conduct a housing code
inspection of his business premises without a search warrant).

50/  Id. at 538.  The Supreme Court applied the Camara
standard of probable cause to administrative searches of
residences in See v. City of Seattle, 387 U.S. 541 (1967).

EXHIBIT 9-000029

- 25 -

The delegates may regard the Supreme Court's acceptance of the less-than-probable cause requirement in "stop and frisk" and administrative search cases as providing inadequate protection for the people of the Northern Marianas. On the other hand, the delegates may conclude that requiring the same degree of proof for all searches might unduly impede the police.  As the Supreme Court has observed,

> When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm. 51/

If the Convention wishes to adopt graduated standards of probable cause, it may duplicate the Fourth Amendment or codify the Supreme Court's decisions in this regard. Alternatively, the Constitution may subject all searches to the same standard of probable cause or provide that certain searches may be conducted only if a warrant has been issued by a judicial officer.  A number of state constitutions explicitly provide that search warrants may issue only when based upon probable cause. 52/

---

51/  Terry v. Ohio, 392 U.S. 1, 24 (1968).

52/  E.g., ALAS. CONST. art. I, § 14; ARK. CONST. art. II, § 15; CAL. CONST. art. I, § 19; MICH. CONST. art. I, § 11; MONT. CONST. art. II, § 11.

EXHIBIT 9-000030

- 26 -

b)  Procedural Fourth Amendment issues:
    remedies for unlawful searches and
    seizures

The delegates must decide what constitutional protections, if any, the Commonwealth Constitution will afford the victims of an illegal search or seizure. The only meaningful remedy available in the courts has been the exclusionary rule.[53/] That rule prevents the introduction of illegally seized evidence at a criminal trial of the victim of such a seizure. As currently applied by the United States Supreme Court, it may not be invoked by a defendant to exclude evidence unlawfully seized from another person or from premises that the defendant does not own or in which he has no proprietary interest.[54/] In addition, the rule does not apply to evidence presented before grand juries.[55/]

---

53/  Mapp v. Ohio, 367 U.S. 643 (1961).

54/  Jones v. United States, 362 U.S. 257, 261 (1960) (to object to introduction of illegally seized evidence, movant must have been "one against whom the search was directed"); Simmons v. United States, 390 U.S. 377 (1968) (defendant's legitimate presence on premises during search of those premises gave him standing to object to admission of evidence seized, despite defendant's lack of possessory interest in the premises).

55/  See United States v. Blue, 384 U.S. 251, 255 n.1 (1966):

> It does not seem to be contended that
> tainted evidence was presented to the
> grand jury; but in any event our prece-
> dents indicate this would not be a basis
> for abating the prosecution pending a new
> indictment, let alone barring it altogether
> . . . .;

[footnote continued on next page]

EXHIBIT 9-000031

- 27 -

The exclusionary rule may be necessary to give meaning to the Fourth Amendment:[56/] without the rule, the Amendment might very well confer a right without providing a remedy. The only way to deter unconstitutional police conduct and preserve the integrity of the courts may be to exclude the evidence illegally obtained. The exclusionary rule does not merely protect criminals. It protects all citizens against the threat of unreasonable governmental intrusions.

Recent decisions of the Supreme Court, however, have suggested that the exclusionary rule may soon be abandoned altogether.[57/] It has been argued that the rule is not an effective deterrent and that it merely impedes law enforcement by keeping probative evidence from the courts

------------------

[footnote continued from preceding page]

Costello v. United States, 350 U.S. 359, 362 (1956) ("[N]either the Fifth Amendment nor any other constitutional provision prescribes the kind of evidence upon which grand juries must act"). Although these cases concerned evidence obtained in violation of the Fifth Amendment, it seems settled that the exclusionary rule likewise does not prevent the grand jury from considering evidence procured against the dictates of the Fourth Amendment. See United States v. Schipani, 315 F. Supp. 253, 257 (E.D.N.Y.), aff'd, 435 F.2d 26 (2d Cir. 1970), cert. denied, 401 U.S. 983 (1971).

It should be noted that the delegates need not consider whether illegally obtained evidence should be admissible in grand jury proceedings if the Convention decides not to provide for the use of grand juries themselves.

56/ Mapp v. Ohio, 387 U.S. 643 (1961).

57/ Bivens v. Six Unknown Named Agents of the Fed. Bureau of Investigation, 403 U.S. 388, 415 (1971) (Burger, C.J., dissenting).

EXHIBIT 9-000032

- 28 -

and allowing the guilty to go free.[58/]

By duplicating the Fourth Amendment in the Common-
wealth Constitution, the delegates would permit the Common-
wealth courts and the legislature to explore more effective
remedies for violations of the Fourth Amendment while main-
taining the exclusionary rule until its abandonment by the
Supreme Court. If, however, the delegates feel strongly that
the exclusionary rule is essential, they can preserve the
rule against the vagaries of future Supreme Court decisions
by expressly adopting the rule in the Commonwealth Constitution.
Only a few state constitutions explicitly provide for the
exclusionary rule.[59/] Such a constitutional provision could
go beyond the federal exclusionary rule by specifying that
any litigant could challenge the admissibility of illegally
seized evidence and that such evidence may not be intro-
duced before grand juries (if grand juries are used in local
cases).

A completely different approach would be to pro-
vide constitutionally that any victim of an illegal search or

---

58/ Chief Justice Burger has been a most vocal critic of
the exclusionary rule. Dissenting in Bivens v. Six Unknown
Named Agents of the Fed. Bureau of Investigation, 403 U.S.
388, 415 (1971), the Chief Justice declared:

> Although I would hesitate to abandon [the
> exclusionary rule] until some meaningful
> substitute is developed, the history of
> the suppression doctrine demonstrates that
> it is both conceptually sterile and prac-
> tically ineffective in [deterring illegal
> searches and seizures].

59/ E.g., FLA. CONST. art. I, § 12.

EXHIBIT 9-000033

- 29 -

seizure may sue the Commonwealth government for money damages, including punitive damages.[60] Such a provision would guarantee to all citizens a remedy for such official lawlessness. Of course, even if the Constitution did not provide this right, the legislature would be free to grant it by statute. If the delegates feel that such a remedy is fundamental to protect the rights of the Northern Marianas people, however, they may not wish to leave the matter to legislative discretion.

    5. <u>Fifth and Sixth Amendments (rights of the accused in a criminal case)</u>

      The Fifth and Sixth Amendments have been the prime sources of protection for those accused of crime. The rights of the accused within the criminal justice system have traditionally been at the heart of a bill of rights. Thus, the Convention's opportunity to provide greater protections than those conferred by the United States Constitution is more significant in this area than in most.

      This section is divided into discussions of the general rights of the person and of his rights within the criminal justice system.

---

60/ This type of alternative or supplemental remedy has been recognized in the federal courts. In <u>Bivens v. Six Unknown Named Agents of the Fed. Bureau of Investigation</u>, 403 U.S. 388 (1971), for example, the Supreme Court held that there is a federal cause of action for damages consequent to a search or seizure by a federal officer in violation of the Fourth Amendment.

EXHIBIT 9-000034

- 30 -

a) <u>General personal rights</u>

i) <u>The privilege against self-incrimina-</u>

<u>tion</u>. The Fifth Amendment declares that "No person shall

. . . be compelled in any criminal case to be a witness

against himself . . . ." The privilege against self-incrimina-

tion is crucial to the American concept of justice. As the

Supreme Court has observed,

> [O]ur accusatory system of criminal
> justice demands that the government seeking
> to punish an individual produce the evi-
> dence against him by its own independent
> labors, rather than by the cruel, simple
> expedient of compelling it from his own
> mouth. 61/

As the Supreme Court noted in <u>Miranda v. Arizona</u>,

the privilege protects the individual from compelled self-

incrimination whenever his "freedom is curtailed in any sig-

nificant way." 62/   In <u>Miranda</u>  the Court held that the

_____

61/  <u>Miranda v. Arizona</u>, 384 U.S. 436, 460 (1960).

