IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| DAVID J. RADICH and LI-RONG RADICH, ) )  Plaintiffs, ) ) v. ) ) JAMES C. DELEON GUERRERO, in his ) official capacity as Commissioner of the ) Department of Public Safety of the ) Commonwealth of Northern Mariana ) Islands, ) )  Defendant. ) | Case No. 1:14-CV-20<br><br>Hearing: March 12, 2015, 8:30AM |

**PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, David J. Radich and Li-Rong Radich, by and through undersigned counsel, hereby submit their Reply to Defendant's Response to their F.R.Civ.P. 56(a) Motion for Summary Judgment.

**ARGUMENT**

I. **The Court has subject matter jurisdiction over this matter, and Plaintiffs can obtain relief on this Motion, without challenging the customs laws or suing the Department of Finance.**

Plaintiffs have standing to bring this claim. "Where the legality of government action is challenged by the object of that action, 'there is ordinarily little question that the action or inaction has caused [or will cause the plaintiff] injury, and that a judgment preventing . . . the action will redress it.'" *N. Mariana Islands v. United States*, 670 F. Supp. 2d 65, 75 (D.D.C. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992)).

In *Renne v. Geary*, 501 U.S. 312 (1991), cited by Defendant, political committees challenged a California law prohibiting candidates in certain elections

1

from stating their political parties, and the political parties from making endorsements in the same elections. The Supreme Court found a lack of a live controversy since the elections were already over, and there were no allegations of present political races affecting the petitioners. *Id.* at 320. The Court specifically said its decision was not based on a party's standing. *Id.* at 319-320. *Renne* does not at all stand for the proposition advanced by the Defendant.

Plaintiffs have two facial and as-applied constitutional challenges – to the ban on the possession of handguns, and the ban on the possession of firearms for self-defense purposes, including the inability to obtain a WIC if the purpose is to obtain a weapon for self-defense. Plaintiffs have standing, and, contrary to *Renne* and exactly like *Heller* and *McDonald*, have a present injury and controversy.

The Customs laws of 6 CMC § 2301 only prohibit the importation of firearms. Even if the Court were to accept Defendant's argument, 6 CMC § 2202 prevents the manufacture, purchase, sale, possession or carrying of a handgun, while § 2222(e) prevents the importation, sale, transfer, giving, purchasing, possession or use of a handgun. The prohibitions of the challenged provisions are thus far broader than the customs law raised by the Defendant. If the Court declares the ban on the importation of handguns unconstitutional under 6 CMC § 2222(e), it will be axiomatic that it will be unconstitutional under 6 CMC § 2301. And if required, the Plaintiffs can remove the "importation" issue of 6 CMC § 2222(e) from this Motion while leaving the remaining prohibitions ripe for resolution by the Court.

## II. <u>Defendant has authority to enforce 6 CMC § 2222(e).</u>

Defendant argues he is not responsible for enforcing 6 CMC § 2222(e), though he admitted in his Answer that he is responsible.

Plaintiff alleges as follows:

Defendant, James C. Deleon Guerrero, in his official capacity as Commissioner of the Department of Public Safety of the CNMI, is responsible for enforcing the CNMI's laws, customs, practices, and policies. In that capacity, Commissioner Deleon Guerrero presently

2

enforces the laws, customs, practices and policies complained of in this action, and is sued in both his individual and official capacities. Specifically, Commissioner Deleon Guerrero is the authority charged with issuing Weapons Identification Cards to residents of the CNMI and is located in the same. (Dkt. #1, par. 9.)

In his Answer to that allegation, Defendant states:

Defendant denies that James C. Deleon Guerrero has been sued in his personal capacity. **Defendant admits the remaining allegations in this paragraph.** (Dkt, #9, par. 9.) (boldface added.)

Therefore, the issue should be consider resolved.

Further, 6 CMC § 2228 states: "The Department of Public Safety may issue, amend and repeal regulations implementing this article in the manner which is or may be provided by law, as may be required by the public interest, safety and welfare." Therefore, correcting the unconstitutional 6 CMC § 2222(e) is exclusively within the Defendant's jurisdiction.

### III. Plaintiffs have standing as they applied for and are entitled to WICs.

It is obvious Defendant wishes to be rewarded for violating its own laws. 6 CMC § 2204(e) states that: "Unless the [WIC] application for use and possession is denied, the identification card shall issue within 60 days from the date of application."

