F I L E D
Clerk
District Court

MAR 28 2016

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

DAVID J. RADICH and LI-RONG RADICH,

                    Plaintiffs,

        v.

JAMES C. DELEON GUERRERO, in his official capacity as Commissioner of the Department of Public Safety of the Commonwealth of the Northern Mariana Islands, and LARRISA LARSON, in her official capacity as Secretary of the Department of Finance of the Commonwealth of the Northern Mariana Islands,

                    Defendants.

Case 1:14-CV-00020

**DECISION AND ORDER GRANTING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

The Commonwealth of the Northern Mariana Islands ("Commonwealth" or "CNMI"), prohibits most private individuals from possessing and importing handguns and handgun ammunition. 6 CMC [N. Mar. I. Code] §§ 2222(e), 2301(a)(3). In order to possess any firearm, an individual must first apply for and receive a weapons identification card ("WIC"). 6 CMC § 2204(a). The WIC application requires that an applicant state her reason for possessing a firearm, but "strongly recommend[s]" that she not use "family protection" as the reason. (WIC Application, ECF No. 53-4.) WICs are limited to U.S. citizens or U.S. nationals who reside within the Commonwealth, and cannot be issued to lawful permanent residents. 6 CMC § 2204(l).

Plaintiffs Li-Rong and David Radich contend that the Commonwealth's restrictions violate the Second Amendment and the Equal Protection Clause of the Fourteenth Amendment. Specifically, their four-count complaint asks the Court to find that: (1) the ban on the *possession* of handguns and handgun ammunition violates the Second Amendment; (2) the ban on *importation* violates the Second Amendment; (3) the implicit ban on receiving a WIC for self-defense purposes violates the Second Amendment; and (4) the ban on lawful permanent residents obtaining a WIC violates equal protection. (Compl. ¶¶ 28-36, ECF No. 42-2.) The Radiches request that the Court enjoin Defendants James C. Deleon Guerrero and Larrisa Larson from enforcing those provisions of the laws in their official capacities as the Commissioner of the Department of Public Safety and the Secretary of the Department of Finance, respectively.

On September 21, 2015, the parties filed cross-motions for summary judgment. (Pl. Mot., ECF No. 51; Def. Mot., ECF No. 50.) The Radiches seek summary judgment on each of the four counts of the Complaint, but the Defendants only seek summary judgment on the first three. Defendants concede that the Radiches should prevail on their equal protection claim. (Def. Opp'n 24, ECF No. 54.) The Court heard arguments on November 19, 2015, and took the motions under advisement. (Min. Entry, ECF No. 59.)

For the following reasons, the Court will grant the Radiches' cross-motion for summary judgment on each count, and deny the Commonwealth's cross-motion.

## II.  BACKGROUND

Plaintiff David J. Radich, a U.S. citizen, served honorably on active duty in the United States Navy during the Gulf War, and continued his public service in Tinian for the CNMI Public School System. He moved to Saipan in 2008, and the following year married Plaintiff Li-Rong Radich. Li-Rong is a Chinese citizen, but has been a lawful permanent resident of the United States since she married David. In 2010, while home alone, Li-Rong was attacked and savagely beaten, suffering two broken ribs, facial contusions, and possibly a broken orbital bone and eye socket.

Three years later, on July 31, 2013, David and Li-Rong applied for WICs from the CNMI Department of Public Safety ("DPS"). However, no action was taken on their applications, and to this day, neither David nor Li-Rong has received a response from DPS.

Defendant James C. Deleon Guerrero is the Commissioner of DPS, and in that capacity is charged with enforcing the Commonwealth's gun control laws, including the issuance of WICs. Defendant Larrisa Larson is the Secretary of Finance, and in that capacity is charged with enforcing—along with Deleon Guerrero—the CNMI's import laws.

