1  **O'CONNOR BERMAN DOTTS & BANES**
   **201 Marianas Business Plaza**
2  **1 Nauru Loop**
   **Susupe, Saipan, CNMI**
3  **Mail: PO Box 501969 Saipan MP 96950**
   **Phone: 234-5684**
4  **Fax: 234-5683**

5  **Attorneys for Movant for Intervention**

6                      **IN THE DISTRICT COURT**
                **FOR THE NORTHERN MARIANA ISLANDS**
7

8  **DAVID J. RADICH and LI-RONG RADICH,**  )      No. 1:14-CV-00020
                                            )
               **Plaintiffs,**             )      **REPLY**
9                                           )      **IN SUPPORT OF**
                                            )      **MOTION TO**
         **vs.**                            )      **INTERVENE**
10                                          )      **FOR PURPOSES**
   **ROBERT GUERRERO,**                     )      **OF APPEAL**
11 **in his official capacity as Commissioner** )
   **of the CNMI Department of Public Safety, and** )
12 **LARISSA LARSON,**                      )
   **in her official capacity as Secretary** )      **Hearing Date: May 26, 2016**
13 **of the CNMI Department of Finance,**   )      **Time:  2:00 pm**
                                            )
14             **Defendants.**              )
   _____ )
15                                          )
   **TANAPAG MIDDLE SCHOOL PARENT**         )
16 **TEACHER STUDENT ASSOCIATION,**         )
                                            )
17         **Movant for Intervention.**     )
   _____ )
18

19                      **INTRODUCTION**

20        The Tanapag Middle School Parent Teacher Student Association (hereinafter PTSA) has

21 moved the Court for leave to intervene in the above-captioned matter for the purpose a taking an

22 appeal from the Court's recent decision that the CNMI's handgun prohibition violated the

23 Covenant.  *See generally* Motion to Intervene for Purposes of Appeal (ECF No. 66) and

24 Memorandum in support thereof (ECF No. 68).  Plaintiffs David and Li-Rong Radich have

1   opposed the motion on the ground that the PTSA lacks standing to intervene, because its

2   grievances are "generalized."   *See generally* Plaintiffs' Opposition to F.R.Civ.P. 24 Motion to

3   Intervene (ECF No. 70).[1]   Plaintiffs are incorrect for two reasons: first, they misapprehend the

4   meaning of a "generalized" grievance as meaning merely one that is widely shared, when in fact

5   it means one that is abstract; and, second, the PTSA has grievances that are additional to and

6   distinct from those that it shares with the population at large, and thus are not "generalized" even

7   under Plaintiff's mistaken understanding of the term.

8                                                **ARGUMENT**

9          **Plaintiffs Dispute Only the "Particularized" Character of the PTSA's Injury.**

10         The Supreme Court has set forth the requirements of Article III standing concisely as

11  follows:

12         [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has
           suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or
13         imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the
           challenged action of the defendant; and (3) it is likely, as opposed to merely
14         speculative, that the injury will be redressed by a favorable decision.

15  Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 180-81

16  (2000) (*citing* Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).   In the context of

17  standing to appeal, the same factors apply, except that the focus is on "injury caused by the

18  judgment rather than injury caused by the underlying facts."   Tachiona v. United States, 386 F.3d

19  205, 211 (2nd Cir. 2004) (*citing* Wright & Miller, Federal Practice and Procedure § 3902).   *See*

20  *also, e.g.*, Transamerica Ins. Co. v. South, 125 F.3d 392, 396 (7th Cir. 1997) ("[S]tanding to

21  appeal is recognized if the appellant can show an adverse effect of the judgment.").

22

23  _____

24  [1]       The CNMI government defendants have filed no opposition to the motion.

                                                      2

Plaintiffs challenges only one aspect of the PTSA's standing to appeal in this case – the requirement that the injury be "particularized." Plaintiffs contend that the PTSA has only a "generalized" grievance, insufficient to support standing, "because the reasons the PTSA proffers in support of its bid are germane to every resident of the Commonwealth in light of the Court's March 28, 2016 ruling." Opposition (ECF No. 70) at 4. This argument fails for the following reasons.