The cases have emphasized that the privilege extends only
to "individual disclosure of a 'testimonial or communicative
nature.'" <u>United States v. Nobles</u>, 422 U.S. 225, 233 (1975),
<u>citing</u> <u>Schmerber v. California</u>, 384 U.S. 757, 761 (1966).
Thus, it prevents the government from compelling production
of personal papers and effects, <u>Bellis v. United States</u>, 417
U.S. 85 (1974), from compelling answers to incriminating ques-
tions in a collateral proceeding if such answers may be used
in a subsequent prosecution, <u>Lefkowitz v. Turley</u>, 414 U.S.
70 (1973), and from commenting at trial on the failure of the
accused to testify, <u>Chapman v. California</u>, 386 U.S. 18 (1967).

It does not prevent compelled blood tests if reasonably
performed, <u>Breithaupt v. Abram</u>, 352 U.S. 432 (1957), compelled
handwriting exemplars, <u>Gilbert v. California</u>, 388 U.S.
263 (1967), compelled lineup participation, <u>United States
v. Wade</u>, 388 U.S. 218 (1969), or compelled speaking for iden-
tification only.  <u>Id</u>.

62/  384 U.S. 436, 467 (1966).

EXHIBIT 9-000035

- 31 -

interrogation of a person while he is in police custody trans-
gresses his privilege against self-incrimination unless he
is informed of his right to remain silent, is warned that
anything he says may be used against him, and is advised that
he may have an attorney present during questioning.[63]   Although
the privilege may be waived, no waiver is effective unless
"specifically made after the [Miranda] warnings . . . have
been given."[64]   Recent Supreme Court decisions, however, in-
dicate a retreat from Miranda,[65]   and lower courts tradi-
tionally have been reluctant to apply Miranda to exclude evi-
dence when the alleged self-incriminating communication appears
voluntary.

    If the Commonwealth Constitution remains silent[66]
as to the privilege against self-incrimination, the courts
of the Northern Marianas will apply the privilege as it is
interpreted by the U.S. Supreme Court.  If the Commonwealth
Constitution duplicates the text of the Fifth Amendment, a
similar result is likely.  Thus, silence or duplication would
rest the Fifth Amendment privilege on a body of federal law
that is in flux, with the result that the reach of the privi-
lege in the future would be subject to evolving standards.

---

63/  Id. at 478-79.

64/  Id. at 469-70.

65/  Michigan v. Tucker, 417 U.S. 433 (1974), holding
that the warnings prescribed in Miranda are merely prophylac-
tic and implying that they are not constitutionally required.

66/  Only three states fail to provide for the privilege
against self-incrimination in their constitutions.

EXHIBIT 9-000036

- 32 -

On the other hand, the delegates may believe that
the privilege against self-incrimination is so vital that
affording legal counsel to a suspect is the only effective
protection for the privilege.  Under this view, no confession
is truly voluntary unless an attorney advises the person who
is incriminating himself.  Two approaches are available to
the delegates if they take this expansive view of the privi-
lege against self-incrimination.  First, the Constitution of
the Northern Marianas could codify the Supreme Court's holding
in Miranda, thereby protecting against a retreat from this
decision by the federal courts.  Alternatively, the Convention
may draft an entirely new provision setting out the parameters
of the privilege against self-incrimination.  Such a provi-
sion, for example, could provide that forcing a suspect to
submit to fingerprinting or to participate in a lineup con-
stitutes compelling him to be a witness against himself.  This
provision would extend the privilege against self-incrimina-
tion to those situations, thereby entitling the suspect to
receive the warnings required by Miranda before being finger-
printed or placed in a line-up.

In determining how to treat the privilege against
self-incrimination, the delegates should consider the conduct
of public officers in the Northern Marianas.  If that conduct
has been distinguished by respect for the rights of all North-
ern Marianas people, then it may be unnecessary to expand on
the federal protections against self-incrimination.  If,

EXHIBIT 9-000037

- 33 -

however, police behavior has been marked by a tradition of coercion, the Northern Marianas people may require the armor of a more broadly defined privilege. While a number of state constitutions provide that a person shall not be compelled to give evidence against himself in a criminal case,[67/] very few constitutions mandate that the accused be told of his rights. Louisiana's constitution enumerates a list of those rights of which any accused is to be advised.[68/]

     ii)   **Right to counsel.**[69/]   The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." Virtually all state constitutions provide that the defendant in a criminal case is entitled to legal counsel.[70/]   The Supreme Court has extended the right of counsel to all "critical" stages of a criminal proceeding.[71/]

---

67/   **E.g.**, GA. CONST. art. I, § 1, ¶ VI; HAWAII CONST. art. I, § 8; ILL. CONST. art. I, § 10; KY. CONST. § 11.

68/   LA. CONST. art. I, § 13.

69/   The right to counsel comes into play before trial as well as during the courtroom proceedings in a criminal case. Accordingly, the right is discussed in this subsection rather than in § II(5)(B) below.

70/   **E.g.**, ALA. CONST. art. I, § 6; DEL. CONST. art. I, § 7; ILL. CONST. art. II, § 9; MD. CONST. Declaration of Rights art. 21; N.Y. CONST. art. I, § 6; OKLA. CONST. art. II, § 20.

71/   The term derives from United States v. Wade, 388 U.S. 218, 224 (1967). A stage is "critical" if "counsel's assistance [is] necessary to assure a meaningful 'defense'." Id. at 225.

EXHIBIT 9-000038

- 34 -

In addition, the Supreme Court has used the right to counsel
as a bulwark for other fundamental rights, such as the privi-
lege against self-incrimination[72] and the right of a defen-
dant to confront adverse witnesses.[73]  The critical stage
usually begins at the initiation of "adversary judicial pro-
ceedings," usually indictment.[74]  This approach, however,
may lead to illogical distinctions.  It has been held, for
example, that there is no right to counsel at a pre-indictment
line-up,[75] but there is a right to counsel at a line-up after
indictment.[76]

The Sixth and Fourteenth Amendments will require
the Commonwealth, as the states are required, to provide
counsel at trial to indigent defendants who are sentenced to
prison and in the first appeal, if any, to which such defen-
dants are entitled.[77]  This raises the question whether the
Constitution should guarantee a lawyer to indigent defendants
in all criminal cases.  The small number of lawyers in the

---

72/  Miranda v. Arizona, 384 U.S. 431 (1966).

73/  United States v. Wade, 388 U.S. 218 (1967).

74/  Kirby v. Illinois, 406 U.S. 682, 689 (1972).

75/  Id. at 690.

76/  United States v. Wade, 388 U.S. 218 (1967); Gilbert
v. California, 388 U.S. 263 (1967).

77/  Argersinger v. Hamlin, 407 U.S. 25 (1972); Douglas v.
California, 372 U.S. 353 (1963).  See also Gideon v. Wain-
wright, 372 U.S. 335 (1963).

EXHIBIT 9-000039

- 35 -

Northern Marianas[78/] and the cost of providing a lawyer to
every impoverished defendant would make such a guarantee
very difficult to implement. No state provides counsel to
indigents in all criminal cases.