It is undisputed both David Radich and Li-Rong applied for WICs, and despite the passage of much more than 60 days, have not been denied the WICs. Therefore, under 6 CMC § 2204(b), their applications "shall" have been issued. This was Defendant's responsibility. Plaintiffs did not receive them, and Defendant admits this (Dkt. #9, par. 16). Plaintiffs have suffered injuries as a result of the Defendant's action. Now, for the first time in a Response to a Motion for Summary Judgment, Defendant argues Plaintiffs are ineligible for a WIC, using circular logic and discriminatory interpretations of the law. The court should reject these last-ditch efforts to justify the unjustifiable.

## IV. Li-Rong Radich is entitled to possess firearms in the CNMI.

Defendant argues, again for the first time in his Summary Judgment Response, Li-Rong Radich (a permanent resident alien of the United States since 2009, and a resident of Saipan, CNMI (Declaration of Li-Rong Radich at par.2)) is ineligible to obtain a WIC, despite the passage of more than sixty days since her Application was filed without a denial, because the CNMI allegedly has a semantical loophole it has failed to fix since 1991, and it is therefore acceptable to discriminate against Li-Rong.

However, Li-Rong, and all lawful aliens residing in the CNMI, enjoy Second and Fourteenth Amendment rights per the Supreme Court. ". . . '[T]he people' protected by the . . . Second [Amendment] . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). That includes those who are legally in the country. *See United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904).

"The Fourteenth Amendment relevantly provides, 'Nor shall any State . . . deny to any person within its jurisdiction the equal protection of the laws.' It has long been settled that the term 'person' in this context encompasses lawfully admitted resident aliens as well as citizens of the United States and entitles both citizens and aliens to the equal protection of the laws of the State in which they reside." *Graham v. Richardson*, 403 U.S. 365, 371 (1971) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)).

State action violates equal protection rights if it separates individuals into discrete classes based on citizenship and subjects those individuals to disparate treatment. *Graham*, 403 U.S. at 371, 377. A classification based on an individual's status as an alien is "inherently suspect and subject to close judicial scrutiny." *Id.* at 372.

The Court concluded in *Fletcher v. Haas*, 851 F. Supp. 2d 287 (D.Mass., 2012):

> With this framework in mind, I find no justification for refusing to extend the Second Amendment to lawful permanent residents. They have necessarily "developed sufficient connection with this country to be considered part of [the] community." *Verdugo-Urquidez*, 494 U.S. at 265. Professor Rosberg has identified as "the traditional premise of the country's immigration policy—that resident aliens are virtually full-fledged members of the American community, sharing the burdens of membership as well as the benefits." Gerald M. Rosberg, *The Protection of Aliens from Discriminatory Treatment by the National Government*, 1977 Sup. Ct. Rev. 275, 337 (1978).

*Fletcher*, 851 F. Supp. 2d at 301. Thus, the Court in *Fletcher* determined that the plaintiffs in that case, two lawful permanent resident aliens, were entitled to Second Amendment rights. *Fletcher*, 851 F. Supp. 2d at 301-02. *See also State of Washington v. Ibrahim*, 164 Wn. App. 503, 514 (Wash. App. Div. 3, 2011) (legal alien's conviction for unlawful possession of firearm reversed when statute barring lawful aliens from possessing firearms found to unconstitutionally deny defendant 14th Amendment right to equal protection of law).

There is precedent as to this direct issue. The District of Hawaii recently enjoined a ban on lawful resident aliens from obtaining a permit to purchase firearms. *Fotoudis v. City and County of Honolulu*, 2014 U.S.Dist. LEXIS 130525 (D.HI, September 17, 2014). The Court held:

> The undisputed facts establish that Fotoudis, as a lawful permanent resident alien of the United States (and resident of Hawaii), was denied the opportunity to apply for a permit to acquire firearms solely because of his alienage. This classification violates the equal protection clause of the U.S. Constitution. HRS § 134-2(d) is thus unconstitutional as-applied to Fotoudis (and other lawful permanent resident aliens), and Defendants are therefore permanently enjoined from denying Fotoudis the opportunity (1) to apply for a permit to acquire firearms, and (2) to obtain such a permit, if he otherwise meets the qualifications of state law, as specifically set forth in the Conclusion of this Order.

*Id.* at *9.

Per now-common Second Amendment analysis (*See*, *e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)), infringements on the core Second Amendment right of possession for self-defense must satisfy a level of scrutiny approaching strict scrutiny. *Id*. at 708. This means the CNMI's prohibition, ". . . a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end." *Id*. It is evident Defendant cannot defend its arbitrary ban, especially as it is newly-raised. Further, under any level of scrutiny (rational basis not even being up for consideration under *Heller*, 128 S. Ct. at 2818, fn 27), CNMI's law fails.