## III.    DISCUSSION

The Second Amendment, as well as the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment, are the law of the land in the CNMI as if it were a state. The Second Amendment, made applicable against the states through the Fourteenth Amendment, protects the fundamental right of armed self-defense, and prohibits any state from completely banning handguns. The Equal Protection Clause prohibits discrimination against suspect classes of individuals, including lawful permanent residents, without a legitimate state interest as justification. Here, because the Commonwealth's gun control laws ban the right to keep and bear handguns, or implicitly any firearm for the purpose of self-defense, and because the import ban would frustrate the exercise of that right, the Commonwealth's laws are unconstitutional, and Defendants must be enjoined from enforcing them. Similarly, because the Commonwealth prohibits lawful permanent residents from exercising the right to keep and bear arms without any legitimate interest whatsoever, the prohibition violates the Equal Protection Clause and the Defendants must be enjoined from enforcing the law.

*A.  The Second Amendment Applies to the Commonwealth.*

Unlike the United States, the Commonwealth does not derive the source of its laws from the U.S. Constitution, but rather from the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ("Covenant"). Covenant

§ 201 (stating that the "supreme law of the land" shall be the Covenant, "together with those provisions of the Constitution, treaties and laws of the United States applicable to the [CNMI]").

Several provisions of the U.S. Constitution are made applicable to the Commonwealth through the Covenant:

> To the extent that they are not applicable of their own force, *the following provisions of the Constitution of the United States will be applicable within the Northern Mariana Islands as if the Northern Mariana Islands were one of the several States*: Article I, Section 9, Clauses 2, 3, and 8; Article I, Section 10, Clauses 1 and 3; Article IV, Section 1 and Section 2, Clauses 1 and 2; *Amendments 1 through 9, inclusive*; Amendment 13; Amendment 14, Section 1; Amendment 15; Amendment 19; and Amendment 26; provided, however, that neither trial by jury nor indictment by grand jury shall be required in any civil action or criminal prosecution based on local law, except where required by local law. Other provisions of or amendments to the Constitution of the United States, which do not apply of their own force within the Northern Mariana Islands, will be applicable within the Northern Mariana Islands only with the approval of the Government of the Northern Mariana Islands and of the Government of the United States.

Covenant § 501(a) (emphasis added). As the plain language of the Covenant provides, the Second Amendment and section 1 of the Fourteenth Amendment—including the Due Process Clause and the Equal Protection Clause—apply within the Commonwealth as if it were a state.

The Second Amendment, through the Due Process Clause of the Fourteenth Amendment, applies against the states. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010) ("we hold that the Second Amendment right is fully applicable to the States"). Accordingly, the Second Amendment applies with full force in the Commonwealth as if it were a state.

*B. The Second Amendment Secures the Right to Self-Defense Using a Handgun.*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the operative clause of the Second Amendment—"the right of the people to keep and bear Arms, shall not be infringed"—guarantees "the individual right to possess and carry weapons in case of

4

confrontation." 554 U.S. 570, 592 (2008). Applying that individual right, the Court struck down a District of Columbia ban on the "possession of usable handguns in the home[.]" *Id.* at 573, 635 ("we hold that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense").

The Commonwealth, like the District of Columbia in *Heller*, categorically bans handguns. 6 CMC §§ 2222(e) ("No person shall . . . [i]mport, sell, transfer, give away, purchase, possess or use any handgun, automatic weapon, or ammunition other than" .22 or .223 caliber rifles or .410 gauge shotguns), 2301(a)(3) (stating that it is unlawful to import contraband, including firearms other than .22 or .223 caliber rifles or .410 gauge shotguns). Because the Commonwealth's ban on handguns cannot be squared with the Second Amendment right described in *Heller* and *McDonald* and applied in the CNMI pursuant to the Covenant, it is invalid and must be enjoined.

i.

Defendants make two arguments against applying *Heller* and *McDonald* in the Commonwealth: (1) the cases "directly contradict[] the known understanding of the framers of the Covenant"; and (2) handguns have "never been kept or used for self-defense" in the Commonwealth, as distinct from the rest of the states and the Supreme Court's rationale in *Heller*. (Def. Opp'n 13.) Neither argument has merit.

Defendants first argue that the holdings of *Heller* and *McDonald* are inconsistent with the original intent of the Covenant's framers—who Defendants allege conceived of the Second Amendment as limiting only federal action and not creating an individual right to keep and bear arms—and are therefore not the law in this case. (Def. Opp'n 6-13.)