### A Widespread Grievance Is Not Per Se a "Generalized" One.

First, even if it were true that "the reasons the PTSA proffers in support of its bid are germane to every resident of the Commonwealth," that would not mean that the PTSA states only a "generalized grievance." A grievance is not "generalized" simply because of the number of people who suffer it. *See, e.g.,* Massachusetts v. EPA, 549 U.S. 497, 517 (2007) ("[I]t does not matter how many persons have been injured by the challenged action," so long as "the party bringing suit . . . show[s] that the action injures him in a concrete and personal way") (*quoting* Lujan, *supra*, 504 U.S. at 581 (Kennedy, J., concurring)); United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 687 (1973) ("[S]tanding is not to be denied simply because many people suffer the same injury."); *id*. at 688 ("To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody. We cannot accept that conclusion."); Novak v. United States, 795 F.3d 1012, 1018 (9th Cir. 2015) ("[T]he district court mistakenly focused only on the size of the population allegedly harmed."); Jewel v. National Security Agency, 673 F.3d 902, 909 (9th Cir. 2011) ("[T]he fact that a harm is widely shared does not necessarily render it a generalized grievance."); Newdow v. Lefevre, 598 F.3d 638, 642

1    (9th Cir. 2010) ("That Newdow's encounters with the motto are common to all Americans does

2    not defeat his standing[.]").

3            "Generalized," in the context of standing law, is a qualitative, not a quantitative, term.  It

4    refers to a harm which is "not only widely shared, but is also of an abstract and indefinite nature

5    – for example, harm to the common concern for obedience to law."  <u>Federal Election</u>

6    <u>Commission v. Akins</u>, 524 U.S. 11, 23 (1998) (emphasis added) (internal quotation marks

7    omitted).  Indeed, the term "generalized grievance" is seldom if ever used to refer to anything

8    else, to the point that "harm to the common concern for the obedience to law," can fairly be

9    considered not only an example but the very definition of the term.[2]  This grievance consists of

10   an "abstract outrage at the enactment of an unconstitutional law," <u>City of South Lake Tahoe v.</u>

11   <u>California Tahoe Regional Planning Agency</u>, 625 F.2d 231, 237 (9th Cir. 1980), or, conversely, at

12   the invalidation of a constitutional one.  A case based solely on such a grievance, in which the

13   litigants have no more "personal stake in the outcome" than the vindication of their own

14   "abstract outrage," becomes a battle of legal opinions asserted for their own sake, or, worse, a

15   mere clash of "value interests,"[3] and thus fails to "assure that concrete adverseness which

16   sharpens the presentation of issues upon which the court so largely depends for illumination."

17

18

---

19   [2]        <i>See, e.g.</i>, <u>Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, ___ U.S. ___, 134 S. Ct.

20   1377, 1387 fn. 3 (2014) ("Take, for example, our reluctance to entertain generalized grievances – <i>i.e.,</i> suits 'claiming only harm to the plaintiff's and every citizen's interest in proper application

21   of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large.") (<i>quoting</i> <u>Lujan</u>, <i>supra</i>, 504 U.S. at 573-74) (internal brackets omitted).

22

23   [3]        <u>Diamond v. Charles</u>, 476 U.S. 54, 62 (1986) (abortion opponent lacked standing to appeal lower court's invalidation of state restricting abortion).  <i>See also, e.g.</i>, <u>Hollingsworth v.</u>

24   <u>Perry</u>, ___ U.S. ___, 133 S.Ct. 2652 (2013) (opponents of same-sex marriage lacked standing to appeal lower court's invalidation of state law denying recognition to such marriages).

1    <u>Massachusetts v. EPA</u>, *supra*, 549 U.S. at 517 (*quoting* <u>Baker v. Carr</u>, 369 U.S. 186, 204 (1962))

2    (internal quotation marks omitted).

3          The PTSA, however, does not seek to intervene out of mere "abstract outrage" at the

4    court's decision, or simply to vindicate a "value interest" in philosophical opposition to the

5    legalization of handguns.  It does so because of the direct and personal physical danger such

6    guns pose to the students whose welfare the PTSA exists to protect:

7          The PTSA opposes the legalization of handguns in the CNMI, *because* handguns
           add a new and dangerous threat to the welfare of our students.  A handgun in the
8          home or school creates new opportunities for murder, assault and suicide, as well
           as attempts and threats to commit them, not to mention accidental death and
9          injury from gunshot.

10   Kodep Declaration at ¶ 4 (emphasis added).  Parents are recognized to have a valid interest in the

11   safety and welfare of their children.  *See, e.g.*, <u>Smuck v. Hobson</u>, 408 F.2d 175, 180 (D.C. Cir.