Duplication would permit the courts to continue
to balance the suspect's interest in an efficient and inex-
pensive criminal justice system. But it can be argued that,
since the definition of "critical stage" has been subject to
such uncertainty, a more rigid rule regarding the right to
counsel is necessary to achieve equitable results and con-
sistent judicial decisions.[79/]

iii) <u>Double jeopardy</u>. The Fifth Amendment
provides, in relevant part, "[N]or shall any person be sub-
ject for the same offense to be twice put in jeopardy of life
or limb."

It is clear that the double jeopardy provision
prevents one government, such as that of a state, from twice
prosecuting a person for the identical crime. The Supreme
Court, however, has held that different governments, such
as those of a state and the United States, may try a defen-
dant for the same offense.[80/]

Thus, if a defendant was prosecuted in federal
court for bank robbery, he could still be tried by the

---

78/ BRIEFING PAPER NO. 4: THE JUDICIAL BRANCH OF GOVERN-
MENT p. 13.

79/ <u>Kirby v. Illinois</u>, 406 U.S. 682, 702-03 (1972) (Brennan,
J., dissenting).

80/ <u>Bartkus v. Illinois</u>, 359 U.S. 121 (1959).

EXHIBIT 9-000040

- 36 -

Commonwealth under local law for the same criminal conduct.
After the Supreme Court decision on this issue, the United
States Congress passed a law forbidding federal prosecution
after a state proceeding concerning specified offenses in-
volving interstate carriers, such as buses or trains, and
their officers.[81]   The problem of state prosecution after
federal prosecution of the same offense, however, still
exists.

The issue before the Convention in this area is
relatively clear-cut.  The delegates have the option to pro-
hibit the Commonwealth government from prosecuting a defendant
who has already been subjected to the jeopardy of a federal
prosecution for the same crime.

b)  <u>Rights within the judicial process</u>

This portion of the briefing paper deals with the
provisions of a bill of rights that guarantee a fair court
system.[82]

i)  <u>Speedy and public trial, confrontation,
compulsory process</u>.  The Sixth Amendment assures that:

---

[81]  18 U.S.C. §§ 659, 660, 2117 (1970).  The law states:

A judgment of conviction or acquittal on the
merits under the laws of any State shall be
a bar to any prosecution under this section
for the same act or acts.

28 U.S.C. §§ 659, 2117 (1970).  The language of 28 U.S.C.
§ 660 is substantially the same.

[82]  This paper does not consider the structure of the judicial
system.  A discussion of judicial structure is set out in
BRIEFING PAPER NO. 4:  THE JUDICIAL BRANCH OF GOVERNMENT.

EXHIBIT 9-000041

- 37 -

> In all criminal prosecutions, the accused
> shall enjoy the right to a speedy and
> public trial . . . and to be informed
> of the nature and cause of the accusation;
> to be confronted with the Witnesses
> against him; to have compulsory process
> for obtaining witnesses in his favor,
> and to have the Assistance of Counsel for
> his defense.

The Sixth Amendment guarantees of speedy and public trial, confrontation and compulsory process have been applied to the states and will be applied to the Commonwealth. The only real question for the Convention in this area is whether to duplicate the language quoted above. While the delegates could devise new language, it would be difficult to improve upon the language of the Sixth Amendment.

Almost all states emphasize the fundamental nature of these guarantees by duplication.[83/] The Model State Constitution also takes this approach.[84/]

ii) Bail and cruel and unusual punishment. The Eighth Amendment states that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Amendment thus confers three substantive rights. First, it guarantees that the amount of bail required of a prisoner will be no greater than that necessary to ensure his later appearance at trial.[85/]

---

83/ E.g., HAWAII CONST. art. I, § 11; MICH. CONST. art. I, § 20; MINN. CONST. art. I, § 6; MONT. CONST. art. I, §§ 24-26.

84/ MODEL CONST. art. I, § 1.06.

85/ Stack v. Boyle, 342 U.S. 1 (1951).

EXHIBIT 9-000042

- 38 -

Second, the Amendment prohibits unduly harsh fines. Finally, it prohibits cruel and unusual punishments.

The Supreme Court has not applied the Eighth Amendment to require a state or the federal government to permit prisoners to bail themselves out of jail, whatever their financial resources. Rather, the provision only assures that, if release pending trial is available, a court may not require excessive bail. Thus, the Eighth Amendment creates no absolute right to bail.[86/]

A right to bail might be viewed as essential to prevent the Commonwealth from harassing citizens by incarcerating them until their trials.[87/] Such a guarantee, however, also might allow dangerous criminals the opportunity to commit more crimes[88/] or to flee the Commonwealth. The Convention should consider whether it wishes to guarantee accused prisoners awaiting trial the right to bail. If so, the Constitution ought to contain language to that effect. Should the delegates not wish to expand the scope of the Eighth Amendment, they should either duplicate its language or omit from the Constitution any provision concerning bail.

Almost all the states constitutionally confer a right to bail on all defendants prior to conviction, except

_____

86/  Carlson v. Landon, 342 U.S. 524, 545-46 (1952).

87/  Id. at 557 (Black, J., dissenting).

88/  Id. at 538.

EXHIBIT 9-000043

- 39 -

those accused of capital offenses and against whom there is a specified amount of evidence.[89] Louisiana also permits bail to defendants who are appealing convictions and whose minimum sentence is not more than five years' imprisonment at hard labor.[90]

The Eighth Amendment's proscription of excessive fines is straightforward. If the delegates wish to embrace that proscription as the public policy of the Commonwealth, they may duplicate the language of the U.S. Constitution.

Broad prohibitions of excessive fines are included in essentially all of the state bills of rights.[91] Vermont's constitution requires that fines be proportioned to offenses.[92] The Tennessee constitution contains specific language limiting to fifty dollars the amount of any fine not assessed by a jury.[93]

The Eighth Amendment's prohibition against "cruel and unusual punishments" is applicable to the states,[94] and

---

89/ E.g., ALAS. CONST. art. I, § 11; COLO. CONST. art. II, § 19; DEL. CONST. art. I, § 12; MO. CONST. art. I, § 20; OHIO CONST. art. I, § 9; UTAH CONST. art. I, § 8.

90/ LA. CONST. art. I, § 12.

91/ E.g., ARIZ. CONST. art. II, § 15; CAL. CONST. art. I, § 6; MINN. CONST. art. I, § 5; MO. CONST. art. I, § 21; WIS. CONST. art. I, § 6.

92/ VT. CONST. art. II, § 31.

93/ TENN. CONST. art. VI, § 14.

94/ Washington v. Lee, 263 F. Supp. 327 (M.D. Ala. 1966), aff'd, 390 U.S. 333 (1968).

EXHIBIT 9-000044

- 40 -

therefore binds the Commonwealth government.[95/]    As a re-
sult, the Northern Marianas courts will be able to impose
no punishments that the Supreme Court has denounced as viola-
tive of the Eighth Amendment.

The Supreme Court appears to have generally left
the definition of "cruel and unusual" to the lower federal
courts.  These tribunals have developed a dual standard for
deciding if a punishment complies with the Eighth Amendment.
First, the punishment must not, in light of all the surround-
ing circumstances, shock the general conscience or fail to be
fundamentally fair.  Second, the penalty must be designed to
achieve a legitimate penal aim.[96/]

The Supreme Court recently confronted the question
whether the death penalty contravenes the Eighth Amendment.
State statutes requiring the execution of all defendants con-
victed of specified acts of murder were held unconstitutional.[97/]
Statutes _authorizing_ the death sentence but requiring a care-
ful examination of the circumstances of a homicide before
such a sentence may be pronounced, however, were upheld.[98/]

---

95/  COVENANT art. V, § 501(a).