In *Bateman v. Perdue*, 881 F.Supp.2d 709 (E.D.NC, 2012), the Court applied strict scrutiny and struck down the portion of the North Carolina Riot Control Act of 1969 which prohibited residents from bearing arms for self-defense as an unconstitutional violation of Second Amendment rights. *Id*. at 716. The Court in *Bateman* applied strict scrutiny because the plaintiffs were law-abiding residents of the State. *Id*. at 715. Li-Rong deserves the same consideration, especially since she is a member of a suspect class being discriminated against solely for that reason. Further, a complete ban on possession of firearms for an entire class of legal CNMI residents, based on nothing more than citizenship status, must meet the same fate.

Plaintiff Li-Rong as a legal alien enjoys Second Amendment rights, which includes the right to own and possess handguns for self-defense. Towards that end, Defendant has the power to fix 6 CMC § 2204(l), and instead of trying to hide behind faulty immigration laws, with only inertia cited as a reason, he should uphold the Constitution. At the same time, he should follow his duty under CNMI law and issue Li-Rong the WIC, since more than 60 days has expired since her application without a denial.

## V. The intent of the Covenant's framers was to adopt the Second Amendment.

When the CNMI signed the Covenant, including Section 501(a) thereof, the CNMI agreed that the Second Amendment and Section 1 of the Fourteenth Amendment would be applicable to the CNMI "as if the Northern Mariana Islands were one of the several States." There is no ambiguity there. "Statutory interpretation begins with the plain language of the statute . . . If the plain meaning of the statute is unambiguous, that meaning is controlling . . . ." *United States v. Johnson*, 680 F.3d 1140, 1144 (9th Cir. 2012).

This plain reading comports with Defendant's Exhibit 6, where the intent of the Covenant was stated to "place the same sorts of limitations on the exercise of governmental power by the federal and the Commonwealth governments as are placed by the U. S. Constitution on the actions of the federal and state governments in every state of the Union." (Dkt. #20-6, p.1)

Defendant argues the CNMI intended to deny the people Second Amendment rights and their interpretation of the Second Amendment should be "paramount," citing to *Brown v. GSA*, 425 U.S. 820 (1976). But the Supreme Court only looked to legislative intent in *Brown* because the statute at issue was ambiguous. "Congress simply failed explicitly to describe § 717's position in the constellation of antidiscrimination law. We must, therefore, infer congressional intent in less obvious ways." *Id*. at 825. That is not the case here. Similarly, Section 501(a) specifically applies the Second Amendment to the CNMI as if it were one of the several states.

Defendant argues just because CNMI does not like the way constitutional law has changed and evolved since the Covenant was entered and later implemented, the Court should ignore the changes and allow the CNMI government to live in the past. In many areas, the Defendant and CNMI may be free to do just that. The Second Amendment is not one of them.

Every year, the Courts make rulings that affect and change people's and government's rights and responsibilities. Some are profound, landmark decisions, such as *United States v. Windsor*, 570 U.S. ___ (2013) (striking down a federal "heterosexual-only" definition of marriage in the Defense of Marriage Act) and *Citizens United v. FEC*, 558 U.S. 310 (2010) (holding that First Amendment prohibits government from restricting independent election spending by non-profit corporations). *Heller* also falls into this category. In these cases, some people are often upset that their way of doing things must change (*e.g.*, the City of Chicago's attempt to ignore *Heller* led to *McDonald v. City of Chicago*, 130 S.Ct. 3010 (2010). But this lack of perfect agreement goes back to *Bush v. Gore*, 531 U.S 98 (2000), *Brown v. Board of Education*, 347 U.S. 483 (1954), and throughout American history. The legal decisions may have been unpleasant to political leaders of the time, who sometimes even go so far as to say that the Court decisions are against the Framers' intentions. But whether or not a particular person or political body agrees with the Supreme Court's rulings, they must be followed. Defendant's suggestion that the Court's Second Amendment jurisprudence should be frozen as of 1975 completely lacks merit.

Plaintiffs will not waste time rebutting the "collective right" cases cited by Defendant, as they were soundly rejected in *Heller* and are not the law of the United States. Likewise, cases holding the Second Amendment did not apply to the several states were rejected in *McDonald* and are not the law. Even the Covenant's Framer's knew the meaning of the Second Amendment was unclear at the time and could change (Dkt. #20-6, p.12 ("At what point the importance of a well-regulated Militia would mandate greater freedom to remain armed is not explained by [*U.S. v. Miller*], and remains unclear")). [1]

---

[1] Plaintiffs are not stipulating to the admissibility of Defendant's "ancient" documents, since with no foundation or context, Plaintiffs cannot say who drafted them, marked them up, or how, if at all, they were used.