"The most basic canon of statutory construction is that 'the [statutory] language must be given its plain meaning, where the meaning is clear and unambiguous.'" *Saipan Achugao Resort Members' Ass'n v. Yoon*, 2011 MP 12, ¶ 23 (citations omitted); *accord United States v. Johnson*,

680 F.3d 1140, 1144 (9th Cir. 2012) ("If the plain meaning of the statute is unambiguous, that meaning is controlling . . . ." (quoting *United States v. Williams*, 659 F.3d 1223, 1225 (9th Cir. 2011))); *see Fleming v. Department of Pub. Safety*, 837 F.2d 401, 405-06 (9th Cir. 1988) (applying principles of statutory construction to interpret the Covenant). The Covenant provides that the Second Amendment and section 1 of the Fourteenth Amendment "will be applicable within the [CNMI] as if the [CNMI] were one of the several States." Covenant § 501(a). Defendants have not alleged, nor could they plausibly allege, that § 501(a)'s plain meaning leaves any room for ambiguity. *Cf. Milner v. Department of Navy*, 562 U.S. 562, 572 (2011) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text. We will not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language.").

Even if the Defendants were correct that legislative history could be used to create ambiguity in an otherwise clear provision, their argument fails on the merits. As Defendants correctly note, the framers excluded certain constitutional provisions from the Covenant. *See* Covenant § 501(a) ("neither trial by jury nor indictment by grand jury shall be required in any civil action or criminal prosecution based on local law, except where required by local law"). Defendants suggest that, had the framers of the Covenant known that the Second Amendment guarantees an individual right to keep and bear arms and that it applies against states as well as the federal government, then "they might well have" carved out exceptions to that right in the Covenant, as they did others. (Def. Opp'n 12.) But Defendants' argument actually shows that the framers *did* intend for the Second Amendment to apply in the CNMI, exactly as the Covenant applies other provisions of the Constitution.

Seven years before the Covenant came into being, the Supreme Court held that the Sixth Amendment right to trial by jury in criminal cases applied against the states through the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145, 157-58 (1968) ("in the American States, as in

6

the federal judicial system, a general grant of jury trial for serious offenses is a fundamental right, essential for preventing miscarriages of justice and for assuring that fair trials are provided for all defendants"). Because the Covenant applies the Sixth and Fourteenth Amendments to the CNMI, the holding in *Duncan* would require that the Commonwealth provide juries for its criminal defendants, as each state must. Covenant § 501(a). However, *Duncan* does not control, because the framers of the Covenant expressly rejected the right to trial by jury. Covenant § 501(a) (trials for civil or criminal cases based on local law do not require juries); *see Northern Mariana Islands v. Atalig*, 723 F.2d 682, 688-91 (9th Cir. 1984) (relying on the *Insular Cases* to find that the Covenant's rejection of criminal jury trials, while a violation of a "fundamental right" in the states, violates no such fundamental right in the Commonwealth, because the Commonwealth need not partake in Anglo-American judicial traditions).

Defendants essentially argue that it is unfair to burden the Commonwealth with a ruling it did not see coming in 1975, because, as the framers' rejection of criminal jury trials makes clear, they could have avoided it if they had but known. But that argument ignores other exceptions to the U.S. Constitution that the framers added to the Covenant—notably the right to indictment by grand jury.

The framers of the Covenant knew that they did not have to wait for the Supreme Court to rule on an issue of incorporation before handling it in the Covenant. The Covenant not only rejects the Sixth Amendment right to criminal jury trials as established in *Duncan*, it also rejects the Fifth Amendment right to indictment by grand jury, which has never been held to apply against the states. Covenant § 501(a) ("neither trial by jury *nor indictment by grand jury* shall be required" (emphasis added)). In fact, only three years before the Covenant was adopted, the Supreme Court rejected the notion that the Fourteenth Amendment incorporates the Fifth Amendment right to indictment by grand jury. *See Alexander v. Louisiana*, 405 U.S. 625, 633 (1972) (noting that due process "does not require the States to observe the Fifth Amendment's provision for presentment