12   1969) ("Both courts and legislatures have recognized as appropriate the concern for their

13   children's welfare which the parents here seek to protect by intervention."); <u>Johnson v. San</u>

14   <u>Francisco Unified School Dist.</u>, 500 F.2d 349, 352 (9th Cir. 1974) (endorsing this interest as a

15   basis for intervention).  Indeed, the PTSA's interest in their children's safety is not appreciably

16   different from the Radiches' interest in protecting their own safety, which led them to file this

17   action in the first place, however differently they may feel about the best way to accomplish that

18   end.  *See* Second Amended Complaint (ECF No. 30-1) at ¶¶ 20-21 ("Plaintiffs have been and

19   continue to be extremely concerned about the self-defense of their persons. . . . [The] CNMI's

20   prohibition on the importation and possession of handguns by virtually all CNMI residents

21   (including Plaintiffs) significantly limits the Plaintiffs' ability to protect themselves and their

22   family in the event of violence.").  In both cases, moreover, the danger sought to be guarded

23   against necessarily exists for each person (and each person's child) separately, personally and

24

1    individually.  Only rarely, for example, does a single gunshot strike more than one person, and,

2    even then, each of them suffers his own injury.[4]  It is, therefore, very much a "particularized"

3    danger, notwithstanding the fact that it may be experienced by many different persons

4    simultaneously, and notwithstanding the fact that the likelihood of occurrence for any one

5    individual is comparatively small.  *See generally* Village of Elk Grove Village v. Evans, 997

6    F.2d 328, 329 (7th Cir. 1993) ("[E]ven a small probability of injury is sufficient to create a case

7    or controversy – to take a suit out of the category of the hypothetical – provided of course that

8    the relief sought would, if granted, reduce the probability.") (*quoted with approval in*

9    Massachusetts v. EPA, *supra*, 549 U.S. at 526 fn. 23).

10                    **The Threatened Harm Specifically Effects Schoolchildren.**

11           Plaintiffs' argument fails for the further reason that it is simply not true that the reasons

12    cited by the PTSA for seeking to intervene are equally "germane" to every resident of the

13    Commonwealth.  On the contrary, the dangers that the PTSA seeks to prevent by way of its

14    appeal are dangers specific to its members' particular area of concern, namely schools and

15    school children.  For example, school children are particularly apt to be attracted to the allure of

16    guns.[5]   At the same time, however, they are particularly likely to use them unsafely.[6]

17

18    _____

19    [4]       *Cf.* Akins, supra, 524 U.S. at 35 (Scalia, J., dissenting) ("One tort victim suffers a burnt
      leg, another a burnt arm – or even if both suffer burnt arms they are *different* arms. . . . With the
20    generalized grievance, on the other hand, the injury or deprivation is not only widely shared but
      it is *undifferentiated.*") (emphasis in original).

21    [5]       *See* Kodep Declaration at ¶ 4 ("[I]t [a handgun] has a cool and tough image with a natural
      appeal to adolescents.").  *See also, e.g.*, ABC News, "Kids Have Fatal Attraction to Guns."
22    (http://abcnews.go.com/Primetime/story?id=132159&page=1) ("The experiment, which took
      place last year, suggests what some clinical studies have shown: Teenagers who claim to
23    understand the danger of guns and say they would do the right thing if they found one are in fact
      so seduced by the sight of a gun that they cannot resist the urge to touch it.").

24

                                                   6

1   Furthermore, children are particularly likely to be traumatized by gun violence at home or

2   school, whether accidental or intentional.[7]  And, of course, schools are a particularly emotional

3   target, thus a particularly attractive one for shooters who wish to shock and outrage, as well as

4   copycats, who have made "school shootings" a familiar phrase and a subject of focused analysis

5   in a way that "hotel shootings," "restaurant shootings" or even "bank shootings" are not.[8]

6           The special character of schools and school children with respect to the danger of gun

7   violence is repeatedly recognized in laws regulating gun possession and usage, which regularly

8   single out children for special restriction and schools for special protection.  The recently enacted

9   CNMI SAFE Act is a prime example of this phenomenon.  *See* CNMI PL 19-42 at § 202

10  (penalizing "[a]ny person who allows a minor, defined as any person under 21 years of age, to

11  use or possess a firearm without adult supervision"); *id.* at § 203 (penalizing "[a]ny person who

12  knowingly or intentionally sells, transfers or distributes a firearm . . . or ammunition to a person

13  under 21 years of age"); *id.* at § 204 (requiring special steps to secure firearms from minors at

14  home; punishing violation as "criminally negligent storage of a firearm;" increasing penalty

15

16  [6]      *See* Kodep Declaration at ¶ 4 ("A handgun can be easily carried, brandished and used
    even by children too young to fully appreciate its danger.").  *See also, e.g.*, American Academy
17  of Child & Adolescent Psychiatry, "Children and Guns" (2008) (http://www.aacap.org/
    AACAP/Policy_Statements/2013/Children_and_Guns.aspx) ("Access to firearms by youth must
18  be restricted, controlled and closely supervised, due to *the inherent impulsivity of this
    population*.") (emphasis added).