96/  E.g., Hancock v. Avery, 301 F. Supp. 786 (M.D. Tenn. 1969);
Jordan v. Fitzharris, 257 F. Supp. 674 (N.D. Cal. 1966).

97/  Woodson v. North Carolina, 96 S. Ct. 2978 (1976); Roberts
v. Louisiana, 96 S. Ct. 3001 (1976).

98/  Gregg v. Georgia, 96 S. Ct. 2909 (1976); Profitt v. Flo-
rida, 96 S. Ct. 2960 (1976).

EXHIBIT 9-000045

- 41 -

The major issue in this area, therefore, concerns capital punishment. Three principal alternatives are available to the delegates. First, they may ban capital punishment. Second, they may authorize the legislature to deal with the problem. Either an explicit delegation of authority or constitutional silence would accomplish that result. Third, they may specify the crimes for which the death penalty may be imposed. The third alternative tracks the limits detailed by the recent Supreme Court pronouncements.

In making this fearful decision, the delegates should consider whether capital punishment is more effective in deterring crime than are lesser punitive measures, notably imprisonment for life. Informing the delegates' deliberations, moreover, must be the certain knowledge that a person wrongfully executed can never be returned to life. The delegates should also decide whether they wish to put the Commonwealth in the position of itself taking a human life.

Approximately four-fifths of the state constitutions ban cruel or unusual punishments.[99/] Two constitutions provide that such punishments "ought" not to be imposed.[100/] The Arizona constitution prescribes the means by which executions are to be performed.[101/] Michigan's constitution

---

99/ E.g., ARK. CONST. art. II, § 9; LA. CONST. art. I, § 12; MISS. CONST. art. III, § 28; N.D. CONST. art. I, § 6; S.C. CONST. art. I, § 19.

100/ MD. CONST. Declaration of Rights art. 25; VA. CONST. art. I, § 9.

101/ ARIZ. CONST. art. XXIV (executions by lethal gas and within state prison).

EXHIBIT 9-000046

- 42 -

forbids the legislature from enacting a law authorizing
102/
capital punishment.

     6.  <u>Fourteenth Amendment (due process and equal protection)</u>

     Section 1 of the Fourteenth Amendment reads:

> All persons born or naturalized in the
> United States, and subject to the juris-
> diction thereof, are citizens of the United
> States and of the State wherein they
> reside.  No State shall make or enforce any
> law which shall abridge the privileges or
> immunities of citizens of the United
> States; nor shall any State deprive any
> person of life, liberty, or property,
> without due process of law; nor deny to
> any person within its jurisdiction the equal
> protection of the laws.

This section of the briefing paper discusses the two most

important rights -- due process and equal protection -- con-
103/
ferred by the Amendment.

     a)  <u>Due process clause</u>

     The Fourteenth Amendment's due process clause has

been given broad scope by the courts.  Although the Supreme

Court has never clearly articulated the minimum requirements

of the due process clause, Justice Cardozo's generalization
104/
in <u>Palko v. Connecticut</u> is often quoted:

> [Certain rights] have been found to be
> implicit in the concept of ordered liberty,
> and thus, through the Fourteenth Amendment

---

102/  MICH. CONST. art. IV, § 46.

103/  The privileges and immunities clause is discussed above
at pp. 11-12.

104/  302 U.S. 319 (1937).

EXHIBIT 9-000047

- 43 -

become valid as against the states. 105/
The Fourteenth Amendment's guarantee of due process will
apply to the Commonwealth government.

Because of its crucial role in our system of
limited government, 106/ the due process clause merits, at
the very least, duplication in the Northern Marianas Consti-
tution. By duplicating the clause, the Convention would
provide the Commonwealth courts with a broad basis in local
law upon which to rectify abuses by the Northern Marianas
government in its dealings with the people. In interpreting
such a duplicated clause, the Commonwealth courts would have
the power to require the Northern Marianas government to meet
stricter standards of fairness than those fixed by the
federal courts.

Rather than duplicating the federal due process
clause, the Convention may wish to go beyond the reach of the

---

105/ Id. at 325.

106/ Writing for the Supreme Court in Stanley v. Illinois,
405 U.S. 645, 656 (1972), Justice White asserted that

one might fairly say of the Bill of Rights
in general, and the Due Process Clause in
particular, that they were designed to pro-
tect the fragile values of a vulnerable
citizenry from the overbearing concern for
efficiency and efficacy that may character-
ize praiseworthy government officials no
less, and perhaps more, than mediocre ones.

# EXHIBIT 9-000048

- 44 -

federal provision.[107/]    Extending the Commonwealth due process clause to cover private, as well as governmental, discrimination on racial, ethnic or other irrational grounds is one possible means of expansion.  The Supreme Court has held that the Fourteenth Amendment pertains only to the actions of a state or local government.[108/]    Thus, neither the due process nor the equal protection clause of the United States Constitution prohibits private interference with civil rights.[109/]

If the delegates believe that the Commonwealth should prohibit private interference with the civil rights of its people, they have three basic alternatives.  First, the Constitution can be silent on the issue.  The broad powers of the legislature over all rightful subjects of legislation would permit the legislature to enact local civil rights laws to regulate private conduct in this area.  Second, the Constitution could expressly authorize or direct the legislature to protect the civil rights of all the people of the Northern Marianas.  Such an exhortation in the Constitution would provide greater assurance that the legislature

---

107/  Expansion of the due process clause by codification is not a viable alternative.  The Supreme Court's opinions concerning due process are so numerous and its interpretation of the clause so varied that codification of the law in this area would be virtually impossible.

108/  Civil Rights Cases, 109 U.S. 3 (1883).

109/  Id.  In some instances a private citizen who is discriminating according to race, would, however, violate the Civil Rights Act of 1964.  Katzenbach v. McClung, 379 U.S. 294 (1964).

EXHIBIT 9-000049

- 45 -

will take appropriate action. Finally, the Constitution could prescribe a right to be free of private interference in the exercise of civil rights and provide further that such provision would be self-enforcing in the courts. Such an approach would assure a remedy against all those who violate the civil rights of others, leaving the legislature free to grant even more extensive protection (such as "affirmative action" requirements for past victims of racial or ethnic discrimination) as it deems appropriate.

In making this decision the delegates should recognize that the federal Civil Rights Acts provide significant protection against private interference with civil rights. The delegates should also consider that constitutional treatment is usually reserved for protecting rights against governmental interference, not for regulating relations among private citizens. Finally, if a self-enforcing right against private interference with civil rights is to be included in the Commonwealth Constitution, the delegates will have to confront difficult drafting decisions: what civil rights are to be protected and what constitutes "interference." These types of definitional problems can best be resolved in the legislative process, with the opportunity for experimentation and relatively simple amendment over time. If the delegates believe this matter is too important to be left to the legislature, however, some form of constitutional treatment will be required.

EXHIBIT 9-000050

Over 30 state constitutions contain due process clauses.[110]/ No state charter explicitly reaches private action under its due process clause.

b)  Equal protection clause

All states have an equal protection clause of some sort. Such a clause guarantees that government will treat all persons similarly situated in the same manner. While the legislative and executive branches must classify along certain lines, the equal protection clause forbids classifications that are irrational. As to certain classifications, notably those involving racial or ethnic characteristics, the classification must be more than rational. The Supreme Court has held that classifications involving these special characteristics are subject to strict scrutiny of means and ends. The courts will not uphold a classification that is subject to strict scrutiny unless the classification serves a "compelling state interest," and the classification is narrowly tailored to achieve that interest.[111]/ This usually means that the classification is invalidated.[112]/ Only classifications clearly based on race or ethnic backgrounds are subject to strict scrutiny.