However, Defendant's discussion of extraneous documents is irrelevant because a Court "may not make a silent statute speak by inserting language the Legislature did not put in the legislation." *Garcia v. Pacificare of Cal., Inc.*, 750 F.3d 1113, 1117 (9th Cir. 2014). Whereas the intent of the Covenant was to limit the government's power, Defendant is improperly attempting to use the Covenant to expand that power. Maybe the government would like to pretend *Heller*, *McDonald* and *Peruta* never happened, but these precedents must be followed. That should end the discussion.

## VI. The Second Amendment protects people's right to possess handguns even though they have been illegal in CNMI.

The Defendant's argument has been rejected in both *Heller* and *McDonald*. In *Heller*, the right to possess handguns, the "the most preferred firearm in the nation to keep and use for protection of one's home and family" (554 U.S. at 628-29) was upheld in the District of Columbia notwithstanding the fact that handguns had been banned there for decades. And in 2010 in *McDonald*, the Chicago handgun ban was struck down, even though handguns had been banned since 1982 (almost as long a time as the signing of the Covenant), and therefore no one had legally used a handgun for self-defense in Chicago in almost three decades.

The CNMI cannot use the fact that handguns have always been illegal under CNMI law as an excuse to continue to unconstitutionally prohibit them. The Supreme Court in *Heller* did not ask for a state-by-state survey to determine where handguns were actually "in common use" so that it could rule handguns were protected in certain geographical areas but not in others. If it had, D.C.'s and Chicago's bans may have been upheld using the same twisted logic as employed by Defendant. The Plaintiffs have a right to self-defense, and they have the right to possess a handgun to do so. "[T]he enshrinement of constitutional rights

---

Further, if Defendant can ask the Court to admit the "ancient" documents, there should be no objection to Plaintiff's documents, which can be found on CNMI websites this very minute.

necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home." *Heller*, 554 U.S. 570, 636 (U.S. 2008).  Summary judgment for Plaintiffs is proper.

## **CONCLUSION**

WHEREFORE, the Plaintiffs, David J. Radich and Li-Rong Radich, request this Honorable Court to grant their F.R.Civ.P. 56(a) Motion for Summary Judgment, as well as any and all further relief as this Court deems just and proper.

Dated: February 19, 2015                    Respectfully submitted,


By:      /s/ David G. Sigale
         One of the Attorneys for Plaintiffs


Lead Counsel
David G. Sigale, Esq. (#6238103 (IL))
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
Tel:  630.452.4547
Fax:  630.596.4445
dsigale@sigalelaw.com
Admitted *Pro hac vice*

*Attorneys for Plaintiffs*

Local Civil Rule 83.5(f) Counsel
Daniel T. Guidotti, Esq. (#F0473 CNMI))
Marianas Pacific Law LLC
2nd Floor, J.E. Tenorio Building
Middle Road, Gualo Rai
P.O. Box 506057
Saipan, MP 96950
Tel: +1.670.233.0777
Fax: +1.670.233.0776
dan.guidotti@mpaclaw.com

**CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING**

The undersigned certifies that:

1. On February 19, 2015, the foregoing document was electronically filed with the District Court Clerk *via* CM/ECF filing system;

2. Pursuant to F.R.Civ.P. 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.

                                              /s/ David G. Sigale
                                              One of the Attorneys for Plaintiffs

| Lead Counsel | Local Civil Rule 83.5(f) Counsel |
|---|---|
| David G. Sigale, Esq. (#6238103 (IL)) | Daniel T. Guidotti, Esq. (#F0473 (CNMI)) |
| LAW FIRM OF DAVID G. SIGALE, P.C. | Marianas Pacific Law LLC |
| 799 Roosevelt Road, Suite 207 | 2nd Floor, J.E. Tenorio Building |
| Glen Ellyn, IL 60137 | Middle Road, Gualo Rai |
| Tel: 630.452.4547 | P.O. Box 506057 |
| Fax: 630.596.4445 | Saipan, MP 96950 |
| dsigale@sigalelaw.com | Tel: +1.670.233.0777 |
| Admitted *Pro hac vice* | Fax: +1.670.233.0776 |
| | dan.guidotti@mpaclaw.com |

*Attorneys for Plaintiffs*