7

or indictment by a grand jury. . . . [T]he Court has never held that federal concepts of a 'grand jury,' binding on the federal courts under the Fifth Amendment, are obligatory for the States" (citing *Hurtado v. California*, 110 U.S. 516 (1884)). Because the Fifth Amendment right to indictment by grand jury did not apply to the states, it would not have applied to the CNMI. *See* Covenant § 501(a) (making the Fifth Amendment applicable to the CNMI as if it were a state). Nevertheless, the framers added an unnecessary clause to the proviso in section 501(a) to make clear that "indictment by grand jury" would not be required in the new Commonwealth. *Id.* Why do such a thing?

The reason for the superfluous clause is as obvious as it is ruinous for Defendants' argument: because the framers knew that the Supreme Court could change its mind, and they wanted to ensure that grand juries would never be required, regardless of future changes in the law. Had the framers truly shared Defendants' concerns about the Second Amendment individual right to keep and bear arms applying within the CNMI, then they could have added an exception to prevent it from happening, just as they did for grand juries. Contrary to Defendants' assertions and submissions, the framers intended that the CNMI would be bound by future development of the law, including the law of the Second Amendment. And so it is.

There are likely other post-Covenant decisions of the Supreme Court with which the framers might personally disagree or at the very least find surprising, but which nevertheless apply with full force in the CNMI. *See, e.g., Texas v. Johnson*, 491 U.S. 397, 399 (1989) (flag burning is protected by the First Amendment); *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 365 (2010) (consistent with the First Amendment, "the Government may not suppress political speech on the basis of the speaker's corporate identity"); *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004) (the Confrontation Clause of the Sixth Amendment restricts the use of testimonial hearsay in criminal cases regardless of the statement's reliability); *Obergefell v. Hodges*, __ U.S. __, 135 S. Ct. 2584, 2602-03 (2015) (the right of same-sex couples to marry is protected by the

Due Process and Equal Protection Clauses of the Fourteenth Amendment). This case differs only in substance, not in form. As with every other provision of the Constitution made applicable to the CNMI through the Covenant, the Supreme Court's constitutional decisions say what the law is for the federal government, the states, and our own Commonwealth, just as the framers intended.

At oral argument, Defendants argued that *Heller* was unforeseeable in 1975 because prior Supreme Court cases had already limited the scope of the Second Amendment to militias. However, as the Supreme Court explained in *Heller*, "nothing in our precedents forecloses our adoption of the original understanding of the Second Amendment." 554 U.S. at 625. For instance, in *Presser v. Illinois*, 116 U.S. 252 (1886), the Court "held that the right to keep and bear arms was not violated by a law that forbade 'bodies of men to associate together as military organizations, or to drill or parade with arms in cities and towns unless authorized by law.'" *Heller*, 554 U.S. at 620 (quoting *Presser*, 116 U.S. at 264-65). Simply, that holding has no relevance to whether an individual has a right to armed self-defense. *Heller*, 554 U.S. at 621 ("*Presser* said nothing about the Second Amendment's meaning or scope, beyond the fact that it does not prevent the prohibition of private paramilitary organizations.").

Similarly, in *United States v. Miller*, the Supreme Court upheld an indictment against two defendants for transporting an unregistered sawed-off shotgun in interstate commerce in violation of the National Firearms Act of 1934. 307 U.S. 174, 178 (1939) ("In the absence of any evidence tending to show that possession or use of a [sawed-off shotgun] . . . has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument."). As the *Heller* Court noted, *Miller* was based on the *type* of weapon at issue, and "positively suggests[] that the Second Amendment confers an individual right to keep and bear arms." 554 U.S. at 621-22. Indeed, the Court "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-

barreled shotguns," which "accords with the historical understanding of the scope of the right." *Heller*, 554 U.S. at 625.