19
    [7]      *See, e.g.*, Lynne Shallcross, "When Tragedy Hits Close to Home," Counseling Today
20  (July 24, 2015) (http://ct.counseling.org/tag/topic-ct-trauma-and-disaster/) ("The long-term
    impact of trauma on children is particularly concerning within the Sandy Hook community
21  because the brains of those directly impacted are in their most formative stages, ages 5 to 18. . . .
    There is also the impact on academic learning and performance.") (internal brackets omitted).
22
    [8]      *See ,e.g.*, Warnick, Johnson & Rocha, "Tragedy and the Meaning of School Shootings,"
23  in Educational Theory, http://adams-jeffcohazmatauthority.org/documents/tragedyandmeaningof
    schoolshooting.pdf
24

when, as a result of violation, "a minor causes injury or death to himself or another with the firearm"); *id*. at § 401(a)(16) (prohibiting possession of firearm within 1000 feet of any "elementary or secondary school facility").  Other such laws include, for example, 18 U.S.C. § 922(q)(1)(F) (Gun Free School Zones Act) (finding that "the occurrence of violent crime in school zones has resulted in a decline in the quality of education in our country"), and 20 U.S.C. § 7961 (Gun-Free Schools Act) (requiring state policy of one-year expulsion for any student possessing firearm at school).

Finally, the faculty members of the PTSA are particularly affected by the danger of handguns due to the special legal duty they have to anticipate and guard against dangers to their students.  *See, e.g.*, Patel v. Kent School District, 648 F.3d 965, 972-73 (9th Cir. 2011) ("[S]tate tort doctrine requires schools to anticipate dangers which may reasonably be anticipated and then take precautions to protect the pupils from those dangers.") (internal quotation marks omitted); Van Ort v. Estate of Stanewich, 92 F.3d 831, 841 (9th Cir. 1996) ("[S]chool districts have an affirmative duty to take all reasonable steps to protect their students.  This includes protecting students against private actors[.]") (citations omitted); Halladay ex rel. A.H. v. Wenatchee School District, 598 F. Supp. 2d 1169, 1174 (E.D. Wash. 2009) ("The court asks whether the harm that occurred is of a sort that was within a general field of danger that should have been anticipated.") (citations and internal punctuation marks omitted); RESTATEMENT (SECOND) OF TORTS § 320 (recognizing same principle); *id.* at cmt. a ("The rule stated in this Section is applicable to . . . teachers or other persons in charge of a public school."); *id*. at cmt. d ("One who has taken custody of another may not only be required to exercise reasonable care for the other's protection when he knows or has reason to know that the other is in immediate need of it, but also to make careful preparations to enable him to give effective protection when the need

1  arises, and to exercise reasonable vigilance to ascertain the need of giving it."). The emergence

2  of a new threat to students thus has the effect on teachers of forcing them to consider, develop

3  and adopt new protective measures.[9]  The need to take precautionary measures of this type "are

4  sufficiently concrete to satisfy the injury-in-fact prong of the constitutional standing analysis."

5  Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 155 (2010).

6  The situation has been well summed up as follows:

7  The school setting is unique in many ways.  It forces large groups of people
   together for extended periods of time in small areas.  Many of the people who are

8  forced into the small area are minors who are incapable of making legal decisions.
   The adults that are present in these small areas are agents of the government, but

9  not primarily trained in safety measures, who must nevertheless act to protect the
   children while respecting their rights as young citizens.

10

11  http://education.findlaw.com/school-safety/school-violence-and-weapons-background.html.  Due

   to these various unique factors, the PTSA and its members are particularly affected by the

12

13  Court's decision, in ways distinct from its effect on the population at large, and thus have

   standing to appeal even if such distinct effect is required.

14

15                                    **CONCLUSION**

16  For the foregoing reasons, and the reasons stated in its opening papers in support of this

17  motion, the Tanapag Middle School PTSA should be granted leave to intervene in this action for

   the purpose of taking an appeal.

18

19

20  //

21

22  //

23

_____

[9]     *See* Kodep Declaration at ¶ 6 ("We do not want to be put in the position where we need
24  to be concerned about developing such protective policies, or need to rely on them.").

Respectfully submitted this 19th day of May, 2016.

O'CONNOR BERMAN DOTTS & BANES
Attorneys for Movants


By: _____/s/_____
                Joseph E. Horey

*1000-09-160518-PL-M to intervene-REP BR 4*