_____

110/ E.g.,  IDAHO CONST. art. I, § 13; MINN. CONST. art. I, § 6; MISS. CONST. art. III, § 14; S.D. CONST. art. VI, § 2; WASH. CONST. art. I, § 3; WYO. CONST. art. I, § 6.

111/ Kramer v. Union Free School Dist., 395 U.S. 621, 632-33 (1969).

112/ Loving v. Virginia, 388 U.S. 1 (1967).

EXHIBIT 9-000051

- 47 -

The Court has, however, treated some classifications, such as those based upon gender and alienage, with almost equal suspicion.[113]

The question for the Convention here is the degree to which certain classifications should be expressly designated as "highly suspect" under the Commonwealth equal protection clause.  The following discussion deals with classifications to which the Convention may wish to extend strict scrutiny. If a classification is accorded this treatment, the groups involved will receive a very high degree of protection against discrimination.

  i)  <u>Gender</u>.  The Supreme Court has not yet held that classification according to gender gives rise to the "strict scrutiny" accorded racial groupings.  While setting forth a rationality test as the standard of review, the Court has in fact used stricter standards to invalidate some forms of sexual classifications.[114]

Although women are not a numerical minority, they may lack political, social and economic power.[115]  On the other hand, women have not been denied access to political power to the same extent as have, for example, black Americans.  Moreover, there are many legitimate bases upon which a government may wish to differentiate between the sexes.

---

113/ <u>Schlesinger v. Ballard</u>, 419 U.S. 498 (1975).

114/ <u>Frontiero v. Richardson</u>, 411 U.S. 677, 688 (1973).

115/ <u>Id</u>. at 686 n.17.

EXHIBIT 9-000052

If the Convention wishes to increase the consti-
tutional protection afforded to women, it may include a
reference to gender within the equal protection clause.
Almost all newly written or revised state constitutions
have added sex to their equal protection clauses. 116/
This would continue to validate legitimate classifications,
although the degree of judicial scrutiny of such classifi-
cations would be increased. 117/

---

116/  E.g., HAWAII CONST. art. I, § 4:

> No person shall be deprived of life,
> liberty or property without due process
> of law, nor be denied the equal pro-
> tection of the laws, nor be denied
> enjoyment of his civil rights or be
> discriminated against in the exercise
> thereof because of race, religion,
> sex or ancestry.

California has declared women a highly protected class by
judicial construction, relying on California's duplicated
equal protection clause.  Sail'er Inn v. Kirby, 5 Cal.3d 1,
485 P.2d 529, 95 Cal. Rptr. 329 (1971).

117/  Another alternative is to include in the Commonwealth
Constitution the proposed Equal Rights Amendment to the U.S.
Constitution.  That Amendment would also prohibit unjusti-
fiable discrimination based upon gender.  The proposed Amend-
ment would provide, in relevant part, "Equality of rights
under the law shall not be denied or abridged by the United
States or by any State on account of sex."  The Equal Rights
Amendment was passed by the U.S. House of Representatives
on October 12, 1971, 117 CONG. REC. 35815 (1971), and by the
U.S. Senate on March 22, 1972, 118 CONG. REC. 9598 (1972).
The approval of 38 state legislatures is necessary for the
adoption of this proposal.  This requirement has not yet been
met.

EXHIBIT 9-000053

- 49 -

ii) Alienage. The Supreme Court recently held that alienage is a highly suspect classification.[118/] The Court has invalidated attempts to exclude aliens from welfare benefits,[119/] to deny them admission to legal practice,[120/] and to refuse them civil service employment.[121/]

The Supreme Court, however, has not decided whether restrictions based upon alienage, such as the right to vote and the right to hold high public office, are still valid.[122/] In both of these cases, the legislative end is to guarantee a "loyal" political process. Since aliens do not share citizens' ties of "loyalty" to the Commonwealth, it may be logical to exclude aliens from the affairs of government.

If the delegates wish to permit the continuation of such distinctions based on alienage, they should probably not include any special reference to alienage in the Commonwealth Constitution. Should the Convention have the opposite view, it may phrase the Commonwealth's equal protection clause so as to provide that no person shall be denied the equal protection of the laws on the basis of "race, color, creed, ancestry or alienage."

------

118/ In re Griffiths, 413 U.S. 717 (1973)..

119/ Graham v. Richardson, 403 U.S. 365 (1971).

120/ In re Griffiths, 413 U.S. 717 (1973).

121/ Sugarman v. Dougall, 413 U.S. 634, 647 (1973).

122/ See In re Griffiths, 413 U.S. 717, 729 n.21 (1973).

EXHIBIT 9-000054

- 49 -

ii) <u>Alienage</u>. The Supreme Court recently
held that alienage is a highly suspect classification.[118]
The Court has invalidated attempts to exclude aliens from
welfare benefits,[119] to deny them admission to legal prac-
tice,[120] and to refuse them civil service employment.[121]

The Supreme Court, however, has not decided whether
restrictions based upon alienage, such as the right to vote
and the right to hold high public office, are still valid.[122]
In both of these cases, the legislative end is to guarantee
a "loyal" political process. Since aliens do not share
citizens' ties of "loyalty" to the Commonwealth, it may be
logical to exclude aliens from the affairs of government.

If the delegates wish to permit the continuation
of such distinctions based on alienage, they should probably
not include any special reference to alienage in the Common-
wealth Constitution. Should the Convention have the opposite
view, it may phrase the Commonwealth's equal protection clause
so as to provide that no person shall be denied the equal pro-
tection of the laws on the basis of "race, color, creed,
ancestry or alienage."

---

118/ <u>In re Griffiths</u>, 413 U.S. 717 (1973).

119/ <u>Graham v. Richardson</u>, 403 U.S. 365 (1971).

120/ <u>In re Griffiths</u>, 413 U.S. 717 (1973).

121/ <u>Sugarman v. Dougall</u>, 413 U.S. 634, 647 (1973).

122/ See <u>In re Griffiths</u>, 413 U.S. 717, 729 n.21 (1973).

EXHIBIT 9-000055

- 50 -

B.  Rights Secured by the United States Constitution But
    Not Applicable Against the Northern Marianas
    Government

    1.  Second Amendment (right to bear arms)

    The Second Amendment prevents infringement by

Congress of the right of the Commonwealth to maintain a

militia.[123/]    The Amendment provides, "A well regulated

militia being necessary to the security of a free State,

the right of the people to keep and bear arms shall not be

infringed."

    The right to bear arms has been interpreted by

the Supreme Court as designed to further the policy of a

"well regulated militia."[124/]    The Amendment, therefore,

guarantees the right of a state to maintain a militia, not

that of an individual to possess any particular weapon.[125/]

In order to come within the Amendment's protection, the

individual must provide evidence that his weapon is ordinary

---

123/  The Supreme Court, has limited the Second Amendment's
protection to only infringement by Congress, not by any state
regulatory scheme.  United States v. Cruikshank, 92 U.S. 542,
553 (1876).  But see Stevens v. United States, 440 F.2d 144,
149 (6th Cir. 1971)(upholding federal regulation of individual
possession under the commerce clause of Article I of the Con-
stitution).

124/  United States v. Miller, 307 U.S. 174, 178 (1939).

125/  Id.:

        In the absence of any evidence tending to
        show that possession . . . of [the firearm]
        has some reasonable relationship to the
        preservation . . . of a well regulated
        militia, we cannot say that the Second Amend-
        ment guarantees the right to keep and bear such
        an instrument.