In sum, when the Covenant was adopted in 1975, no Supreme Court case limited the scope of the Second Amendment to militias, or purported to deny an individual right to bear arms. *Heller*, 554 U.S. at 625-26 ("It should be unsurprising that such a significant matter has for so long [been] judicially unresolved . . . [f]or most of our history the question did not present itself"). Defendants' insinuation that *Heller* and *McDonald* were unforeseeable to the framers or otherwise precluded by prior Supreme Court precedent fails to accurately account for the history of the Second Amendment. *Heller* was a watershed case, but it should not have come as a surprise.

ii.

Defendants next contend that "handguns are not constitutionally protected in the Commonwealth because they have never been kept or used for self-defense" within the CNMI. (Def. Opp'n 6.) Even if true, the assertion is irrelevant.

In *Heller*, after the Court held that the Second Amendment protected the individual right to keep and bear arms, it determined that handguns were included within the right because handguns were "the most preferred firearm in the nation to keep and use for protection of one's home and family." 554 U.S. at 628-29 (internal quotation marks omitted). Because "the American people have considered the handgun to be the quintessential self-defense weapon," the District of Columbia could not banish it completely. 554 U.S. at 629 ("Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.").

Defendants argue that the Court should reapply the *Heller* analysis to the Commonwealth, asking whether handguns have traditionally been used for self-defense by law-abiding residents in the CNMI. Defendants note that statistics in *Heller* do not account for the CNMI. Defendants may

be correct that the CNMI is absent from gun ownership statistics, but it does not matter; it certainly does not call for a Commonwealth-specific Second Amendment analysis.

Individuals born in the Commonwealth are Americans, and constitute the same "American people" as the rest of the United States. *See* Covenant § 303 ("All persons born in the Commonwealth . . . and subject to the jurisdiction of the United States will be citizens of the United States at birth."). *Heller*'s multiple references to the nation, Americans, and the American people shows that the Second Amendment is national in scope. *See* 554 U.S. at 628-30. If Defendants were correct that local gun preferences dictate the scope of the Second Amendment, then the gun laws of the District of Columbia and Chicago presumably would have been upheld as the product of democratically elected officials applying the preference of the majority. That did not happen. *See Heller*, 554 U.S. at 636 ("the enshrinement of constitutional rights necessarily takes certain policy choices off the table"). The Court will not treat the people of the CNMI as second-class citizens, somehow fundamentally different from their mainland compatriots.

Defendants point out that in two post-*Heller* cases, courts have considered anew whether a particular kind of firearm is covered by the Second Amendment by asking whether law-abiding citizens typically use it for self-defense or lawful purposes. *See United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (holding that machine gun possession is not entitled to Second Amendment protection because machine guns are "highly dangerous and unusual weapons that are not typically possessed by law-abiding citizens for lawful purposes" (citations omitted)); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) (holding that machine guns are "not in common use by law-abiding citizens for lawful purposes" and may therefore be restricted by the government); *cf. Heller*, 554 U.S. at 627 (observing the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" (citing 4 Blackstone 148-49 (1769))).

However, *Henry* and *Fincher* do not support Defendants' arguments for at least two reasons. First, *Henry* and *Fincher* only deal with machine guns—not handguns. *See* 688 F.3d at

11

640; 538 F.3d at 868. Had the question in either case been whether the Second Amendment protects a right to possess a handgun, there would be no need to conduct a "law-abiding citizen" or "dangerous and unusual" analysis because the Supreme Court already did it in *Heller*.

Second, contrary to the Defendants' suggestion that the Court apply a CNMI-specific "law-abiding citizen" or "dangerous and unusual" test, neither *Henry* nor *Fincher* considered machine gun ownership solely limited to the district or circuit in which the case arose. *See* 688 F.3d at 640 (noting that machine gun possession has generally been outlawed across the nation by Congress since 1986); 538 F.3d at 874 (discussing the "common use by law-abiding citizens" generally).

That handguns have never been used in the Commonwealth by law-abiding citizens for legitimate purposes does not render *Heller* inapplicable in this jurisdiction. Rather, because the people of the Commonwealth are part of the American people who have overwhelmingly chosen handguns as their principal means of self-defense, the Second Amendment protects that right here as well.