EXHIBIT 9-000056

- 52 -

constitutions grant the right to bear arms either in the "common defense,"[128/] in defense of the state[129/] or in the aid of civil power when legally summoned.[130/] About half of the state charters secure the right to use arms in self-defense.[131/] Five states assure the right to bear arms in defense of one's home,[132/] with those charters also conferring that right for the protection of property.[133/]

Other constitutions refer to the right to "keep" arms.[134/] Some charters refer not only to the right to bear but also the right to keep arms.[135/]

No state constitution prohibits the private ownership of arms.

---

[128/] E.g., ARK. CONST. art. II, § 5.

[129/] E.g., ALA. CONST. art. I, § 26; CONN. CONST. art. I, § 15.

[130/] E.g., MISS. CONST. art. III, § 12.

[131/] E.g., ALA. CONST. art. I, § 26; IND. CONST. art. I, § 32.

[132/] COLO. CONST. art. II, § 13; MISS. CONST. art. III, § 12; MO. CONST. art. I, §23; MONT. CONST. art. III, § 13; OKLA. CONST. art. II, § 26.

[133/] Id.

[134/] E.g., COLO. CONST. art. II, § 12; MONT. CONST. art. III, § 13.

[135/] E.g., MISS. CONST. art. III, § 12.

EXHIBIT 9-000057

- 51 -

military equipment or that its use could contribute to the common defense.[126/]   While Congress could enact various types of gun control legislation, there is serious doubt whether it could prohibit absolutely the private possession of any firearms.

The issue for the delegates is whether to recognize a right to bear arms within the Commonwealth.  If the Commonwealth Constitution is silent, the people are protected against federal action in this area by the United States Constitution, but the Commonwealth government could prohibit the possession of all firearms if that were deemed appropriate.

If the Convention duplicates the language of the Second Amendment, such drastic legislation would probably be prohibited although the Commonwealth legislature would be free to enact various forms of effective gun control legislation, short of an absolute prohibition of any private possession of weapons.

Seven state constitutions guarantee that the right to bear arms will not be infringed.[127/]   Almost half of the

---

126/  Id.

127/  ALAS. CONST. art. I, § 19; GA. CONST. art. I, § I, ¶ XXII; HAWAII CONST. art. I, § 15; LA. CONST. art. I, § 8; N.C. CONST. art. I, § 24; R.I. CONST. art. I, § 22; S.C. CONST. art. I, § 26.

EXHIBIT 9-000058

- 53 -

## 2. Third Amendment (quartering soldiers in homes)

The Third Amendment will protect the Northern Marianas people from being forced to house United States soldiers in peacetime. The Amendment provides, "No soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law." Duplication of this provision would protect against the forced billetting of the Northern Marianas militia or national guard (if there is one) in the homes of the Northern Marianas people during peacetime. Almost all of the state constitutions contain a guarantee similar to the assurance of the Third Amendment. [135a/]

## 3. Fifth Amendment (indictment by grand jury)

The federal government is subject to the constraints of the Fifth Amendment, which provides, in relevant part, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." The grand jury requirement of the Fifth Amendment, however, has not been applied to the states [136/] and therefore is not applied to the Commonwealth by the Covenant.

Historically, the grand jury screened felony cases, handing down indictments when a certain standard of proof was met. The grand jury was intended to be a necessary

---

[135a/] E.g., CAL. CONST. art. I, § 12; ILL. CONST. art. II, § 16; MO. CONST. art. I, § 24; PA. CONST. art. I, § 23; R.I. CONST. art. I, § 19.

[136/] Hurtado v. California, 110 U.S. 516 (1884); COVENANT art. V, § 501(a).

EXHIBIT 9-000059

- 54 -

buffer between the citizen and the state:  the state was
prevented from harassing the citizen with capricious
criminal charges.

The Convention may duplicate the federal provi-
sion.  Duplication would have the substantive effect of
creating a right not otherwise applicable against the
Commonwealth.  The majority of states duplicates the federal
grand jury provision.<sup>137/</sup>  Alternatively, the delegates
may provide for the right to a grand jury in all felony
cases.<sup>138/</sup>  Another alternative would give the prosecutor
the option to proceed by means of the grand jury.<sup>139/</sup>  The
delegates may also omit any provision, thereby leaving the
issue to the legislature.<sup>140/</sup>  Finally, the Convention may
prohibit the use of the grand jury.

---

137/  E.g., W. VA. CONST. art. III, § 4.  Most of these
limit the right to capital offenses.  E.g., N.Y. CONST.
art. I, § 6.

138/  This approach is followed in a few states.  E.g.,
COLO. CONST. art. II, % 8; N.D. CONST. art. I, § 8; WYO.
CONST. art. I, § 13.

139/  This method is used by California.  CAL. CONST. art.
I, § 8.

140/  Almost half the states omit any reference to a grand
jury.  E.g., MINN. CONST. art. I, §§ 6,7; VA. CONST. art. I,
§ 8.  Illinois provides for a grand jury, but allows the
legislature to abolish it.  ILL. CONST. art. I, § 7.

EXHIBIT 9-000060

- 55 -

Preference for any alternative will depend on the delegates' view of the purposes that a grand jury would serve in the Northern Mariana Islands. The grand jury is not a traditional institution in the Northern Marianas.[141] Due to the relatively small population, it may be difficult to compose a disinterested grand jury in many cases.

Opponents of the grand jury point out that it is a costly and time-consuming formality.[142] It may no longer serve as a buffer between the state's machinery and the citizen, but rather exist only as an inefficient, expensive rubber stamp for the prosecutor's decisions.[143]

In contrast, supporters of the grand jury believe that it is much more than a rubber stamp.[144] The grand jury may provide an important barrier between citizen and state. In addition, the grand jury may single out abuses

---

141/ Neither the Mariana Islands District Code nor the Trust Territory Code provides for grand juries.

142/ Whyte, Is the Grand Jury Necessary?, 45 VA. L. REV. p. 461, at 488-91 (1959). It is interesting that Great Britain, which originated the grand jury, has abandoned its use.

143/ Boudin, The Federal Grand Jury, 61 GEO. L.J. p. 1. (1972).

144/ See generally United States v. Calandra, 414 U.S. 338 (1974), and citations therein; United States v. Smyth, 104 F. Supp. 283 (N.D. Cal. 1952).

EXHIBIT 9-000061

- 55 -

Preference for any alternative will depend on the delegates' view of the purposes that a grand jury would serve in the Northern Mariana Islands. The grand jury is not a traditional institution in the Northern Marianas.[141/] Due to the relatively small population, it may be difficult to compose a disinterested grand jury in many cases.

Opponents of the grand jury point out that it is a costly and time-consuming formality.[142/] It may no longer serve as a buffer between the state's machinery and the citizen, but rather exist only as an inefficient, expensive rubber stamp for the prosecutor's decisions.[143/]

In contrast, supporters of the grand jury believe that it is much more than a rubber stamp.[144/] The grand jury may provide an important barrier between citizen and state. In addition, the grand jury may single out abuses

---

141/ Neither the Mariana Islands District Code nor the Trust Territory Code provides for grand juries.

142/ Whyte, Is the Grand Jury Necessary?, 45 VA. L. REV. p. 461, at 488-91 (1959). It is interesting that Great Britain, which originated the grand jury, has abandoned its use.

143/ Boudin, The Federal Grand Jury, 61 GEO. L.J. p. 1. (1972).

144/ See generally United States v. Calandra, 414 U.S. 338 (1974), and citations therein; United States v. Smyth, 104 F. Supp. 283 (N.D. Cal. 1952).

EXHIBIT 9-000062

for correction even when it does not return an indictment.[145/]

Special grand juries are used frequently in the United States to investigate official wrongdoing and to make recommendations for correcting governmental corruption and inefficiency.