## C. *The Second Amendment Prohibits the Commonwealth from Banning the Import of Handguns.*

The Second Amendment, applied through the Covenant, secures an individual right to keep and bear a handgun for self-defense, and the Commonwealth may not extinguish that right by preventing handguns from being imported into the CNMI.

As counsel for Defendants admits, the Radiches cannot obtain the relief they seek in this case unless both the Commonwealth's possession *and* import bans are struck down, because the Radiches would not be able to lawfully obtain a handgun to exercise their constitutional rights if only the possession ban were deemed unconstitutional. (Def. Opp'n to Pl. Mot. Summ. J. of Jan. 10, 2015, 6, ECF No. 20.) Imported contraband, such as a handgun or ammunition, is forfeited. 6 CMC § 2303. Moreover, as Defendants point out, handguns have been illegal within the CNMI for forty years. Outside a direct sale from law enforcement, which seems unlikely, or a black

market purchase, which would be unlawful, the Radiches will not be able to obtain the handgun they have the right to possess.

If the Second Amendment individual right to keep and bear a handgun for self-defense is to have any meaning, it must protect an eligible individual's right to purchase a handgun, as well as the complimentary right to sell handguns. *See United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010) (noting that "commercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment" under any reading of *Heller*). Indeed, the same rationale underpins other cases striking down restrictions on *selling*, but not *possessing*, certain goods necessary to exercise constitutional rights. *See, e.g., Carey v. Population Serv., Int'l*, 431 U.S. 678, 684-88 (1977) (striking down a New York statute forbidding distribution of non-medical contraceptives through anyone but a licensed pharmacist and noting that a "total prohibition against sale of contraceptives" could have "an even more devastating effect upon" the right to choose to beget a child than a direct ban on contraceptives itself would); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 740, 743 (5th Cir. 2008) (striking down a Texas statute that prohibited the promotion or sale of sexual devices and noting that "restricting the ability to purchase an item is tantamount to restricting that item's use"); *Postscript Enterprises, Inc. v. Whaley*, 658 F.2d 1249, 1252-53 (8th Cir. 1981) (striking down an ordinance restricting the sale of contraceptives and prophylactics as an unconstitutional burden on the right to contraception choice).

In the Commonwealth, the import ban on handguns can only operate as a sales ban on a constitutionally protected product. The import ban on handguns and their ammunition is unconstitutional and violates the Covenant; Defendants will be enjoined from enforcing it.

Defendants contend that the Commonwealth's sovereignty over its customs territory, as provided in the Covenant, somehow means that individual rights need not concern it. (Def. Opp'n 19-23.) The argument is unfounded, and Defendants provide not a single case in support.

Put simply, a government's authority to act is limited by its duty not to violate individual rights. No party in *Heller*, for instance, challenged the District's authority to make laws. *Cf.* 542 U.S. at 631 ("Respondent conceded at oral argument that he does not 'have a problem with . . . licensing' and the District's law is permissible so long as it is 'not enforced in an arbitrary and capricious manner.'"). The reason is obvious: if individual rights were not a check on government power, then they would serve no purpose, an absurd outcome. *See McDonald*, 561 U.S. at 769 (noting that the framers of the U.S. Constitution and their opponents both agreed that the "right to bear arms was fundamental to the newly formed system of government," but that "those who were fearful that the new Federal Government would infringe traditional rights such as the right to keep and bear arms insisted on the adoption of the Bill of Rights as a condition for ratification of the Constitution"); *see Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 569 (1985) (Powell, J., dissenting) ("So strong was the concern that the proposed Constitution was seriously defective without a specific bill of rights . . . that in order to secure the votes for ratification, the Federalists eventually conceded that such provisions were necessary.")

D. *The Second Amendment Prohibits the Commonwealth from Denying WIC Applications on the Basis of Self-Defense.*

The Second Amendment guarantees the "individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592, 628 ("the inherent right of self-defense has been central to the Second Amendment right"). In the Commonwealth, the WIC application includes a "strong[] recommend[ation]" not to use "family protection" as the reason for applying for the permit. (WIC Application.) "Family protection" falls within the ambit of the Second Amendment's "core lawful purpose of self-defense," and cannot form a lawful basis for denying a WIC. *Heller*, 554 U.S. at 630. To the extent that the Commonwealth prohibits access to firearms for lawful self-defense purposes, the prohibition is unconstitutional, and will therefore be enjoined.