### 4. Sixth Amendment (jury trial in criminal cases)

The Sixth Amendment guarantees, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State . . . ." Although the jury right in criminal cases has been applied against the states through the Fourteenth Amendment,[146/] the Covenant permits the Convention to decide if there will be a right to trial by jury in criminal cases arising under Commonwealth law.[147/]

The Convention has a range of options in dealing with the issue. At one end of the spectrum, the Common-

---

145/ Kuh, The Grand Jury Presentment: Foul Blow or Fair Play?, 55 COLUM. L. REV. p. 1103 (1955).

146/ Duncan v. Louisiana, 391 U.S. 145 (1968).

147/ Article V, § 501(a) of the Covenant provides, in relevant part, "trial by jury . . . shall [not] be required in any . . . criminal prosecution based on local law, except where recognized by local law." Thus, if the Constitution does not specify whether or not a jury trial will be afforded defendants in local criminal trials, that decision will remain for the legislature.

EXHIBIT 9-000063

- 57 -

wealth Constitution may duplicate the Sixth Amendment, thereby granting every criminal defendant the right to a jury trial. If the delegates wish a less sweeping provision, they may draft language conferring a jury right only in specific cases. At the other end of the spectrum, the Constitution could forbid the use of juries in Commonwealth criminal cases. Finally, the Constitution, either by silence or by express provision, may leave the decision for the legislature.

The delegates may believe that it is important to punish a defendant only after he has been tried and found guilty by his peers. The jury's function is to introduce the "common sense" and "humanity" of the non-legal mind to the judicial process. On the other hand, the Convention may decide that the heralded "common sense" of the jury is actually unregulated emotion, rendering jury verdicts unreliable as indicators of guilt.[148] The use of lay judges in the Northern Marianas[149] or panels of judges may lessen the need for a jury.

---

148/ See DeStefano v. Woods, 392 U.S. 631 (1968).

149/ BRIEFING PAPER NO. 4: THE JUDICIAL BRANCH OF GOVERNMENT § II(B)(1).

EXHIBIT 9-000064

- 58 -

### 5. Seventh Amendment (jury trial in civil cases)

The Seventh Amendment directs that the federal courts must afford either the plaintiff or the defendant a jury trial in specified civil cases:[150/]

> In Suits at common law, where the value
> in controversy shall exceed twenty dol-
> lars, the right of trial by jury shall
> be preserved, and no fact tried by a
> jury, shall be otherwise re-examined in
> any Court of the United States, than
> according to the rules of common law.

The right to a jury trial in a federal civil case turns on the nature of the relief sought by the plaintiff.[151/] Either litigant in a civil case is entitled to a jury trial if the relief sought invokes the court's common law, rather than equitable or maritime, jurisdiction.[152/] Thus, an action for money damages gives rise to the jury right, since it would have been tried at common law when the Amendment was ratified in 1791. In contrast, an action for an injunction would have been heard in equity in 1791, and therefore neither party would be entitled to a jury trial under the Seventh Amendment.

---

150/ Pearson v. Yewdall, 95 U.S. 294 (1877); Gustafson v. Peck, 216 F. Supp. 370 (N.D. Iowa 1963).

151/ Damsky v. Zavatt, 289 F.2d 46 (2d Cir. 1961). See generally MOORE'S FEDERAL PRACTICE, vol. 5, ¶ 38.08(5).

152/ Ross v. Bernhard, 396 U.S. 531 (1970).

EXHIBIT 9-000065

The right to a jury trial in civil cases is considered less fundamental than the comparable right in criminal cases. Accordingly, the Supreme Court has held that the due process clause of the Fourteenth Amendment does not require the states to afford civil jury trials in local courts. [153/] Similarly, such a right is not applied against the Commonwealth government by the Covenant. [154/] The delegates must decide, therefore, whether to guarantee such a right in the Constitution or to leave the matter open for future legislative experimentation.

Since the Northern Marianas does not have a tradition of reliance upon jury trials, even in criminal cases, granting such a new right might be somewhat disruptive, especially in the formative years of the local court system. Moreover, a jury system will be expensive to administer and may increase the number of appeals in the local court system. The delegates should decide, however, whether civil jury trials are so fundamental to the administration of justice

---

153/ Walker v. Sauvinet, 92 U.S. 90 (1875)(rejecting argument that the Seventh Amendment should be "incorporated" by the Fourteenth Amendment).

154/ COVENANT art. V, § 501(a).

EXHIBIT 9-000066

in the Commonwealth that they should be required from the outset of the new government. 155/

C. Rights Not Recognized in the United States Constitution

This section of the briefing paper presents for the delegates' consideration provisions that are not recognized in the United States Constitution but that the Convention may choose to include in the Commonwealth bill of rights. The rights expressed in these provisions will be constitutionally secured only if mentioned in the Commonwealth Constitution. 156/

1. Right to an education

The Convention may wish to provide constitutionally that every Northern Marianas citizen will have

_____

155/ A number of state constitutions specifically preserve the right to jury trial in civil matters, although some specify a minimum sum to be in controversy. E.g., ALAS. CONST. art. I, § 16 ($250); HAWAII CONST. art. I, § 10 ($100); IND. CONST. art. I, § 20; ORE. CONST. art. I, § 17; W. VA. CONST. art. III, § 13 ($20).

156/ In devising provisions that guarantee specific new rights the delegates may be increasing the risk that a court would conclude that any right not specified was intentionally omitted and could not be inferred from the more general provisions of the bill of rights. This risk would be minimized by a section in the bill of rights providing that the enumeration of specified rights is not intended to minimize or deny others that are retained by the people. The Ninth Amendment to the United States Constitution contains such language. Almost three-fifths of the state constitutions include a similar provision. E.g., IDAHO CONST. art. I, § 21; NEB. CONST. art. I, § 26; N.M. CONST. art. II, § 23; N.C. CONST. art I, § 37; ORE. CONST. art. I, § 33.

EXHIBIT 9-000067

- 61 -

the right to a free public education. Such a provision could be included in the bill of rights[157] or reserved for a separate article on education. The language of the provision may be sparse, guaranteeing only the right to a specified amount of schooling, such as through elementary or high school. Alternatively, the provision could be

---

[157] Puerto Rico's bill of rights confers the right to an education:

> Every person has the right to an education which shall be directed to the full development of the human personality and to the strengthening of respect for human rights and fundamental freedoms. There shall be a system of free and wholly nonsectarian public education. Instruction in the elementary and secondary schools shall be free and shall be compulsory in the elementary schools to the extent permitted by the facilities of the state. No public property or public funds shall be used for the support of schools or educational institutions other than those of the state. Nothing contained in this provision shall prevent the state from furnishing to any child non-educational services established by law for the protection or welfare of children. Compulsory attendance at elementary public schools to the extent permitted by the facilities of the state as herein provided shall not be construed as applicable to those who receive elementary education in schools established under non-governmental auspices.

P.R. CONST. art. II, § 5.

EXHIBIT 9-000068

- 62 -

detailed, covering such topics as school financing, curriculum and the qualifications of teachers. This topic is discussed in Briefing Paper No. 13: Education § II(A).

2. Right to a clean environment

The environment is another area in which some state constitutions have recognized new "rights." If the Convention decides that the Commonwealth Constitution should protect the environment, an appropriate provision may be inserted in the bill of rights or placed in an article dealing with natural resources. Because the guardianship of the environment is intimately linked to the preservation of all natural resources, the delegates may prefer to address problems pertaining to conservation and air and water quality in one article of the Constitution. The issue of the environment is explored in Briefing Paper No. 11: Natural Resources § II(E).