E. *The Equal Protection Clause Prohibits Disparate Treatment of Lawful Permanent Residents in Firearm Permitting.*

The parties agree that Li-Rong may not be denied a WIC solely on the basis of her alienage. *See* U.S. Const. amend. XIV, § 1 ("nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws"); *Graham v. Richardson*, 403 U.S. 365, 371 (1971) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)) ("the term 'person' in [the Fourteenth Amendment] encompasses lawfully admitted resident aliens as well as citizens of the United States and entitles both citizens and aliens to the equal protection of the laws of the State in which they reside"). Such restrictions based on alienage are "inherently suspect and subject to close judicial scrutiny." *Graham*, 403 at 372. Here, the Commonwealth's restriction on issuing WICs to lawful permanent residents has no justification. Accordingly, the Defendants shall be enjoined from enforcing 6 CMC § 2204(l) to prohibit lawful permanent residents from obtaining WICs.

## IV. CONCLUSION

Because the Covenant applies both the Second Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the U.S. Constitution to the CNMI as if it were a state, and it is unconstitutional for a state to ban handguns for self-defense purposes in the home or to restrict handgun possession to citizens but not lawful permanent residents, the Court must grant the Radiches cross-motion for summary judgment as to all counts, and similarly deny the Defendants' cross-motion for summary judgment in its entirety.

Accordingly, it is hereby ORDERED that:

1. Plaintiffs' cross-motion for summary judgment (ECF No. 51) is granted and Defendants' cross-motion for summary judgment (ECF No. 50) is denied;

2. The handgun and handgun ammunition ban contained in 6 CMC § 2222(e) is declared unconstitutional and in violation of the Covenant that incorporated the Second Amendment to the U.S. Constitution;

3. The handgun and handgun ammunition import ban contained in 6 CMC § 2222(e) and 6 CMC § 2301(a)(3) is declared unconstitutional and in violation of the Covenant that incorporated the Second Amendment to the U.S. Constitution;

4. The prohibition on issuing WICs to lawful permanent residents in 6 CMC § 2204(l) is declared unconstitutional and in violation of the Covenant that incorporated the Fourteenth Amendment to the U.S. Constitution;

5. The implied prohibition on issuing WICs for self-defense, or "family defense" as stated on the WIC application, is declared unconstitutional and in violation of the Covenant that incorporated the Second Amendment to the U.S. Constitution;

6. Defendant Deleon Guerrero, in his official capacity as Commissioner of the DPS, and Defendant Larson, in her official capacity as the Secretary of the Department of Finance, are permanently enjoined from enforcing the unconstitutional handgun and handgun ammunition bans contained in 6 CMC §§ 2222(e) and 6 CMC § 2301(a)(3) against Plaintiffs;

7. Defendant Deleon Guerrero, in his official capacity as Commissioner of the DPS, is permanently enjoined from enforcing the prohibition on issuing WICs to lawful permanent aliens in 6 CMC § 2204(l) against Plaintiff Li-Rong Radich;

8. Defendant Deleon Guerrero, in his official capacity as Commissioner of the DPS, is permanently enjoined from refusing to issue WICs to Plaintiffs for self-defense purposes, or "family defense" as stated on the WIC application;

9. Defendant Deleon Guerrero, in his official capacity as Commissioner of the DPS, shall issue WICs to Plaintiffs, if he finds that they satisfy the unchallenged

provisions of the Weapons Control Act, no later than **30 days after the issuance of this Decision and Order**; and

10. Plaintiffs are awarded costs and fees pursuant to 42 U.S.C. § 1988:

    a. Plaintiffs shall submit their costs and fees to the Court no later than **April 11, 2016**, and

    b. Defendants shall file their response, if any, no later than **April 18, 2016**.

IT IS SO ORDERED this 28th day of March, 2016.

RAMONA V. MANGLONA
Chief Judge