3. Right of popular participation in government

The Convention may wish to state explicitly that the Northern Marianas people will enjoy the right to participate in decisions taken by their government. The Montana constitution, for example, provides:

> The public has the right to expect
> governmental agencies to afford such
> reasonable opportunity for citizen
> participation in the operation of

EXHIBIT 9-000069

the agencies prior to the final
decision as may be provided by
law.158/

A provision like this would express the Commonwealth's
commitment to a citizenry educated in public affairs and
participating in governmental decisions. As such, a guar-
anteed "right to participate" may increase the Commonwealth
government's sensitivity to the needs of the people. On
the other hand, a "right to participate" provision may be
little more than excess verbiage, and more the object of neg-
lect than a catalyst for governmental concern.

4. Right to privacy

Safeguarding the privacy of the Northern Marianas
people is at the heart of a provision governing searches
and seizures.159/ Indeed, one state constitution phrases

_____

158/ MONT. CONST. art. II, § 8. The right to participate
has little meaning unless the people are provided with suf-
ficient information upon which to ask questions of govern-
mental officials and then to make reasoned judgments. Ac-
cordingly, if the Convention adopts a "right to participate"
provision, it may also wish to include language along the
lines of article II, § 9 of the Montana constitution. That
section provides:

No person shall be deprived of the right
to examine documents or to observe the
deliberations of all public bodies or
agencies of state government and its sub-
divisions, except in cases in which the
demand of individual privacy clearly
exceeds the merits of public disclosure.

159/ The search and seizure issue is described in detail
above at pp. 20-29.

EXHIBIT 9-000070

its guarantee against unreasonable searches and seizures in terms of securing the right to privacy.[160/]

The delegates, however, may wish to give a more expansive meaning to the concept of privacy.  Such was the choice of the draftsmen of the Montana constitution, which provides, "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."[161/]

This type of provision, however, demonstrates the shortcomings of all broadly phrased constitutional language: the word "privacy," as well as the phrase "compelling state interest," may be so vague as to defy judicial enforcement. Yet, this language may set a tone of governmental respect for the sanctity of the homes and personal affairs of the Northern Marianas people.

---

160/  LA. CONST. art. I, § 5:

> Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy.  No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search.  Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.

161/  MONT. CONST. art. II, § 10.

EXHIBIT 9-000071

- 65 -

5. <u>Right to organize and bargain collectively</u>

A provision guaranteeing the right to organize and bargain collectively would grant Northern Marianas workers a tool in promoting their own welfare.  Such a provision would enable employees to join together in negotiating with their employer over wages, benefits and conditions of employment.

Three state constitutions contain a collective bargaining provision.[162]  Florida's clause is typical: "The right of employees, by and through a labor organization, to bargain collectively shall not be denied or abridged."[163]  The Constitution could also provide that public employees will not have the right to strike.  The Florida constitution contains such a limitation.[164]

6. <u>Prisoners' rights</u>

The delegates may wish to ensure the humane treatment of prisoners.  The Wyoming constitution makes this guarantee:

> No person arrested and confined
> in jail shall be treated with unneces-
> sary rigor.  The erection of safe and
> comfortable prisons, and inspection of

---

162/  FLA. CONST. art. I, § 6; MO. CONST. art. I, § 29; N.J. CONST. art. I, ¶ 19.

163/  FLA. CONST. art. I, § 6.

164/  Id.

EXHIBIT 9-000072

- 66 -

> prisons, and the humane treatment of
> prisoners shall be provided for. 165/

This provision would go far towards increasing the likeli-
hood that prisoners will be rehabilitated in prison and
will return to society as useful citizens.  Such language
would also reiterate the Commonwealth's commitment to
treat all persons with restraint.  On the other hand,
such a provision could be enforced by the courts in such
a way as to inflate the cost of operating the Commonwealth's
penal system beyond the means of the new government.

## Conclusion

The bill of rights will represent a statement
by the people of the Northern Mariana Islands of the
fundamental limitations on the power of government.  Such
a statement should be comprehensive, without being inflex-
ible.  It should be clear, without being overly specific.
In drafting such a statement, the delegates should aim
to create a document that can adjust to growth and change
in the Commonwealth without sacrificing the basic rights
that are essential to a free society.

---

165/  WYO. CONST. art. I, § 16.

EXHIBIT 9-000073
APPENDIX A

| U.S. CONSTITU-TIONAL PROVISION | DESCRIPTION OF PROVISION | APPLICABLE UNDER COVENANT TO FEDERAL AND COMMONWEALTH GOVERNMENTS | APPLICABLE UNDER COV-ENANT ONLY TO FEDERAL GOVERNMENT | APPLICABLE UNDER COVENANT ONLY TO COMMONWEALTH GOVERNMENT |
|---|---|---|---|---|
| Art. I, § 9, clause 2 | Habeas corpus | | X | |
| Art. I, § 9, clause 3 | Bill of attainder and ex post facto law | | X | |
| Art. I, § 9, clause 8 | Title of nobility | | X | |
| Art. I, § 10, clause 1 | Bill of attainder, ex post fact law, obliga-tion of contracts, and title of nobility | | | X |
| Art. I, § 10, clause 3 | Troops, warships, treaties, duty of tonnage | | | X |
| Art. IV, § 1 | Full faith and credit | | | X |
| Art. IV, § 2 | Privileges and immuni-ties | | | 1/ X |
| First Amendment | Freedoms of religion, speech and press; right to assemble and peti-tion government | X | | |
| Second Amendment | Militia: right to bear arms | | X | |
| Third Amendment | Quartering troops | | X | |
| Fourth Amendment | Search and seizure | X | | |
| Fifth Amendment | Indictments by grand jury | | X | |
| Fifth Amendment | Double jeopardy, self-incrimination, due pro-cess of law and taking of property | X | | |
| Sixth Amendment | Jury trial in criminal cases | | X | |
| Sixth Amendment | Speedy and public trial, confrontation, compul-sory process of witnesses and assistance of counsel | X | | |
| Seventh Amendment | Jury trial in civil cases | | X | |

# EXHIBIT 9-000074

| U.S. CONSTITU-TIONAL PROVISION | DESCRIPTION OF PROVISION | APPLICABLE UNDER COVENANT TO FEDERAL AND COMMONWEALTH GOVERNMENTS | APPLICABLE UNDER COV-ENANT ONLY TO FEDERAL GOVERNMENT | APPLICABLE UNDER COVENANT ONLY TO COMMONWEALTH GOVERNMENT |
|---|---|---|---|---|
| Eighth Amendment | Excessive bail, excessive fines, and cruel and unusual punishments | X | | |
| Ninth Amendment | Rights retained by people | X | | |
| Thirteenth Amendment | Slavery | X | | |
| Fourteenth Amendment, § 1 | Privileges and immunities of U.S. citizens, due process of law and equal protection of the laws | | | 1/ X |
| Fifteenth Amendment | No denial or abridgement of right to vote because of race, color or previous servitude | X | | |
| Nineteenth Amendment | No denial or abridgement of right to vote because of sex | X | | |
| Twenty-Sixth Amendment | No denial or abridgement of right to vote because of age if at least 18 years old | X | | |

---

1/ Notwithstanding the privileges and immunities clause, § 805(a) of the Covenant requires the Commonwealth government to prevent those not of "Northern Mariana Islands descent" from acquiring "permanent and long-term interests in real property" during the twenty-five-year period following the termination of the Trusteeship Agreement. After that period, the Northern Marianas government has the discretion to continue regulating the alienation of such interests in land. Thus, Marianas citizens will enjoy a privilege denied to United States citizens who are not of Northern Marianas lineage. For a full discussion of the ramifications of § 805(a), see BRIEFING PAPER NO. 12: RESTRICTIONS ON LAND ALIENATION.